# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**MICHAEL POTTINGER, PETER CARTER AND BERRY YOUNG,**

      **Plaintiffs,**

**vs.**

**CITY OF MIAMI,**

      **Defendant.**

_____/

**CASE NO. 88-2406-CIV-ATKINS**

NIGHT BOX
FILED

SEP 1 8 1998

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

## JOINT MOTION TO APPROVE SETTLEMENT AGREEMENT

The Plaintiffs, MICHAEL POTTINGER, PETER CARTER, and the class of homeless plaintiffs they represent, by and through undersigned counsel of the American Civil Liberties Union, and the City of Miami, by and through the Miami City Attorney, jointly move this court to expeditiously approve their Settlement Agreement in its entirety. As grounds therefore, the parties state:

### I. THE DIRECTIVE TO MEDIATE.

1.      Following two trials and two appeals spanning eight years of vigorous litigation, the Eleventh Circuit Court of Appeals entered its Interim Order referring this matter to its Chief Circuit Mediator for settlement negotiations. *Pottinger v. City of Miami*, 76 F.3d 1154 (11th Cir. 1996).

### II. THE MEDIATION PROCESS.

2.      Over approximately the next 18 months, the parties jointly invested well over 1000 hours including approximately 12 to 15 full day sessions, and struggled to resolve this contentious controversy that involved difficult and far-reaching legal and social policy issues. The City was represented by four senior assistant city attorneys, typically with two or three present at each

1

mediation session. Additionally, the City retained two private attorneys to represent it throughout the mediation: former United States District Judge and now United States Attorney Tom Scott (before he became the United States Attorney) and former United States Attorney Kendall Coffey. Other city representatives who participated directly in the negotiations included City of Miami Fire Chief Carlos Jimenez, Assistant Chief of Police Raul Martinez, City Commissioner Willie Gort, and the head of Miami's Homeless Outreach Program, Livia Garcia.

3.      The Plaintiffs were represented by three veteran ACLU attorneys, a legal services attorney specializing in homeless assistance, a University of Miami law professor specializing in human rights, constitutional law, and property law, one of the named Plaintiffs, Peter Carter, who has actively participated in this lawsuit from its inception.

4.      The mediation drew upon the resources of numerous other community leaders and advocates with expertise and experience in homeless including several Barry University professors of sociology, Dr. Joe Greer of Camillus Health Concern, Brother Paul Johnson of Camillus House, representatives of the Dade County Homeless Trust, Lynn Sommers the executive director of the Miami Homeless Assistance Center, and several homeless and formerly homeless individuals.

5.      Throughout the mediation, the litigants painstakingly analyzed and discussed innumerable aspects of the controversy that gave rise to this lawsuit and homelessness in general. They addressed the causes of homelessness, police and municipal treatment of homeless persons, attitudes of city officials and the public toward homeless persons, the need for police training and education regarding homelessness, ongoing monitoring of homelessness in Miami, compensation for the injuries the Plaintiffs claimed they had sustained as a result of the actions of the City, the dynamics of proving that a particular homeless person was injured by any municipal mistreatment

of the homeless, explaining the lawsuit and the settlement to the sizable Plaintiff class, assisting homeless persons to manage any compensatory award they might receive, attorneys fees and costs, and community expectations.

## III. THE SETTLEMENT AGREEMENT.

6.     At the conclusion of the mediation, the parties entered into the comprehensive Settlement Agreement for which they now seek approval.  It provides for:

      a.     law enforcement training regarding the causes of homelessness and the circumstances, needs, and rights of homeless persons;

      b.     a municipal policy to protect the constitutional rights of homeless persons;

      c.     a law enforcement protocol providing police detailed guidance regarding all interactions with homeless persons;

      d.     the generation and maintenance of records to monitor police treatment of homeless persons;

      e.     an advisory committee to monitor all police contacts with homeless persons and other matters contemplated by the Settlement Agreement;

      f.     a system to compensate homeless persons who sustained injuries as a result of the police conduct about which the Plaintiffs complained;

      g.     attorneys fees and costs;

      h.     continuing jurisdiction of the court to enforce settlement;

      i.     mediation between the parties before enforcement is sought; and

      j.     notice to the class members about the settlement.  The Settlement Agreement has been previously provided to the court.

## IV. ENDORSEMENT OF THE SETTLEMENT AGREEMENT.

7.     The Settlement Agreement was approved by the Miami City Commission, the Miami Mayor, and the Governor's Oversight Committee for Miami.  Additionally, it was officially

approved by the two remaining named Plaintiffs, Michael Pottinger and Peter Carter, as well as the Board of Directors of the Miami Chapter of the ACLU. Also, no objections to approval were received from any class member although one expressed concern with aspects that are addressed below. The National Law Center for Poverty and Homelessness, and the Florida Coalition for the Homeless recommended approval of the Settlement Agreement. Copies of the Settlement Agreement have been requested by various civil rights advocates throughout the country to use as a model to improve police interaction with the homeless in their cities, and is currently being used as a model for resolving similar litigation in Atlanta, Georgia.

## V. COMMENTS SUBMITTED REGARDING SETTLEMENT AGREEMENT.

8.      In its Omnibus Order dated May 12, 1998, this court suggested concerns about several aspects of the Settlement Agreement. As indicated by this court's Order Requesting Filing of Proposed Order Approving Settlement Agreement dated September 4, 1998, one class member, Morris Drew, submitted comments on two particular matters. The parties jointly respond to these comments as follows:

### A.      Arrest Record Requirement.

9.      Mr. Drew submitted a comment regarding the requirement in Part III, #13, Section B, requiring claimants to submit one of various specified records evidencing the type of arrest which is one basis for recovery under the Settlement Agreement. He expressed concern that it may be difficult to obtain the arrest documents and suggested that the filing of a claimant's sworn affidavit recounting the arrest would be sufficient.

10.      The parties believe that no legitimate claimant will be barred from recovery because of an inability to obtain the necessary arrest information. It was the parties' intent that the claims

4

procedure they designed would be as informal and accessible as possible.  Thus, the method of proving a claimant's arrest was a matter of substantial debate during the mediation.  Plaintiffs' counsel especially wanted to ensure that each person who had sustained an arrest of the type compensable under the Settlement Agreement would easily be able to substantiate his or her claim. Plaintiffs' counsel also shared the City's desire to prevent fraudulent claims by persons who were not injured by the type of arrest that gave rise to this lawsuit.  The parties agreed that an arrest record (or another of the specified official documents) would best meet both objectives.  This would minimize the possibility of fraudulent claims.  To ensure ease of access, the parties agreed that such records would be made available to any claimant, upon request and without charge, at the downtown City of Miami Police Department.  Additionally, the ACLU has a non-exhaustive compilation of 3,500 qualifying arrests records.  These will be accessible by simply contacting the ACLU.  In the event that the ACLU has an arrest affidavit for anyone requesting to make a claim, arrangements will be made with the claimant to conveniently provide the record.

11.    The Settlement Agreement provides that the claim forms that must be submitted to request compensation will be available with instructions in English, Spanish, and Creole at the reception desk of the City of Miami Police Department (downtown), all city NET (Neighborhood Enhancement Team) offices (located throughout the city), the City of Miami Office of Homeless Programs, and the ACLU's Miami Office. *Settlement Agreement Section X, Paragraph 23(a)(2).* It is hoped that any claimant will be able to independently access the forms and instructions, fill them out and obtain any necessary supporting documents, and file them with the Clerk of the Court for the Southern District of Florida.  Plaintiffs' counsel have also contacted numerous local homeless assistance facilities and groups which are now aware of the claim procedure and will assist claimants

in filing their claims.  Plaintiffs' counsel are also working with a group of 10 to 20 law school students with whom they intend to set up booths at locations throughout the city (Camillus House, the Salvation Army, etc.) where homeless persons tend to congregate, for the purpose of contacting potential claimants and assisting them in filling out, substantiating, and filing claim forms.  This operation will continue throughout the 90-day claim period to facilitate the filing of the greatest number of claims from potential claimants.

### B. Contemporaneous Documents Evidencing Property Destruction.

12.     In its Omnibus Order, the court expressed concern with the requirement that persons whose claims are based solely on property loss submit documents evidencing the loss created around the time of the loss.  Examples of such documents include newspapers articles, affidavits signed around the time of the incidents, or letters or other materials describing the property destruction that were written at the time of the incidents.  This court expressed concern that claimants would probably not have such documents for property losses as long as 14 years ago and that such documents may never have had documentation regarding their property losses.

13.     As with the proof of arrests, the parties discussed the question of how to prove this type of injury at great length.  As with the issue of proof of arrest, the plaintiffs' counsel wanted to ensure that all persons with legitimate property loss claims would be able to substantiate them; the Plaintiff's counsel also shared the City's desire to prevent persons lacking valid claims from fabricating the proof necessary to secure compensation thereby diminishing the fund available to legitimate claimants.

14.     The parties believe that the vast number of persons who may have sustained property losses likely did so as a result of arrests that can be readily proven and will also serve as the basis

for a claim.  (One of the scenarios described by various homeless persons was losing property they were forced to abandon as a result of being arrested.)  Additionally, other persons who may have sustained property losses might well have sustained one or more independent arrests which will serve as the basis for their claim for compensation.

15.    For those claimants without arrests, a variety of contemporaneous documents that may have been generated will serve to substantiate these claims.  A newspaper article identifying a homeless person and describing the property loss (several were written); a diary entry or letter written to a friend or relative at the time of the loss describing it; any complaint filed with any agency at the time of the loss describing it; or testimony given in court or by deposition, in this case or any other case, near the time of the loss and describing it will all suffice.  In addition to these documents, plaintiffs' counsel investigated several incidents of property destruction and have affidavits from several of these persons who sustained property losses.  The parties believe that these circumstances and procedures will ensure that the vast majority of persons who are entitled to claim compensation based on property losses will be able to substantiate their claims.

### C.    Public Restrooms.

16.    This court suggested that public restrooms be installed in downtown areas so as to ensure access by homeless persons.  This matter, too, was the subject of close attention during the mediation.  Although the problem of access to restrooms was recognized, it was ultimately determined that provision for such access in the Settlement Agreement went beyond the scope of the complaint in this lawsuit which sought primarily to restrain police conduct regarding homeless people.

### D.    Police Trainers.

17.    This court indicated a concern that, while homeless persons may be used to assist with the police training, that these persons not be used instead of academics or other experts on homelessness.  In their joint response to this court's omnibus order, the parties clarified that this was the intent of the relevant provision of the Settlement Agreement and that it would be carried out in accordance with this court's suggestion.

### E.    Attorney Fees.

18.    Regarding attorney fees, claimant Drew takes up this court's initial suggestion that the attorney fees of $900,000 be reduced to $749,000, and that the fund for plaintiff compensation be raised from $600,000 to $751,000, so that the attorney fees would be at least nominally less than the compensatory damage fund.  Such a readjustment raises thorny ethical concerns.  It gives the appearance that the city could have, and may have, offered up a sum of money to resolve this lawsuit and that plaintiffs' attorneys simply divided up the sum between themselves and their clients allocating the greater portion of the sum to themselves.  Such a mode of mediation would have created an insurmountable conflict of interests for plaintiffs' counsel and would have violated several rules of professional conduct.  To the contrary, the plaintiffs insisted that all negotiations regarding attorney fees be entirely distinct from the negotiations regarding compensatory damages. Plaintiffs' counsel were represented by fee counsel whose sole responsibility was this necessary aspect of any civil rights litigation.  Fee counsel represented the plaintiffs' counsel during the mediation, as well.  The city presented distinct ideas and positions regarding both compensatory damages and attorney fees.  It was never represented that, for instance, in negotiating attorney fees, plaintiffs' counsel were negotiating away compensatory damages.  Indeed, though it is impossible

8

to predict how this matter would have been resolved had one or more of the dynamics changed, the parties are confident that even had the plaintiffs's counsel requested less attorney fees, the city would not have negotiated a larger amount of compensatory damages.

19.     The court and Mr. Drew appear to focus primarily upon the proportionality between the compensatory damages and attorney fees criticizing the division because the attorney fees amount a greater portion of the total monies being paid by the City.  As previously stated, in the context of the mediation, these figures were negotiated as separate and distinct matters.  At no time was any consideration given to their relative amounts.

20.     It is important to note that there has never been a requirement that attorney fees be no greater than, or only a certain portion of, the amount of compensatory damages awarded in a civil rights case.  Indeed, attorney fees are provided for under 42 U.S.C. section 1988 even where *no* compensatory damages are awarded and only injunctive or declaratory relief is secured.  In cases where compensatory damages have been awarded, a sampling of cases demonstrates that attorney fee awards many times greater than compensatory damage awards have been approved and upheld. *See, e.g., **Davis v. Locke**,* 936 F.2d 1208, 1215 (11th Cir. 1991) (upholding $62,000 fee award on $3,500 recovery in prison brutality case and stating that each civil rights plaintiffs' victory "contributes significantly to the deterrence of civil rights violations in the future"); ***Cullins v. Georgia Department of Transportation***, 29 F.3d 1489, 1494 (11th Cir. 1994); ***Ustrak v. Fairman***, 851 F.2d 983, 989 (7th Cir. 1988) (fixing fee award at 21 times greater than damage award); ***Estate of Borst v. O'Brien***, 979 F.2d 511, 516-17 (7th Cir. 1992) (upholding fee award 47 times greater than damage award); ***Butler v. Dowd***, 979 F.2d 661 (8th Cir. 1992) (upholding fee award of over $90,000 where only nominal damages awarded but defendants subsequently instituted safety

9

measures).

21.     Even if it were necessary or appropriate to compare the amount of attorney fees in this case to the amount of compensatory damages, $600,000 is not a fair measure of benefits won for the class.  When this lawsuit was filed 10 years ago, there were only approximately 700 beds in all of Dade County to accommodate thousands of homeless persons.  There was no municipal sponsored program to address homelessness.  There was no Dade County Homeless Trust.  There was no Homeless Assistance Center.  Since that time, thousands of beds have been made available to homeless persons in Miami and Miami-Dade County for free.  The Dade County Homeless Trust has been established to facilitate homeless assistance throughout Miami and Miami-Dade County.  Two Homeless Assistance Centers have been erected; one has been functioning for several years within the City of Miami.  There is a one percent food and beverage tax in Miami-Dade County which has brought in hundreds of thousands of dollars annually to Miami and Miami-Dade County dedicated exclusively to homeless assistance.  Since the filing of this lawsuit, it has been estimated that as much as $120,000,000 in grants, taxes, and other financial forms of assistance have come into this community for homeless assistance.  The City acknowledged in paragraph 4 of the Settlement Agreement that it participated in this effort "[a]s a result of this lawsuit."  Further, it is not unreasonable to conclude that the lawsuit was a major catalyst to this large injection of dollars dedicated to homeless assistance.  When measured by these standards, the attorney fees awarded by the Settlement Agreement constitute an insignificant percent of the compensation won for the plaintiffs.

22.     Looking at the amount of attorney fees independently, the parties submit that they are eminently reasonable.  Since the beginning of this case more than 10 years ago through the

conclusion of the mediation in 1997, plaintiffs' counsel have submitted conservative attorney hour compilations, affidavits, and some estimates indicating attorney hours in excess of 5,000. The work of plaintiffs' counsel is far from over. They have continued to represent the plaintiffs in additional district court proceedings, court of appeal proceedings, outreach and other measures intended to provide notice of the settlement to all class member, and the provider community and preparation for the settlement hearing. As noted, counsel are organizing and managing a team of law students to perform additional outreach during the Settlement Agreements 90 days claims period to ensure that each person who has a legitimate claim for compensation under the Settlement Agreement will be able to file it. It is anticipated that substantial additional work will be necessary once the claims for compensation are filed and they are presented to the magistrate pursuant to the Settlement Agreement. Other work will also need to be done to monitor other aspects of the Settlement Agreement. It would not be surprising if an additional thousand hours of attorney services will have been required.

23.      Plaintiffs' counsel are experienced trial and appellate lawyers who have substantial expertise regarding the civil rights and constitutional law bearing on this case. Each attorney has made a substantial commitment of their professional services, time, and lives to this case. Despite this monumental effort, no fees, whatsoever, have been paid for the past 10 years.

24.      It is hard to make comparisons between this case and any other. Nonetheless, even recently there have been reported cases in which attorneys whose active representation of their clients spanned far less than 10 years recovered attorneys fees of far more than $900,000. As the court noted in *Hispanics United of DuPage County v. Village of Addison*, 988 F.Supp. 1130 (N.D. Ill. 1997), "While a $2.5 million attorneys' fee may seem large to the inexperienced public, the

11

Court wishes to emphasize that this figure is a modest, compromised amount for the herculean efforts by the highly skilled and dedicated group of plaintiffs' counsel... ." *Id.* at 1166.

25.     In evaluating the attorney fees, it is also appropriate to consider the success achieved by plaintiffs' counsel.  To begin with, the odds against success when the plaintiffs' counsel agreed to file this lawsuit were tremendous.  To the best of counsel's knowledge, a successful lawsuit of this nature had never been filed.  Constitutional scholars and experts suggested that the lawsuit was a difficult undertaking.  The plaintiffs' first motion for an emergency preliminary injunction, as well as other initial requests, were flatly denied.  Counsel persevered.

26.     Ultimately, based on this court's 1992 landmark judgment and opinion, the plaintiffs' counsel were able to negotiate a comprehensive settlement that provides homeless persons unprecedented safeguards for the protection of their civil liberties.  The political impact of the case, too, cannot be ignored.  As noted *supra*, while this lawsuit is not the sole basis for the changes in homeless assistance, it has helped bring the issue of homelessness to the fore placed homeless on the agenda of politicians, and helped improve public opinion regarding the need to assist homeless persons.  When this lawsuit began there were minimal services available to homeless persons.  Today Dade County's Homeless Trust and service delivery system is a national model.

27.     As plaintiffs' counsel entered the mediation, the specter of obtaining any compensatory damages was, at best, tenuous. Regarding the compensatory damages that are included in the Settlement Agreement, there was certainly a risk that , in the absence of a settlement, this court's judgment, a necessary foundation for any award of compensatory damages, would have been reversed on appeal.  Even had it been affirmed, the case would have been remanded for a joint trial, or individual trials, on damages.  Such trials would have placed a far greater burden on the

plaintiffs than is contemplated by the Settlement Agreement's claims procedure. If each plaintiff would have had to proceed to trial, some might have been awarded only nominal damages; others, who could testify no more than that their lives were disturbed for a couple of hours while they were arrested, taken to jail, and released, might have recovered substantially less than $1,500. Assuming any recovery, these judgment, too, would have been subject to appeal and possible reversal. At best, the plaintiffs would have received whatever compensatory damage awards they won may years from today. On the other hand, the Settlement Agreement provides a relatively streamlined claim procedure that contemplates payment of $1,500 per claimant (unless prorated) within, in all likelihood, the next six to nine months. Accordingly, the success to the plaintiffs on this issue, as well, has been substantial.

## VI. THE NEED FOR EXPEDITIOUS APPROVAL.

28.    The parties urge this court to enter an order approving the Settlement Agreement and appointing a Magistrate to preside over the claims procedure as expeditiously as possible. The plaintiff class has already waited more than ten years for a resolution of their claim. The sooner the Settlement Agreement is approved, the sooner its provisions, including police training, the police protocol, and the claims procedure, can be initiated. Justice in this case has been a long time coming. It is presently within our reach. This court should now approve the comprehensive Settlement Agreement conscientiously reached by the parties to this controversy. The occasion of the Settlement Agreement approval hearing provides the best opportunity to communicate approval of the Settlement Agreement to the class and the community.

WHEREFORE, the parties pray that this court expeditiously enter the attached Finding of Fact and Conclusion of Law approving the Settlement Agreement in its entirety.

13

Dated this 18th day of September, 1998.

Respectfully submitted,

| | |
|---|---|
| BENJAMIN S. WAXMAN | ALEJANDRO VILARELLO, City Attorney |
| STEPHEN J. SCHNABLY | WARREN BITTNER, Assistant City Attorney |
| ARTHUR ROSENBERG | Attorney for Defendant |
| Cooperating Attorneys for the | 945 Miami Riverside Center |
| Greater Miami Chapter of the | 444 Southwest Second Avenue |
| American Civil Liberties Union | Miami, Florida 33130-1910 |
| Counsel for Plaintiffs | Telephone:    305/416-1800 |
| 2250 Southwest Third Avenue, 4th Floor | Fax:             305/416-1801 |
| Miami, Florida 33129-2095 | |
| Telephone:    305/858-9550 | |
| Fax:             305/858-7491 | |

By: _Benjamin S. Waxman_
    BENJAMIN S. WAXMAN
    Fla. Bar No.  403237

By: _Benjamin Waxman_ _for_
    WARREN BITTNER
    Fla. Bar No. 370959

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MICHAEL POTTINGER, PETER
CARTER AND BERRY YOUNG,
      Plaintiffs,

CASE NO. 88-2406-CIV-ATKINS

vs.

CITY OF MIAMI,
      Defendant

                        /

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a public hearing held on September 29, 1998, to consider whether to grant the parties' Joint Motion to approve the proposed Settlement Agreement entered into by Plaintiffs and Defendant in this case.[1]

In considering whether to approve the parties' Joint Motion, the Court has weighed the following relevant factors:

(1) The likelihood that the judgment would be upheld on appeal if the Motion were not granted;

(2) The complexity, expense, and duration of this case to date, as well as that attributable to further proceedings if the Motion were not approved;

(3) The judgment of experienced trial counsel for both parties;

(4) Any objections raised by the public; and

(5) Whether adoption of the proposed Settlement Agreement would be in public interest.

See *United States v. Board of Public Instruction of St. Lucie County*, 977 F. Supp. 1202, 1205 (S.D. Fla. 1997) (citing *Flinn v. FMC Corp.*, 528 F.2d, 1169, 1173 (4th Cir. 1975), *cert. denied*, 424 U.S. 967 (1976)). See also *Leverso v. SouthTrust Bank of Ala., Nat'l Assoc.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

---

[1] Under Fed. R. Civ. P. 23(e), "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

In weighing these factors, the Court is mindful that "settlements are favored over continued litigation," *Board of Public Instruction of St. Lucie County*, 977 F. Supp. at 1205 (citing *United States v. Miami*, 614 F.2d 1322, 1333 (5th Cir. 1980), *on reh. en banc on other grounds*, 664 F.2d 435 (5th Cir. 1981) (per curiam)).  See also *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).  As one court put it:

> The public interest is served when the parties formulate lasting solutions to divisive litigation through mutual cooperation.  There can be little doubt that "a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming." ... [*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 921 F.2d 1371, 1383 (8th Cir. 1990)].  Accord *United States v. City of Jackson*, 519 F.2d 1147, 1152 (5th Cir. 1975).  Indeed, "[a] strong public policy favors agreements, and courts should approach them with a presumption in their favor."  *Little Rock Sch. Dist.*, 921 F.2d at 1388.

*Vaughns v. Board of Education of Prince George's County*, 1998 U.S. Dist. Lexis 13614 (D. Md. 1998) (regarding civil rights school desegregation cases)

Consequently, as this Court has stated previously:

> The key issues in determining whether to approve a settlement ... is to ensure it is neither unconstitutional, unlawful, contrary to public policy or unreasonable. ...
>
> A finding of the above brings with it a presumption of validity, meaning that the district court must have a "principled reason" for refusing to approve it. ... Mere unfairness is not a valid basis for refusing to adopt a consent decree or approve a settlement.  Rather, the court must state specific reasons why a proposed consent decree unduly burdens one class or another.

*Board of Public Instruction of St. Lucie County*, 977 F. Supp. at 1205-06.

In this case, after full hearing, the court approves the proposed Settlement Agreement.  The Settlement Agreement represents the product of nearly ten years of litigation, appeals, and mediation, and reflects the fact that the parties have engaged in a serious and substantial effort to settle the issues in a manner that protects the interests of the Plaintiffs, the City, and the public.

Pursuant to Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and conclusions of law which shall support its judgment approving the proposed Settlement Agreement.

## I. Findings of Fact

### A. *The Complaint, Preliminary Orders, and Judgment*

1. On December 23, 1988, Plaintiffs filed this action against the City of Miami on behalf of themselves and other homeless persons living in the City pursuant to 42 U.S.C. §§ 1983 *et seq.* Plaintiffs alleged that the City had a "custom, practice and policy for arresting homeless people for conduct which is very simply the ordinary activity of daily life on the streets where Plaintiffs are forced to live." Plaintiffs alleged violations of their rights under the Fourth, Fifth, Eighth, and Fourteenth amendments to the U.S. Constitution, as well as malicious abuse of process and violation of Article I, § 12 of the Florida Constitution. They sought Declaratory, Injunctive, and Compensatory Relief. Plaintiffs also sought a preliminary injunction, which this Court denied.

2. On July 21, 1989, this court certified a class of "homeless persons who reside or will reside on the streets, sidewalks, parks, and in other public places in the geographic area bound on the north by Interstate [3]95, on the south by Flagler Street, on the east by Biscayne Bay, and on the west by Interstate 95, within the City of Miami, who have been, expect to be, or will be arrested, harassed, or otherwise interfered with by members of the City of Miami Police Department for engaging in the ordinary and essential activities of daily living in public due to the lack of other adequate alternatives." *Pottinger v. City of Miami*, 720 F. Supp. 955, 960 (S.D. 1989).

3. On April 26, 1990, this Court, in response to a motion by Plaintiffs, ordered the city to destroy property collected at the time of contact with homeless persons and to follow own written policy of preserving property obtained in any manner by their police units." March 18, 1991, the Court found the City in contempt of its April 26, 1990 order as a res incidents under the I-395 underpass and in Lummus and Bicentennial Parks. March 18,

Order finding City of Miami in Civil Contempt of Court's April 26, 1990 Order and Providing Further Injunctive Relief. On December 13, 1991, this Court denied a motion by Plaintiffs to enjoin the City's plan to evacuate and close Lummus Park and the area under I-395, based on the City's assurances that it would offer comparable or better housing to displaced individuals. Order on Plaintiffs' Application for a Preliminary Injunction, dated December 13, 1992.

4. This Court also denied a motion to dismiss by the City and both parties' motions for summary judgment. See *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1557 n.6 (S.D. Fla. 1992).

5. On June 11, 1991, this Court bifurcated the trial of the case into liability and damages phases. A non-jury trial on liability was held from June 15, 1992 to June 19, 1992.

6. On November 16, 1992, this Court entered its Findings of Fact and Conclusions and Order on Plaintiffs' Request for Declaratory and Injunctive Relief. *Pottinger v. City of Miami*, 810 F. Supp. 1551 (S.D. Fla. 1992). This Court ruled that the City, through a municipal policy, violated various constitutional rights of the Plaintiffs, involuntarily homeless residents of Miami. Accordingly, this Court enjoined the City from arresting Plaintiffs for the involuntary harmless acts they were forced to perform in public and seizing and destroying the Plaintiffs' property without following its own procedures for handling found or seized property. *Id.* at 1854. This Court also directed the establishment of two or more arrest-free zones, or "safe zones," where the City would be enjoined from arresting homeless individuals for engaging in such harmless, involuntary conduct.

B. *The Appeals and Remand*

7.   The City filed a notice of appeal of the judgment against it.  On June 25, 1993, the Court of Appeals stayed implementation of this Court's order of November 16, 1992, pending appeal. Following briefing and oral argument, the Eleventh Circuit Court of Appeals remanded the case to this Court to make further findings of fact and to clarify its judgment. ***Pottinger v. City of Miami***, 40 F.3d 1155 (11th Cir. 1994).  On April 7, 1995, following an evidentiary hearing, this Court entered its Findings and Order on Limited Remand from the Eleventh Circuit Court of Appeals.  This Court concluded that "[t]hough improvement in the overall situation is occurring via the [Dade County Homeless] Trust," "the salient facts of this case have not changed substantially . . . ."  Thus, this Court determined that is original injunction should remain in effect with few modifications.

8.   On February 7, 1996, following further briefing and oral argument, the Eleventh Circuit Court of Appeals entered its Interim Order referring this matter to its Chief Circuit Mediator for settlement discussions. ***Pottinger v. City of Miami***, 76 F.3d 1154 (11th Cir. 1996).

C. *The Mediation*

9.   The negotiations were conducted over a period of 18 to 20 months.   During that period, counsel for Plaintiffs met approximately 12-15 times for full-day mediation sessions with counsel for the City, involving over 100 hours total of face-to-face mediation.  There were many other participants in a number of the mediation sessions as well, including a City Commissioner, the City Manager, the Fire Chief, and the Assistant Chief of Police, and the Director of the City of Miami Office of Homeless Programs.  In addition, representatives of homeless service providers participated in a number of sessions. The City was represented not only by experienced counsel from the City Attorney's Office, including now Circuit Court Judge Leon Firtel and Workers'

Compensation Judge Katherine Pecko, but also by two outside counsel, former U.S. District Judge (and now U.S. Attorney) Tom Scott, and former U.S. Attorney Kendall Coffey. Plaintiffs were represented by a team of experienced counsel as well, led by Benjamin Waxman, a criminal appellate specialist with extensive experience in constitutional and criminal issues, and former co-Chair and later President of the Greater Miami Chapter of the ACLU. Plaintiffs' counsel were assisted by experts in homelessness; in addition, a class representative attended one of the sessions.

10. The mediation effort went well beyond the formal mediation sessions. Counsel for both sides spent numerous hours preparing for mediation sessions, communicating with each other and exchanging drafts, and conferring with interested persons and members of the community. Counsel for Plaintiffs consulted extensively with homeless service providers, academic experts in homeless issues, and other members of the class. Counsel for the City consulted regularly with the Mayor, members of the City Commission, the Police Department, the Fire Department, the Office of Homeless Programs, homeless service providers, and others.

11. The mediation sessions resulted in the signing of a Settlement Agreement by counsel for both parties, in which the parties agreed to resolve each and every remaining issue in this case.

12. On December 9, 1997, the City Commission approved the Settlement Agreement by a vote of 3-2, subject to the condition that the $900,000 in attorneys' fees agreed to in ¶ 25 be paid out over three years. Within the ten-day period for vetoes, the Mayor announced that he would not veto the Settlement Agreement. On February 12, 1998, the Oversight Committee appointed by the Governor of the State of Florida to assist the City to overcome its fiscal crisis approved the Settlement Agreement.

13. Any significant changes to the Settlement Agreement would require the agreement of both the Plaintiffs and the City. The City could give its approval to such changes only by following the same procedures set out above: approval by the City Commission, no veto by the Mayor, and approval by the Oversight Committee.

> D. *The Settlement Agreement*

14. The Settlement Agreement is a comprehensive document of 31 pages. It also has four attachments.

> a. **Exhibit A** is a Departmental Order that the City has agreed to be adopted by the City of Miami Police Department.
>
> b. **Exhibit B** is a Proof of Claim Form, with Instructions.
>
> c. **Exhibit C** is a Form pertaining to the collection of homeless awards.
>
> d. **Exhibit D** is a "Class Claimant Release of All Claims."

All these documents are in English. In addition, the City has translated Exhibit B into Creole and Spanish.

15. Without attempting an exhaustive description of it, and without in any way limiting, modifying, or expanding its terms, the Settlement Agreement can be described generally as follows:

> a. The Settlement Agreement provides that the parties "agree that this lawsuit, including the three pending appeals, ... will be dismissed with prejudice and without costs or attorneys fees (except such attorneys fees as are specifically provided for herein), subject to the terms of this Settlement Agreement and the District Court retaining jurisdiction to enforce this Settlement Agreement." Settlement Agreement, ¶ 5. Ap-

proval by this Court will constitute a release of the City as specified in ¶ 5 of the Set-
tlement Agreement.  The City "does not admit liability by virtue of entering into" the
Settlement Agreement. Settlement Agreement, ¶ 6.

b.  In addition, the "City agrees to implement, various forms of training ... for its law en-
forcement officers for the purpose of sensitizing them to the unique struggle and cir-
cumstances of homeless persons and to ensure that their legal rights shall be fully re-
spected."  Settlement Agreement, Section IV, ¶ 7 ("Law Enforcement Training").
The forms of training are spelled out in detail in ¶ 7 of the Settlement Agreement.  At
the Court's suggestion, the parties agreed to clarify the language in ¶¶ 7A&B of the
Settlement Agreement in one respect.  As clarified, the references in those paragraphs
to "training that includes instruction by academics, service providers, or homeless
persons" shall read instead "training that includes instruction by academics and serv-
ice providers, with assistance by homeless persons."

c.  The City adopts a policy "to protect the constitutional rights of homeless persons, to
prevent arrests and harassment of these persons, and the destruction of their property,
inconsistent with the provisions" of the Settlement Agreement.  Settlement Agree-
ment, ¶ 9.  Disciplinary measures as set out in ¶ 9 of the Settlement Agreement will
be invoked as provided in that paragraph in case of violation of the policy by City
police officers or other City employees.

d.  The City agrees to adopt a "Law Enforcement Protocol," with the aim of "guid[ing]
Miami police officers in their interactions and contacts with homeless persons." Set-
tlement Agreement, ¶ 13.  See also Settlement Agreement, ¶¶ 10-14.  The City has
also agreed that the Police Department will adopt a Departmental Order to implement

8

this Protocol. Section V, ¶ 7[*sic*] ("Adoption of Departmental Order").  The Departmental Order is attached to the Settlement Agreement as Exhibit A.  The Protocol addresses five major situations:

i.  *Homeless person observed not engaging in any criminal conduct.*  There can be no arrest or detention, but there may be other forms of contact as specified in ¶14A of the Settlement Agreement.

ii.  *Homeless person reasonably believed to be mentally ill.*  The Baker Act procedures (currently Fla. Stat. § 394.463) may be invoked.  Settlement Agreement, ¶14.B.

iii.  *Homeless person observed violating a "life sustaining conduct" misdemeanor.*  The law enforcement officer may warn the homeless person committing a "life sustaining conduct" misdemeanor ("those which  a homeless individual commits by the mere fact that he or she is without shelter, and must conduct life sustaining activities, such as eating, sleeping, sitting, congregating, or walking in public," Settlement Agreement, ¶ 14C.1; see Settlement Agreement, ¶14.C.3) to stop the conduct if and only if there is an "available shelter."  Only if there is an "available shelter" and the homeless person in such circumstances refuses to accept it may the law enforcement officer arrest the homeless person.

iv.  *Homeless person observed violating a misdemeanor (which is not classified above as "life-sustaining conduct").*  The law enforcement officer may warn the homeless person or advise him or her of homeless shelter, services or assistance, or may detain or arrest the homeless person.  Settlement Agreement, ¶ 14.D.

v. *Homeless person committing felony offense.* "If a law enforcement officer has probable cause to believe that a homeless person is committing, or has committed, a felony, the law enforcement officer may detain or arrest the homeless person." Settlement Agreement, ¶ 14E.

The Protocol also governs the disposition of personal property belonging to a homeless person who is arrested. It requires the City to follow its "own internal procedures for taking custody of personal property," Settlement Agreement, ¶14.F.1. It prohibits the City from destroying "any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person," with exceptions specified in ¶ 14.F.1 of the Settlement Agreement. It also provides for specified "safeguards ... [to be] undertaken by the arresting officer or any other CITY agent or official to preserve the property of a homeless person, to the extent feasible." Settlement Agreement, ¶ 14F.2.

e. The Settlement Agreement requires the City to adopt a "procedure for monitoring and accounting for its police officers' encounters with the homeless persons." ¶ 15. Among other things, the City agrees to generate forms of records of arrests and other encounters (see Settlement Agreement, ¶¶ 14.A, 14.B, 14.C.2, 14.D.2, 14.E) and create a computer or paper data base of them, available to the Advisory Committee, and to others within the limitations of the Florida Public Records Act, Fla. Stat. ch. 119.

f. The Settlement Agreement establishes an Advisory Committee.

i. *Composition and term.* The Committee will consist of three persons serving as volunteers, with specified copying and secretarial services provided by the City. Settlement Agreement, ¶¶ 16, 17. One member will be selected by each party

and the third by the other two members, as provided in ¶ 16 of the Settlement Agreement. It will remain in existence for three years unless by a majority vote the Committee renews its existence for a single three-year term.   Settlement Agreement, ¶18.

ii. *Functions and powers*.  The function of the Committee is to "monitor all police contacts with homeless persons, and other matters contemplated by this Settlement Agreement."  Settlement Agreement, ¶ 19.  It will also "receive and investigate complaints by homeless persons who claim to have been aggrieved by the CITY's non-compliance with this Settlement Agreement and shall take appropriate responsive action" as set out in ¶ 20 of the Settlement Agreement.  It may also advise the police department regarding police training and the protocol, and make non-binding recommendations for changes to the parties.  Settlement Agreement, ¶¶ 22, 22a.  It has no "authority to seek Court intervention into any matter concerned with this Settlement Agreement."  Settlement Agreement, ¶ 22a. It will meet at least quarterly and issue a report every six months, as well as a report every third year. Settlement Agreement, ¶21.

g. The City agrees to create a Compensation Fund to "compensate members of the class (as amended, altered and modified in this Settlement Agreement) who between December 23, 1984, and the effective date of this Settlement Agreement, suffered the types or kinds of injuries alleged in the Plaintiffs' Complaint (as amended) in this action."  Settlement Agreement, ¶ 23.a.

i. *Aggregate Liability*.  The City's aggregate responsibility for claims under the Compensation Fund shall not exceed $600,000; if valid claims of class members

11

exceed that amount, their awards shall be pro-rated accordingly. If valid claims of class members are less than $600,000, the difference will be used to create a "Start Off Fund," which will provide for vendor payments on behalf of homeless persons in Miami "to help achieve permanent housing." Settlement Agreement, ¶¶ 23.a.8, 23.b.

ii. *Procedure for administering the Compensation Fund.* A U.S. Magistrate appointed by this Court will administer the Compensation Fund. Settlement Agreement, ¶ 23.a(1). Class members may file a claim by filing the Proof of Claim (Exhibit B) with documentation as specified in the Settlement Agreement. The period for filing such claims will be 90 days after the Magistrate enters an order setting the beginning of the period in which claims may be filed. Settlement Agreement, ¶ 23.a(2),(3),(4). The Settlement Agreement contains provisions permitting the City to file specified objections to claims, and specifying the basis and procedure for the Magistrate's rulings on the validity of claims. Settlement Agreement, ¶ 23.a(5).

iii. *Amount of compensation per person.* The Settlement Agreement provides for payment to each successful claimant by means of a debit card in the amount of $1,500; by damages in the form of $1,250 in cash or $1,500 in vouchers, as specified in the Settlement Agreement; or by damages in the form of $1,500 in cash to each claimant if a debit card or voucher program cannot be devised. Because no debit card or voucher program has been devised, the amount and form of compensation per valid claimant from the Compensation Fund shall be $1,500 per person

(unless pro-rated to a smaller amount to ensure that the $600,000 limit is not exceeded).

Payments from the Start Off Fund shall not exceed $1,000 per person, and shall be made in the form of vendor payments.

h. *Attorneys' Fees*. In recognition of the fact that this litigation "has spanned nearly ten years, during which there were two trials and numerous other hearings before the district court, two appeals including two oral arguments before the Court of Appeals for the Eleventh Circuit, as well as extensive court-ordered negotiations and mediation between the parties spanning eighteen months, all requiring substantial commitments of time and professional services on the part of more than ten attorneys for the plaintiffs," and considering "similar payments of attorneys fees to plaintiffs' counsel in other civil rights cases," the City agreed to pay the plaintiffs' attorneys $900,000 for fees and costs, "to conclude all claims for attorneys fees in the underlying litigation, including pending appeals, and in regard to all other matters connected with this Settlement Agreement, except enforcement proceedings" as specified in ¶ 25 of the Settlement Agreement.[2]  The City Commission adopted specifications concerning payment, and conditioned the City's acceptance of the Settlement Agreement on payment of these fees over three years, without interest. Plaintiffs have accepted this condition.

i. Finally, the Settlement Agreement provides for notice to class members, and contains other provisions relating to the manner of its approval.  Settlement Agreement, ¶¶ 26-

_____

[2]Before either party attempts in the future to seek court enforcement of the Settlement Agreement, the parties have agreed to undergo non-binding mediation as specified in ¶ 25a of the Settlement Agreement, except in cases where it "clearly appears from specific facts shown by affi-

27. It provides for the alteration of the class to "consist of all homeless persons who reside, have resided, or will reside on the streets, sidewalks, parks, and in other public places within the geographical boundaries of the City of Miami, who have been, expect to be, or will be in contact with members of the City of Miami Police Department." Settlement Agreement, ¶ 26. It may be modified "by written agreement of the parties, or upon a showing of a significant change of circumstances warranting revision of the Agreement in a way suitably tailored to the change of circumstances, but in either event, only after approval by the Court." Settlement Agreement, ¶ 30.

16. On April 9, 1998, the Eleventh Circuit Court of Appeals issued an order granting the parties' joint motion for remand, which had requested the Eleventh Circuit to remand the case to this Court for the limited purpose of reviewing the proposed Settlement Agreement.

17. On May 12, 1998, this Court entered an Omnibus Order approving, with modifications, the class notice and ordering the parties to discuss amending the proposed Settlement Agreement in four respects and creating two safe zones. In accordance with this order, the parties conferred together with the Chief Circuit Mediator, and agreed to clarify ¶¶ 7 A&B of the Settlement Agreement to provide that "while presentations or assistance by homeless persons may be used as aids to academics or service providers in the training program, they are not be used in place of academics or service providers." Order of May 12, 1998, at 4.

18. The notices to class members were published as provided in this Court's order of May 12, 1998,

- in the Miami Herald and El Nuevo Herald on Friday, July 10, 1998, Tuesday, July 14, 1998, and Sunday July 19, 1998;

---

davit that immediate and irreparable injury, loss or damage will result to the aggrieved party before the aggrieved party and the other party can conduct mediation."

- in The Miami Times on three successive Thursdays, July 9, 1998, July 16, 1998, and July 23, 1998; and
- in The New Times (Miami), in the weekly issues of July 9-15, 1998, July 16-22, 1998, and July 23-29, 1998.

In addition, the Court takes judicial notice of the fact that a number of articles about the proposed settlement have run in the Miami Herald in the past year.[3]

19. One comment by a class member, Morris Drew, was received, suggesting that the attorneys' fees should be smaller than the amount of the Compensation Fund, and that Part III, Section 13.B. of the Proof of Claim Form should be modified to permit filing of a sworn affidavit in place of the documentation required. Letter from Morris Drew to the Court, August 17, 1998. Earlier, the Court had received a letter from the "Downtown Miami Residents Alliance," asking this Court to "sign the Pottinger litigation now." Letter from Lucia Gelotte to the Court, May 1, 1998.

20. Class representatives Peter Carter and Michael Pottinger testified to their strong support of the Settlement Agreement at the hearing held on September 29, 1998. In addition, there was strong public support for approval of the Settlement Agreement, as the testimony of a number of witnesses indicated.

21. Homeless advocacy groups including the National Law Center for Poverty and Homelessness and the Florida Coalition for the Homeless supported approval of the settlement, calling it a model for other cities.

---

[3] *ACLU Informing Homeless of $1,500 Compensation*, Miami Herald, July 14, 1998, at 3B; *A Worthy Settlement*, Miami Herald, December 18, 1997, at 28A (editorial endorsing settlement); Bruce Taylor Seeman, *Settlement Backs Civil Rights of Homeless*, Miami Herald, December 18, 1997, at 1A; Bruce Taylor Seeman, *Homeless Lawsuit Near Settlement*, Miami Herald, November 16, 1997, at 1B.

E. *Other Results of This Lawsuit*

22. Since this lawsuit was initiated, the Dade County Homeless Trust was created, funded by a 1% food and beverage tax in Miami-Dade County, as well as philanthropic contributions. As part of the effort to provide for homeless people, the Trust, in conjunction with the Community Partnership for the Homeless, has established a Homeless Assistance Center in the City of Miami. As this Court noted in its Findings and Order on Limited Remand from the Eleventh Circuit Court of Appeals, April 7, 1995:

> [T]he court cannot ignore the tremendous effort the Trust has made and is making on behalf of homeless people in Dade County. For example, the Trust receives approximately $500,000 a month from the 1% food and beverage tax alone. Additionally, the trust has solicited substantial contributions from the community and has received at least one hefty grant from the federal government. All of these funds are dedicated to providing shelter and services to homeless people residing in Dade County.
>
> ... In sum, the court recognizes the great strides the Trust has taken to provide shelter and services to the homeless of Dade County.

*Id.* at 7-8.

23. As this Court noted in its April 1995 order, "[t] he City is an active participant in the Trust through its representation on the Board of Directors and various committees." *Id.* at 3 n.2. Significantly, the City, while not admitting liability, see Settlement Agreement, ¶ 6, states that "*as a result of this lawsuit*, the CITY has participated in a countywide effort to provide services and assistance to homeless people." Settlement Agreement, ¶ 4 (emphasis added).

24. In addition, although the Eleventh Circuit stayed this Court's November 1992 order, this Court found in April 1995 that the practices upon which the Court had based its holding of liability in November 1992 had diminished. Order of April 7, 1995, at 9-11. Notably, the City itself asserted at that time that "it was not enforcing various laws against homeless persons, which effectively transformed the entire City into a 'safe zone.'" Reply of the City of Miami to Plain-

tiffs' Proposed Findings of Fact and Conclusions of Law on Limited Remand from the Eleventh Circuit Court of Appeals, March 30, 1995, at 3 n.1.

## II. Conclusions of Law

1. The Court holds that the procedures followed in reaching a settlement met the requirements of Rule 23 and comported with due process. In addition, it finds no basis on which to hold the proposed Settlement Agreement to be anything less than fair and adequate for class members.

### A. *The Fairness of the Procedure*

2. The Court finds that the proposed Settlement Agreement was reached as a result of arms-length bargaining in good faith. A number of factors support this conclusion

 a. First, the settlement was reached at a very advanced stage of the litigation, when the parties had the benefit of a judgment by this Court, oral argument — twice — before the Eleventh Circuit, and mediation by an experienced mediator. This posture gave the parties unusual insight into the strengths and weaknesses of their positions and the likelihood of succeeding on appeal.

 b. Second, the Court has had the opportunity to observe counsel for both parties over a number of years. Counsel for both sides are experienced attorneys who have vigorously represented their respective clients. The case was strongly contested over eight years, including two trials and two appeals. The Court has no doubt that the bargaining during the 18-20 months of mediation, which led to the Settlement Agreement, was conducted at arms-length, with vigorous representation of each side's interests.

 c. Third, the costs of failing to approve the Settlement Agreement would be substantial. If this Court did not approve the Settlement Agreement, further litigation would delay

for quite some time any relief for class members and any resolution of the City's liability. If this Court approved the Settlement Agreement conditional upon modifications to it (other than clarifications of the parties' intent), each party would have to agree to the modifications. See *Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986) ("Rule 23(e) does not give the court the power ... to modify a proposed consent decree and order its acceptance over either party's objection."). In the City's case, that would mean presenting the revised Settlement Agreement to the City Commission, the Mayor, and the Oversight Committee, with uncertain results.

d.  Fourth, without suggesting that "incentive awards" to class representatives are uncommon or unfair, see, e.g., *In re: Southern Ohio Correctional Facility*, 175 F.R.D. 270 (S.D. Ohio, 1997), the Court takes note of the fact that the Settlement Agreement here provides for substantial monetary relief for *all* class members, without favoring the class representatives in any way over other class members.

e.  Fifth, support for the Settlement Agreement is widespread among the community.

f.  Finally, there appears to be solid support from within the class. The comments of those class members who stated views ranged from complete support (as the testimony of class representatives Peter Carter and Michael Pottinger indicated) to general support of the Settlement Agreement with reservations as to certain specifics (as in the comment of Morris Drew).[4] No class member opposed approval of the Settlement Agreement. To be sure, the Court recognizes that the silence of most class members

---

[4]The Court wishes to emphasize that it has carefully considered the concerns of Mr. Drew. It addresses the substantive adequacy of the Settlement Agreement in Section II.B below. It addressed the issues raised by the Downtown Miami Residents Alliance in its Omnibus Order of May 12, 1998.

cannot necessarily be interpreted as support for the Settlement Agreement. Nevertheless, the wide publicity accorded the Settlement Agreement, together with its fairness and adequacy (see II.B below) provide strong reasons for concluding that there is little if any significant opposition to the Settlement Agreement among class members.

3. The notice given the class members pursuant to this Court's order of May 12, 1998, constituted fair and effective notice as provided under Fed. R. Civ. P. 23. The notice fairly and accurately described the nature of the proposed Settlement Agreement, the persons whose rights would be affected, and the effect of its terms on their rights. Individual notification by mail would not have been feasible. Further, as noted in ¶ 18 above, the local media published articles about the proposed Settlement Agreement. Finally, this Court finds that members of the homeless services providers community were well aware of the proposed Settlement Agreement, which would provide another means for communicating information about it.

B. *The Adequacy of the Settlement Agreement*

4. Taken as whole, the Settlement Agreement represents a fair and equitable resolution of this case. The Court notes that no one aspect of the Settlement Agreement can be evaluated in isolation from the rest. The Settlement Agreement is obviously a compromise, one not likely to be perfect from either party's point of view. See, e.g., *Neff v. VIA Metropolitan Transit Authority*, 179 F.R.D. 185, 208 (W.D. Tex. 1998) (citing *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 527-28 (E.D. Tex. 1995)):

> [T]he court must approve or disapprove of the proposed settlement as a whole. ... The proposed settlement is not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." ... Compromise is the essence of settlement, and court may rely on the judgment of experienced counsel for the parties.

See also, e.g., *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 n.69 (5th Cir. 1978) ("compromise is the essence of a settlement, and the settlement need not accord the plaintiff class every benefit that might have been gained after full trial"); *Hispanics United of Du-Page County v. Village of Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997)  (court must determine "whether the compromise, taken as a whole, is fair, reasonable and adequate").

5.  Further, the Court notes that the Settlement Agreement itself cannot be evaluated, even as a whole, entirely in isolation from other developments since this litigation began ten years ago. In particular, its reasonableness must be evaluated against the backdrop of other efforts which were spurred on by this lawsuit, including the establishment of the Dade County Homeless Trust and the construction of a Homeless Assistance Center in the City of Miami.   Consequently, while this Court takes note of the reasonableness of various provisions of the Settlement Agreement below — and while it has carefully considered each and every portion of that Agreement — its ultimate judgment that the Settlement Agreement is reasonable rests on a reading of that Agreement as a whole, in its proper context.

6.  In its judgment of November 16, 1992, the Court found that the City had a pattern and practice of arresting or harassing homeless individuals for conducting innocent, life-sustaining activities in public, even though they had no other place in which to perform them, and of destroying their property.  The proposed Settlement Agreement contains police training provisions and a comprehensive Protocol addressing these very concerns. The Protocol limits the City's ability to make arrests for certain "life-sustaining conduct" misdemeanors in the absence of available shelter.  The Protocol also protects the property rights of homeless people in Miami in their encounters with police or other City officials.  In addition, the Settlement Agreement provides for monitoring through record generation and through an Advisory Committee.  It sol-

emnly commits the City, through its police and other officials, to respect the constitutional rights of the homeless. The fact that this Court retains jurisdiction to enforce the terms of the Settlement Agreement provides further assurance that class members' rights will be protected.

7. Plaintiffs originally sought primarily injunctive relief, and a settlement that provided either no damages or nominal damages would have been fair and equitable, although there is no bar here as a matter of law to providing damages.[5] The provision of compensatory damages in the amount of $600,000, or $1,500 per successful claimant (assuming no pro-rating) therefore represents a significant benefit for plaintiffs. It represents a benefit both because the amount of the recovery per successful claimant is sufficiently large to compensate them, and because the recovery of any damages represents in a tangible way the dignity and rights of homeless persons. Further, if the Compensation Fund is not exhausted, the money will be used for a Start Off Fund to help members of the homeless community (many of whom might well be class members) to afford permanent shelter. Finally, the Court holds that the manner of disbursement of the Funds is fair and adequate. Awards from the Compensation Fund will be made according to a carefully crafted procedure directed by a U.S. Magistrate. The procedure is designed to protect *all* class members. It ensures that as many possible recover, by having a relatively informal procedure with as minimal documentation as possible; at the same time, it also protects that Fund from exhaustion by false claims, by ensuring that some form of documentation — as spelled out in the

---

[5]In Rule 23(b)(2) class actions, the primary relief is injunctive. Indeed, "if the appropriate final relief relates solely or chiefly to money damages, a class may not be maintained" under Rule 23(b)(2). *Neff v. VIA Metropolitan Transit Authority*, 179 F.R.D. 185, 195 (W.D. Tex. 1998). Nevertheless, money damages "can be part of an overall menu of relief that is predominantly equitable." *Martens v. Smith Barney, Inc.*, 1998 U.S. Dist. LEXIS 9226, *41 (S.D.N.Y. June 23, 1998). See *Parker v. Local Union No. 1466*, 642 F.2d 104 (5th Cir. 1981) (per curiam); , *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986). See also 3B JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶ 23.40[4] at 23-278 (2d ed.); NEWBERG ON CLASS ACTIONS § 4.14, at 4-46 to 4-47 (3d ed. 1992).

Settlement Agreement — be submitted before a claim can succeed.[6] The disbursement of monies from the Start Off Fund will be handled by the City's office of Homeless Persons, which is experienced in such matters, and will be audited by the City's Department of Internal Audits at the conclusion. Recognizing that no mechanism for providing damages to class members, particularly homeless and formerly homeless persons, can perfectly balance the need to provide relief to all of those who were injured and the need to limit relief to such persons, the Court finds the Settlement Agreement's provision of compensatory damages to be fair and adequate.

8. In light of the length of this case — encompassing 10 years, during which there were two extensive hearings before this Court, two appeals with oral argument before the Eleventh Circuit, and over a year and a half of intensive mediation — this Court finds that the attorneys' fees provisions are fair and reasonable. As noted, the litigation has produced significant benefits for the class members, directly *and* indirectly, in terms of injunctive relief in the settlement, monetary relief, and other wider efforts to help the homeless spurred on by the lawsuit. In addition, counsel for both parties have advised this Court that during the negotiations, the parties made consistent efforts to separate negotiations over the attorneys' fees from negotiations over other issues, and that Plaintiffs' counsel retained separate fee counsel. Counsel for both parties have further advised the Court that Plaintiffs' counsel made every effort to present a fee amount that represented substantial billing judgment in the first place. Finally, as a matter of law, courts have awarded substantial attorneys' fees in cases where purely injunctive relief has been obtained, *see, e.g.,*] ***Ruffin v. Great Dane Trailers***, 969 F.2d 989 (11th Cir. 1992), *cert. denied*, 507 U.S.

---

[6]In addition, at the September 29, 1998 hearing, counsel for Plaintiffs described the procedures they have put in place to assist class members in filing Proof of Claim forms. These include recruiting between 15-20 law students from the University of Miami to go to shelters on a regular basis to let people know about the settlement and to assist them in filling out Proof of Claim forms.

910 (1993), and have also approved attorneys' fees many times greater than compensatory damages, *see, e.g., Davis v. Locke*, 936 F.2d 1208, 1215 (11th Cir. 1991)*; Cullins v. Georgia Dep't of Transportation*, 29 F.3d 1489, 1494 (11th Cir. 1994); *Ustrak v. Fairman*, 851 F.2d 983, 989 (7th Cir. 1988); Estate of Borst v. O'Brien, 979 F.2d 511, 516-17 (7th Cir. 1992); *Butler v. Dowd*, 979 F.2d 661 (8th Cir. 1992), *cert. denied*, 508 U.S. 930 (1993).  In this case, counsel for plaintiffs obtained not only extensive injunctive-type relief in the Settlement Agreement, but significant compensatory relief as well.

9.   The Court is concerned that to some members of the public, the attorneys' fee might appear high.   Under the circumstances, however, and after careful consideration, the Court finds it reasonable.  As another court put it in approving a much larger award of fees,

> It is unfortunate that some of the publicity given the Decree has tended to focus on the amount of plaintiffs' attorneys' fees and costs that it provides.  While a $2.5 million attorneys' fee may seem large to the inexperienced public, the Court wishes to emphasize that this figure is a modest, compromised amount for the herculean efforts by the highly skilled and dedicated group of plaintiffs' counsel ....  It also appropriate to point out that the ... [defendant] was very ably defended by a group of highly effective municipal and trial law specialists, whom the Court safely assumes were not inexpensive.

*Hispanics United of DuPage County v. Village of Addison*, 988 F. Supp. 1130, 1166 (N.D. Ill. 1997).

## III. Conclusion

After review of all the evidence, and with a full understanding of all relevant laws and facts, the Court finds that the proposed Settlement Agreement (with a clarification as set out in ¶ 15.h above) is a full and adequate settlement.  Accordingly, it is

**ORDERED AND ADJUDGED:**

(1)     The Joint Motion to Approve Settlement Agreement is GRANTED;

(2)     This lawsuit is DISMISSED with prejudice and without costs or attorneys fees (except such attorneys fees as are specifically provided in the Settlement Agreement), SUBJECT TO the terms of the Settlement Agreement and this Court's retaining jurisdiction to enforce the Settlement Agreement.

DONE AND ORDERED at Miami, Florida, this __ day of October, 1998.

_____
C. Clyde Atkins
SENIOR UNITED STATES DISTRICT JUDGE