UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 88-2406-CIV-MORENO

MICHAEL POTTINGER, ET AL.,

     Plaintiffs,

vs.

CITY OF MIAMI,

     Defendant.

_____/

## CITY OF MIAMI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CITY OF MIAMI'S MOTION FOR TERMINATION OF THE POTTINGER CONSENT DECREE

Pursuant to this Court's direction, Defendant, City of Miami, by and through its undersigned counsel, hereby submits its proposed findings of fact and conclusions of law on the City of Miami's Motion for Termination, or, Alternatively, Modification of the Pottinger Consent Decree ("Motion to Terminate") (D.E. 566). The parties have submitted the Motion to Terminate (D.E. 566), the Plaintiffs' Response (D.E. 587), and the City's Reply (D.E. 589). The Court also considered the evidence and testimony presented during the evidentiary hearing conducted on September 24-26, October 24-25, and November 1, 2018.

### INTRODUCTION

This matter began in 1988, when the original Plaintiffs filed this action under 42 U.S.C. § 1983, alleging widespread constitutional violations by the City of Miami, through its police department, in the arrest, harassment, and destruction of property of homeless individuals. After years of litigation as a class action, several appeals, and lengthy settlement negotiations, the parties reached a settlement agreement, which this Court approved in October 1998.

In the twenty years since that time, the City of Miami has undergone tremendous change—socially, culturally, economically, and politically. During this time, the City of Miami's approach to its homeless population, as well as that of the County and other neighboring community organizations, has changed significantly. The network of services that have been developed to establish what is referred to as the "continuum of care" for Miami's homeless individuals since the adoption of the settlement agreement is truly impressive.

But the fact remains that homelessness is still a serious issue in our community. At last count, close to 1100 homeless live on the streets of Miami-Dade County, with about 600 of those residing on the streets of Miami alone. (D.E. 622-1 at 21). Many of these individuals suffer from mental illness or alcohol or drug dependency. Often the areas in which homeless individuals congregate or live become sanitary nuisances and public health concerns, issues the City understandably desires to address. It is against this backdrop that the Court considers the Motion to Terminate.

Based on the evidence presented and in light of the relevant legal standards, the City has met its burden of establishing "substantial compliance" with the terms of the Settlement Agreement over the twenty-year period since it was adopted.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

### *Homelessness in the City of Miami in the 1980's*

Prior to the filing of this lawsuit, in the early 1980's, the City of Miami and Miami-Dade County had no coordinated approach or network of service providers to address the issues faced by the homeless population. Within the City of Miami, the City of Miami Police were the City employees that primarily interacted with the homeless, because there was no other City department set up for that purpose. At that time, the City of Miami Police Department provided

no specialized training to its officers to address the unique circumstances faced by the homeless population. (T1: 48). Based on their then-current training, a police officer in the City would view a homeless individual as would any other individual that they encountered committing a violation in public. Although through the lens of today's more modern sensibilities this may seem unfair, the police officers were doing what they perceived to be their jobs in maintaining order and enforcing the law.

***The Original Class Action***

This case arose in December, 1988, with the filing of a lawsuit against the City of Miami ("the City"), under 42 U.S.C. § 1983, which alleged that the City of Miami had "a custom, practice and policy of arresting, harassing and otherwise interfering with homeless people for engaging in basic activities of daily life—including sleeping and eating—in the public places where they are forced to live." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1554 (S.D. Fla. 1992). The Complaint included five counts—cruel and unusual punishment (count I), malicious abuse of process (count II), unlawful search and seizure (count III), violation of right to privacy and autonomy (count IV), and violation of equal protection (count V). All of these counts stem from factual allegations related to arrest and detention of plaintiff by City *police officers*.

The action was certified as a class on July 21, 1989. *Pottinger v. City of Miami*, 720 F. Supp. 955 (S.D. Fla. 1989). The class consisted of:

> homeless persons who reside or will reside on the streets, sidewalks, parks, and in other public places in the geographic area bound on the north by Interstate [3]95, on the south by Flagler Street, on the east by Biscayne Bay, and on the west by Interstate 95, within the City of Miami, who have been, expect to be, or will be arrested, harassed, or otherwise interfered with by members of the City of Miami Police Department for engaging in the ordinary and essential activities of daily living in public due to the lack of other adequate alternatives.

*Id.* at 960. The Second Amended Complaint, which was filed in September 1989, included an additional count for unlawful seizure and taking of plaintiffs' property. (Second Am. Compl. at ¶¶ 40-42). The factual allegations related to this count of the Second Amended Complaint included an allegation that homeless individuals were forced to abandon their personal belongings at public locations upon arrest by City police officers, foreseeably resulting in the loss of those items. *Id.* at ¶ 20. A further allegation related to this count was that the City had "a custom, practice, and policy of seizing and destroying the personal property of Plaintiffs, including identification, clothing, medication, food, and bedding materials, before, during, and after its encounters with the Plaintiff." *Id.*

On June 11, 1991, the court bifurcated the trial, and a non-jury trial was held in June 1992 on the issue of liability. *Pottinger*, 810 F. Supp. at 1557. Following the bench trial, Judge Atkins issued an order granting declaratory and injunctive relief in favor of the Plaintiffs. *Id.* at 1584-85. Judge Atkins held that:

> [T]he City ha[d] a pattern and practice of arresting homeless people for the purpose of driving them from public areas.
> . . . .
> [T]he City's practice of arresting homeless individuals for harmless, involuntary conduct which they must perform in public [wa]s cruel and unusual in violation of the Eighth Amendment to the United States Constitution.
> . . . .
> [S]uch arrests violate[d] plaintiffs' due process rights because they reach innocent and inoffensive conduct.
> . . . .
> [T]he City's failure to follow its own written procedure for handling personal property when seizing or destroying the property of homeless individuals violate[d] plaintiffs' fourth amendment rights.
> . . . .
> [And] the City's practice of arresting homeless individuals for performing essential, life-sustaining acts in public when they have absolutely no place to go effectively infringe[d] on their fundamental right to travel in violation of the equal protection clause.

*Pottinger*, 810 F. Supp. at 1554. The order enjoined the police from arresting homeless individuals for "performing innocent, harmless, inoffensive acts such as sleeping, eating, lying down or sitting" in at least two public area "safe zones" agreed upon by the parties. *Id*. at 1584. The order specified that it did not prevent the City from arresting any individual for any criminal conduct or conduct that was harmful to themselves or others. *Id*. With regard to property of homeless individuals, the order enjoined the City, through the Police Department, from destroying property that it knows or reasonably should know belongs to homeless individuals. *Id*.

The City appealed the order to the Eleventh Circuit, which remanded the matter for further factual findings and to clarify the judgment, in light of the changed circumstances from the time Judge Atkins had entered his order until oral argument had taken place on appeal. *Pottinger v. City of Miami*, 40 F.3d 1155, 1157 (11th Cir. 1994). On remand, Judge Atkins considered the issues once more, but concluded that "the salient facts of this case have not changed substantially." (D.E. 398: 4).

### The Settlement Agreement

The Eleventh Circuit subsequently referred the matter to mediation, *Pottinger v. City of Miami*, 76 F.3d 1154 (11th Cir. 1996), and twenty months of settlement negotiations ensued. The resulting settlement agreement was approved by the City Commission on December 9, 1997, and by this Court on October 1, 1998. (D.E. 398). The Settlement Agreement contains several key terms, as follows:

1. Law Enforcement Training – The Settlement Agreement requires that the City implement certain training for its law enforcement personnel focusing on the causes of homelessness, as well as the circumstances, needs, and rights of homeless persons. Either training at the police academy or post-academy training, together with supplemental in-service training is required under the agreement. (Def. Ex. 1 at 3-5).

1083146

2.      Adoption of a Departmental Order – The Settlement Agreement requires the adoption of a police department departmental order related to the homeless, a draft of which is attached to the settlement agreement as "Exhibit A." (Def. Ex. 1 at 5).

3.      Compliance/Enforcement of Departmental Order – The Settlement Agreement requires that the departmental order be complied with and enforced within the police department, and that violations result in discipline. *Id*.

4.      Law Enforcement Protocol – The Settlement Agreement sets forth a protocol for interaction of law enforcement personnel with homeless individuals in a number of anticipated circumstances. Most of the described protocols are incorporated directly into the draft departmental order. (Def. Ex. 1 at 6-13).

5.      Disposition of Property Belonging to Homeless Person Who Is Arrested – Among the Law Enforcement Protocol is a section entitled "Disposition of Property Belonging to Homeless Person Who Is Arrested" that states:

> The CITY shall respect the personal property of all homeless people. The Miami Police Department (and all other Departments including but not limited to Parks and Recreation and Solid Waste) shall follow their own internal procedures for taking custody of personal property. In no event shall any city official or worker destroy any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e., bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned), except as is permissible by law and in accordance with the department's operating procedure, or if the property is contaminated or otherwise poses a health hazard to CITY workers or to members of the public. (Def. Ex. 1 at 6-13).

6.      Record Generation/ Maintenance/ Access – The Settlement Agreement requires that the City adopt a procedure for monitoring and account for its police officers' encounters with homeless persons, and that the City allow access to those records as consistent with the public records act. (Def. Ex. 1 at 13-14).

7.      Advisory Committee – The Settlement Agreement required the establishment of an advisory committee that would sunset three years after the execution of the agreement. (Def. Ex. 1 at 15-17).

8.   Compensatory Damages – The Settlement Agreement required the payment of damages to the class, through a claims process. (Def. Ex. 1 at 17-27).

9.   Attorney's Fees – The Settlement Agreement required that the City pay $900,000.00 in attorney's fees. (Def. Ex. 1 at 27-28).

***Progress on the Issue of Homelessness in the City and County***

This lawsuit, however, was truly the impetus for social change. (T2: 70). Following the adoption of the settlement agreement, the City of Miami Police Department completely overhauled its policies and procedures with respect to the treatment of homeless individuals. (Def. Ex. 95A; T1: 50-51).[1] Police officers now receive training on the "causes of homelessness, as well as the circumstances, needs, and rights of homeless persons." (Def. Ex. 1 at 3-5; T1: 50-51). The department has adopted a specific protocol for interactions with homeless individuals, as well as for how to handle homeless property. (Def. Ex. 95, 95A). But it wasn't just the City of Miami Police Department that changed following the adoption of the settlement agreement. Over time, the City, County, and other neighboring community organizations have developed a wide variety of services for homeless individuals, all of which make up what is now referred to as the "continuum of care" to assist the area homeless population.

The homeless situation has improved dramatically, in terms of population numbers, since the filing of this lawsuit. The numbers of unsheltered homeless individuals, countywide, have

---

[1] References to the transcripts of the six-day evidentiary hearing, which are not consecutively paginated, will be made as follows:

T1 = September 24, 2018 Hearing Transcript
T2 = September 25, 2018 Hearing Transcript
T3 = September 26, 2018 Hearing Transcript
T4 = October 24, 2018 Hearing Transcript
T5 = October 25, 2018 Hearing Transcript
T6 = November 1, 2018 Hearing Transcript

The reference to the transcript volume will be followed by the pertinent page number(s). For example, A citation to page 13 of the September 25, 2018 Hearing Transcript will be made as "T2: 13."

1083146

dropped from being over 8,000 to being just over 1100, at the last census count. (T2: 11; D.E. 622-1 at 21). A majority of the unsheltered homeless population are "chronic homeless," meaning they have been living on the streets for 365 days or more, or have experienced four instances of homelessness within a three-year period. (T2: 17). This population is "shelter resistant." (T2: 17).

### The Homeless Trust

The Miami-Dade Homeless Trust, which was established in 1993, is a 27-person public board that sets policy and is a primary funder of the continuum of care of homeless services that are offered within the County. (T2: 6). The Homeless Trust receives its funding from the area Food & Beverage Tax, which was implemented with a primary aim of addressing homelessness. (T2: 12). Eighty-five percent (85%) of the Food & Beverage Tax is received by the Homeless Trust, with fifteen (15%) percent of that funding being allocated to addressing issues of domestic violence, as overseen by the Domestic Violence Oversight Board. *Id.* The City of Miami presently provides between thirty-three and thirty-four percent (33-34%) of the total revenues from the Food & Beverage Tax. (T2: 13). The City is the dominant source of Food & Beverage Tax revenues within the County. *Id.* The Homeless Trust also receives funding from other revenue streams, including grants from both the United States Department of Housing and Urban Development and the State of Florida. (T2: 6).

The Homeless Trust is a primary funder of many of the service providers across the continuum of care for the County's homeless population. (T2: 7). Ronald Book, the Chairman of the Homeless Trust for over a decade, testified that the funding of the Homeless Trust, and the continuum of care, will continue even if the Settlement Agreement is terminated. (T2: 15).

Mr. Book also testified to the healthy working relationship that the Homeless Trust maintains with the City, which he views as an "integral partner" in the Trust's efforts to address homelessness in the County. (T2: 9).

### Outreach Program – City Employees

The City, using funding from the Homeless Trust, runs the outreach efforts for the entire County area. (T2: 9). City outreach workers, who are commonly referred to as "green shirts" because of the recognizable uniform shirts that they wear, go out into the streets and engage the homeless population. (T1: 240-42). The outreach workers offer services and shelter placements to the area homeless. *Id*. Sergio Torres, the Director of the City of Miami Department of Veterans Affairs and Homeless Services, described his outreach team as "the gatekeeper" for most of the shelter beds in the County. (T1: 236). Sixty-six percent (66%) of the shelter placements in the County come from within the City alone. (T2: 10).

Outreach workers are trained in the protocol for interaction with the homeless by the City. (T1: 232-34). Mr. Torres testified that his department trains members of other relevant City departments, such as Parks, the Neighborhood Enhancement Team, and the Police Department. *Id*.

The outreach team has various protocols with respect to the property of homeless individuals. When a homeless individual accepts an offer of shelter by an outreach worker, the outreach team assists them in storing any bulkier property that the individual cannot take into the shelter, but would want later. (T1: 254). With regard to cleanup operations, Mr. Torres testified that the City protocol for executing such cleanups was to provide posted notices at least seven days prior to the cleanup, and to conduct increased outreach to offer shelter and services to the individuals in the area of the planned cleanup in the week leading up to the cleanup, to attempt to

move as many people as will voluntarily go to a shelter. (T1: 235-36). If the outreach workers encounter unattended property the day of the cleanup, they sort through it to identify anything important—such as identification cards or medications, and then they either inventory and store the property or discard it, depending on whether it is determined to be contaminated. (T2: 248-49). The outreach workers leave a notice for any property they have taken to store, indicating where the property can be retrieved. *Id.*  This same protocol would apply to apparently abandoned property encountered by outreach workers in the field. (T1: 248-49).

The Department of Veterans Affairs and Homeless Services maintains a storage facility to house property of homeless individuals that has been taken into custody. (T1: 254). The department's policy is to maintain the stored items for ninety days, although Mr. Torres testified that homeless infrequently attempt to retrieve the stored items. (T1: 264).

### Camillus House/Camillus Health

Camillus House provides both emergency housing and permanent supported housing. (T2: 52). Camillus House runs approximately 450 of emergency shelter beds, about 250 of which are under contract with various entities. (T2: 58-59).  The facility also includes an 80-unit permanent housing project called "Shepherd's Court." *Id.*  Camillus House has also offered permanent supported housing placement in locations around the County, in which Camillus provides housing and access to other support services to homeless individuals who are transitioning to a residential setting. (T2: 52). In addition to emergency shelter beds and permanent housing units, Camillus House also offers a broad range of services for the area homeless population.

Through Camillus Health, the facility offers health services, treatment programs, and medication to the homeless. (T2: 52, 55). Camillus House also offers a day program, which

allows unsheltered homeless to access a hot breakfast, clothing, and showers. *Id*. It also offers temporary storage facilities, which allows homeless individuals to temporarily store their belongings while accessing services at the Camillus Campus. *Id*. Individuals can also obtain identification at Camillus House. (T2: 89).

### The Lotus House

The Lotus House is a shelter with "wrap around" support services for high risk, special needs homeless women and children. (T4: 51). It shelters approximately 400 women and children nightly. *Id*. It also provides medical, dental, and behavioral health services to its residents. (T4: 51-52).  The Lotus House is funded by a combination of the sources, including: The Homeless Trust (providing one-third of the funding), the Children's Trust, and a variety of grants and foundation support. (T4: 54).

### Lazarus Project

The Lazarus Project is a program that is named for a member of the City outreach team, Lazaro Trueba, who had the idea to bring treatment out to homeless individuals living on the street with severe mental illness. (T2: 94-95). The goal of the program is to engage those individuals, diagnose them, and begin them on medication, all in the field, with the end goal of getting them to agree to come in for shelter and treatment once they regain some lucidity. *Id*. A team, including psychiatric nurse practitioners and medical assistants from Camillus Health, case managers, and members of the City Homeless Outreach program, is sent into the field to engage potential program participants. (T2: 52). The team conducts a blood draw and EKG on potential program participants. (T2: 105). The individuals are diagnosed and prescribed medications, which are dispensed to them for free by the team. *Id*. The team follows up to make sure the

participant is taking their medications, and to provide additional supplies of medicine, as needed. *Id*.

Dr. Edward Suarez, Jr., a licensed mental health counselor who works with the Needle Exchange Program and previously directed the Lazarus Project, testified to the outreach conducted by the team during a cleanup operation. (T2: 104). Dr. Suarez testified that the team engages any homeless individual at the cleanup location, helps them to discard any garbage that has accumulated around them, offers them clean clothes and blankets. *Id*. The team then offers shelter placement and, if that is rejected, asks the homeless individual to relocate temporarily while the cleanup takes place. *Id*. Dr. Suarez said the homeless are allowed to return to the location after the cleanup. *Id*. He also testified that he had never witnessed any property of homeless individuals being taken by City workers or any homeless person objecting to that type of behavior. (T2: 108-09). He said that he had never seen any City workers treat any homeless individual with anything but dignity and compassion. (T2: 99).

### Needle Exchange Program

The Infectious Disease Elimination Act ("IDEA") Needle Exchange Program is a program operated through the University of Miami to provide clean needles to homeless intravenous drug users, in exchange for used needles. (T2: 106-07). The program also screens participants for HIV and Hepatitis C, both upon enrollment and every three months after that. *Id*. If a program participant tests positive for HIV, the program supplies the latest antiviral treatment and follows up with the individual regularly. *Id*. The program also aims, through engagement with this population, to convince program participants to accept shelter and substance abuse treatment. *Id*. Dr. Suarez testified that the program was started because 51% of people who inject drugs are both HIV positive and homeless. *Id*.

### City Funding of Homeless Services

In addition to be being the dominant source of Food & Beverage Tax revenues in the County, which are distributed to the various service providers by the Homeless Trust, the City also commits additional funding to addressing homelessness. Emilio Gonzalez, the City Manager, testified that the Settlement Agreement hinders the City's efforts to obtain financial support for homeless issues from surrounding municipalities because the City "lacks parity" with other cities such that it is difficult to have meaningful conversations on the issue. (T2: 130).

*Pottinger Beds*

In order to facilitate the portion of the Settlement Agreement that requires the City of Miami Police to offer available shelter beds before warning or arresting a homeless individual committing one of the enumerated life sustaining misdemeanors (Def. Ex. 1 at 8-9), the City has contracted with both Camillus House and the Chapman Partnership to purchase dedicated "Pottinger Beds" to be used specifically for instances involving these types of police interactions. (T1: 237). The City funds seventy-five (75) Pottinger Beds at Camillus House and an additional two beds at the Chapman Partnership. (T2: 237). $460,000 of City budget was allocated for the Pottinger Beds at Camillus House in Fiscal Year 2017-18, and the same amount has been allocated for the City's upcoming budgetary year. (T2: 278-79).

*Construction of New Camillus House Facility*

In 2013, Camillus House and Camillus Health moved to a brand new facility—called the Norwegian Cruise Line Campus, which is located in the City's hospital district. (T2: 30). Of the total $60 Million cost of construction of that facility the City funded $10 Million. *Id*. Former City Commissioner Marc Sarnoff testified that the facility is a preeminent, state-of-the-art facility for providing services to the homeless. *Id*.

*Day Program at Camillus House*

The City allocated funding to save the Day Program at Camillus House. (T2: 279-81). The Day Program is a program operated at Camillus House, which provides homeless individuals with the opportunity to have a meal, take a bath, obtain clean clothes, and to cool off inside for a few hours during the warmer months. *Id*. The City allocated $60,000 in Fiscal Year 2017-18, in order to save the program. *Id*. The City has increased its funding of the program in Fiscal Year 2018-19 to $100,000. *Id*.

*Meal Program at Lotus House*

The City recently allocated funding of $35,000 to supplement the meal program at Lotus House. (T2: 281). Constance Collins, the executive director of The Lotus House, testified that its meal program is used to feed both the sheltered women and children living at the facility and women who live in the neighborhood. (T4: 55).

**The Modification**

In September 2013, the City filed a motion for a limited modification ("the Modification Motion") of the settlement agreement, based on changed circumstances, to slightly modify the law enforcement protocol procedures that had been put in place under the original agreement, based on the experiences of using those procedures in the field, and to address two specific subpopulations of homeless individuals within the City—chronically homeless individuals and homeless individuals who were also sexual predators under state law. (D.E. 464). At that time, the City emphasized many laudable new programs and services that both the City, County and other neighboring community organizations had established to provide a robust network of support services for homeless individuals and families since the adoption of the settlement agreement. *Id*. at 2-4. The City also noted that in the approximately fifteen years since the

adoption of the agreement, there had not been a single complaint or issue with the City's compliance or enforcement of its terms. *Id*. at 2.

The Modification Motion was mediated, and the parties reached an agreement for a modification of the settlement agreement. (D.E. 525-1). This Court approved an addendum to the settlement agreement on March 10, 2014. (D.E. 544). The addendum excludes registered sex offenders from the protected class. *Id*. It also excludes urinating and defecating in public within ¼ mile of a public restroom from the protected class of life sustaining misdemeanors under the settlement agreement. *Id*.

### *Sanitation and Public Health Issues*

Since before the original complaint was filed in this case, the City has had to deal with sanitation and public health issues arising in the areas where homeless people congregate and live. Judge Atkins even recognized the City's interest in maintaining sanitary standards within the City. *Pottinger*, 810 F. Supp. at 1573 ("The court recognizes the City's interest in keeping its parks and public areas clear of unsightly and unsafe items."). To maintain sanitation in these areas, the City has conducted cleanup operations since the adoption of the Settlement Agreement. (T1: 234).

Recently, there have been several areas, within downtown, Overtown, and the hospital district, that have been identified by the City as presenting heightened sanitation and health concerns. (T1: 281-82, 287-89).  In particular, the area located between 13th and 14th Streets and between NW 1st and 2nd Avenues, in Overtown, had been identified as an area of concern for the past two years because it had become a cluster of HIV and Hepatitis infections. (T1: 281-82). The City recently allocated $20,000 to obtain hand sanitizer and antibacterial kits for the homeless, to combat the spread of communicable diseases in this area. (T2: 282).

On September 19, 2018, the Florida Department of Health sent the City a letter confirming these concerns, and indicating that this location was the subject of "a significant public health investigation related to the homeless population." (D.E. 658-1). The Department of Health requested that the City not take any action to disperse the homeless population in that location. *Id.*

The Department of Health subsequently conducted an inspection of the location, and sent the City a report on October 12, 2018, concluding that the area was a "public health sanitary nuisance injurious to health as defined under Chapter 386[, Florida Statutes]." (D.E. 658-2). The Report includes descriptions and images of various sanitary and public health concerns at the site, including: standing water, human urine and feces on the sidewalks—as well as "[u]ntreated human waste (urination and defecation) located in make-shift container on sidewalk," discarded needles and other biomedical waste, and an abundance of garbage and food waste. *Id.* The Department warned that "due to the varying locations and nature of biomedical waste around the sites, hazardous waste pickup should occur by certified professionals trained in biomedical waste pick-up." *Id.*

The City conducted a cleanup operation of the area on Friday, October 19, 2018, after engaging a team trained in the disposal of biomedical waste. (T5: 79-80). Class representative David Peery, testified that he observed the cleanup operation on that day and although "[t]here was a wholesale cleaning of the entire area, everything was removed from all three of those streets," he was "not aware that anybody's property was destroyed or taken against their wishes or against their will on that date." (T5: 80).

*The Motions to Terminate & Enforce*

On May 30, 2018, the City filed its Motion to Terminate. In the Motion to Terminate, the City asserts that the settlement agreement should be terminated because the City has demonstrated substantial compliance with its terms and because significant changes in circumstances warrant termination at this time. (D.E. 566). Also on May 30, 2018, the Plaintiffs filed their Motion to Enforce the Pottinger Consent Decree and to Hold the City in Contempt ("Motion to Enforce") (D.E. 568). In the Motion to Enforce, Plaintiffs assert that the institutional, systemic constitutional violations that were the impetus for the 1988 filing this lawsuit still exist today, and that far from termination, the settlement agreement needs judicial enforcement and the City should be held in contempt for widespread violations of the agreement. *Id*.

The Court conducted an evidentiary hearing on both motions on September 24-26, October 24-25, and November 1, 2018.

## FINDINGS OF FACT

*Goal and Contents of the Settlement Agreement*

1.     Neither the goal of the original class action nor the purpose of the Settlement Agreement was to end homelessness, either in the City of Miami or anywhere else. Rather, the chief aim of the settlement agreement was the institutional reform of the City of Miami Police Department, which had been the primary offending agency in the constitutional violations at issue in the case. Prior to the initiation of the case, there was no City department dedicated, in part or in whole, to addressing the issue of homelessness in the City.

2.     To that end, the settlement agreement, which was the result of almost two years of negotiations between the parties, both well represented by counsel, focused much attention on

the City of Miami Police Department policies and procedures with respect to the homeless population, which are discussed in more detail, below.

3.    Although the subsection titled "Disposition of Property Belonging to Homeless Person Who Is Arrested," placed within the section that addresses "law enforcement protocol," includes broader references to "all other Departments including but not limited to Parks and Recreation and Solid Waste" and "any city official or worker," the primary purpose of the settlement agreement, as well as the focus of the draft departmental order (attached as Exhibit A thereto) was an institutional reform of the City of Miami Police Department. (Def. Ex. 1 at Ex. A).

4.    Finally, the settlement agreement also contains several other key conditions which did not pertain to the police, and which were to have been satisfied within a certain time frame of the agreement's adoption. These included: (1) the payment of damages to the class members, based on a claims process; (2) the payment of attorney's fees; and (3) the creation of an advisory committee to oversee implementation of the agreement, which was to sunset after three years. Compliance with the conditions of the settlement agreement mentioned in this paragraph have either been stipulated to by the parties or are not in dispute, nor are any other conditions not discussed in this order in dispute or relevant to the determination of the motion to terminate.

***City of Miami Police Department Policies/Practices Addressing the Homeless***

5.    Since the inception of this lawsuit, and the entry of the Settlement Agreement, the Court finds that there has been much needed change in the way the City of Miami Police Department approaches interactions with the homeless. As the Chief of Police, Jorge Colina, testified, it is a very different department now than it was when he began working there some

twenty-eight years ago. (T1: 42-44). Many of the changes that have been implemented, were required as conditions of the Settlement Agreement, as follows:

**Implementation of Law Enforcement Training**

6.     Chief Colina testified that police officers receive training on how to treat homeless individuals specifically, and the Departmental Order pertaining to such treatment, during their academy training. (T1: 50-51). All police officers also receive further instruction on this issue through in-service training known as scenario-based training. *Id*.

7.     James Bernat, an executive officer for the Department and an eleven-year veteran with the force (T1: 96), testified that every police officer received an additional training course on homelessness after the 2014 modification of the Settlement Agreement, which included training on the changes in policies and procedures that resulted from the modification. (T1: 104-05).

8.     Based on the above, that the City of Miami Police Department has implemented the training required under Section IV of the Settlement Agreement. (Def. Ex. 1 at 3-5).

**Adoption of Departmental Order/ Law Enforcement Protocol**

9.     The City of Miami Police Department has adopted the departmental order required under Section V of the Settlement Agreement. (Def. Ex. 1 at 5).

10.     Both the original 1998 version of the Departmental Order and the current version were admitted into evidence. (Def. Ex. 95, 95A). It is undisputed that these Departmental Orders are identical to those negotiated as part of the Settlement Agreement and Modification, respectively.

11.     The departmental order is a codification of the law enforcement protocol set forth in Section VII of the Settlement Agreement. (Def. Ex. 1 at 6-13).

**Enforcement of Departmental Order**

12.     Chief Colina testified that compliance with all Departmental Orders, including the order pertaining to homelessness, was mandatory for all City of Miami Police Officers. (T1: 47-48).

13.     Any police officers found to have violated the order are subject to discipline, up to and including termination or arrest. *Id.*

14.     As an example of this, Chief Colina testified that one of the incidents that was at issue in the case—involving a homeless individual named Java Brooks—was presently under investigation with the Department's Internal Affairs. (T1: 87-88).

15.     Chief Colina emphasized that if any of the other class member Plaintiffs had reported any of the alleged violations to Internal Affairs, those matters would have been investigated too. *Id.*

16.     Based on the above credible testimony, the City of Miami Police Department has a policy of enforcing Departmental Order 11, Chapter 10, in accordance with Section VI of the Settlement Agreement. (Def. Ex. 1 at 5-6).

**Records Requirements**

17.     The City has adopted a records system pertaining to interaction of City employees with the homeless population, pursuant to Section VIII of the Settlement Agreement.

18.     The police Departmental Order indicates several circumstances where a "field information card" is to be filled out. (Def. Ex. 95). The Departmental Order requires that these cards be kept on file with the police records unit. *Id.*

19.     Further, the Departmental Order indicates that an officer must add the notation "homeless" at the top of an arrest affidavit, if a homeless individual is arrested for committing a

life sustaining misdemeanor after refusing available shelter. *Id*. These arrest affidavits must also be forwarded to the police records unit. *Id*.

20.     The City has submitted a summary of Defendant's Exhibit 100, which are four years' worth of field information cards on record with the City police department. (D.E. 659; Def. Ex. 100). Defendant's Exhibit 100 demonstrates the City's compliance with the records requirements in Section VIII of the Settlement Agreement.

***Other City Department Policies/Practices Addressing the Homeless***

21.     As of Fall 2018, the City of Miami department that most directly addresses and coordinates the City's efforts with regard to homeless issues is the Department of Human Services. (T1: 276). That department will incorporate a number of social services, including: homeless outreach, a child-care center, and employment and job services training. (T1: 277). Prior to this time, the City's homeless outreach was handled by the City of Miami Department of Veterans Affairs and Homeless Services. (T1: 232).

22.     The homeless outreach component of the Department of Human Services, which was previously implemented by the Department of Veterans Affairs and Homeless Services, primarily involves City employees conducting daily outreach with homeless on the streets of Miami, in order to offer those individuals shelter or access to any of the many social services available through the continuum of care.

23.     These outreach operations are aided by the police department's neighborhood resource officers, who are assigned to one of the City's Neighborhood Enhancement Team areas, and whose primary function is to "bridge the gap between the community and the City of Miami Police." (T1: 203).

24.     Despite these outreach efforts, there was credible testimony that many, if not a majority, of the homeless individuals living on the streets of Miami today are "chronically homeless" or "shelter resistant." (T2: 105; T2: 17).

25.     Sergio Torres, the Director of the Department of Veterans Affairs and Homeless Services, testified that he conducted trainings for his department employees and for employees of other City departments, such as Parks & Recreation, Neighborhood Enhancement Teams, and the City of Miami Police Department, on the City's policies and protocols for homeless outreach and interaction. (T1: 233-34, 238-40). Training materials used by the City for this purpose were created by Mr. Torres, and were admitted into evidence. (T1: 239; Def. Ex. 39).

26.     Specifically with regard to the property of homeless individuals, Mr. Torres testified as to the policy of the City in dealing with those items. (T1: 248-49, 254). When a homeless individual accepts an offer of shelter by an outreach worker, the outreach team assists them in storing any bulkier property that the individual cannot take into the shelter, but would want later. (T1: 254). City protocol for executing such cleanups was to provide posted notices at least seven days prior to the cleanup, and to conduct increased outreach to offer shelter and services to the individuals in the area of the planned cleanup in the week leading up to the cleanup, to attempt to move as many people as will voluntarily go to a shelter. (T1: 235-36). If the outreach workers encounter unattended property the day of the cleanup, they sort through it to identify anything important—such as identification cards or medications, and then they either inventory and store the property or discard it, depending on whether it is determined to be contaminated. (T2: 248-49). The outreach workers leave a notice for any property they have taken to store, indicating where the property can be retrieved. *Id.*  This same protocol would

apply to apparently abandoned property encountered by outreach workers in the field. (T1: 248-49).

27.     The Department of Veterans Affairs and Homeless Services maintains a storage facility to store any property taken into custody. (T1: 254). The department's policy is to maintain the stored items for ninety days, although Mr. Torres testified that homeless infrequently attempt to retrieve the stored items. (T1: 264).

***City's Recent Sanitary/ Public Health Issues Regarding Homeless Population***

28.     The City has historically had concerns with sanitation issues in areas where the homeless population congregates and sleeps.

29.     In recent years these sanitation issues have developed into public health issues—with outbreaks of certain communicable diseases appearing among the homeless population in areas where those individuals live and sleep in large groups.

30.     The City has historically conducted cleanup operations to combat these issues, specifically to pressure wash the side walk of human excrement and to pick up any food waste and other garbage that might be causing sanitary hazards.

31.     On September 19, 2018, the Florida Department of Health notified the City of a specific area of concern located between 13th and 14th Streets and between NW 1st and 2nd Avenues, in Overtown, and indicated that this location was the subject of "a significant public health investigation related to the homeless population." (D.E. 658-1). The Department of Health requested that the City not take any action to disperse the homeless population in that location. *Id.*

32.     The City met with other community partners to determine the best approach to cleaning this area, which had become a growing concern by the City and nearby residents.

33.     The Florida Department of Health conducted an investigation of the area, and issued a report on October 12, 2018, declaring the area to be a sanitary nuisance. (D.E. 658-2). The Department of Health advised the City that any cleanup operations must be handled with the assistance of a specialized biohazard waste cleanup crew. *Id.*

34.     On October 19, 2018, the City conducted a cleanup operation of the area pursuant to the Florida Department of Health's directions. (T5: 79-80).

### *The Testimony of Alleged Violations of the Settlement Agreement*

35.     Thirty-seven class members testified with respect to alleged violations of the Settlement Agreement. (T3: 9-280; T4: 83-94; T5: 6-81).

36.     Of those witnesses, only ten witnessed the alleged incidents at issue. The Court finds that it cannot accept the testimony of the remaining twenty-six class members as evidence that their belongings were taken by employees of the City. However, the Court would note that several of those witnesses testified generally that they had witnessed City of Miami employees throwing unattended property into trucks. *See, e.g.*, (T5: 18).

37.     Of the ten witnesses who saw the alleged violations complained of, only two involved situations concerning asserted violations by the City of Miami Police of the protocol set forth in the Departmental Order. (T3: 151-60; T5: 6-15). Java Brooks and Rafael Villalonga each testified that City police officers told them to move locations in the middle of the night with no justification. *Id.* A video of the incident involving Java Brooks was played into evidence. (D.E. 578-39; T5: 81). Brooks makes a statement towards the end of the video implying that she is motivated by the possibility of being paid by the City for any violation of Pottinger captured on the film. *Id.*

38.     The remaining eight witnesses testified to seven incidents of alleged confiscation of property by City employees. (T3: 52-67, 82-85, 87-94, 107-117, 261-65; T4: 83-86, 87-94; T5: 35-56).  All incidents testified to involved City cleanup operations. *Id*. The class members generally testified that their property was improperly confiscated by City employees prior to the sidewalks being pressure cleaned. *Id*. Typically, the witnesses testified that their property was thrown into the truck when they were not present, but that they saw their property on the truck when they returned. *Id*. Some said they asked the City employees for their property back but that their requests were denied. (T3: 263-64; T4: 90). Class members almost uniformly testified to the loss of small personal items, such as medications, identification cards, eye glasses, and photographs and other personal papers. (T3: 52-67, 82-85, 87-94, 107-117, 261-65; T4: 83-86, 87-94). Sometimes they testified about the loss of clothing or bedding. *Id*.

39.     The City introduced credible evidence that homeless individuals are put on notice of any cleanup operations when signs are posted in the area for approximately one week prior to the cleanup operation. (T1: 235-36; 216-17).

40.     Class representative David Peery testified to the same incident testified to by Wilbur Cauley, and which was partially recorded on a video which was played into evidence. (T5: 35-56; D.E. 578-40-A). This incident took place just yards away from the area of concern flagged by the Florida Department of Health as a public health nuisance. (T5: 44).

41.     Although much of the testimony presented was inadmissible hearsay, the admissible evidence cannot be discredited out of hand. While some witnesses may have been more credible than others, for the purpose of this order it is presumed that there was credible testimony that the City of Miami has confiscated property of class members during cleanup operations. However, all the witnesses testified that their property was left unattended during

cleanup operations at the time it was seized, and the City of Miami has introduced evidence as to the protocol used by the outreach workers in addressing unattended property during cleanup operations. (T3: 52-67, 82-85, 87-94, 107-117, 261-65; T4: 83-86, 87-94; T1: 248-49, 254).

42.     The Court also finds, in light of the supporting video, that Java Brooks was told to move by the City of Miami Police without any demonstrated violation, and without any shelter being offered. (D.E. 578-40-A). However, Chief Colina testified that this incident was under investigation by Internal Affairs. (T1: 87-88).

## CONCLUSIONS OF LAW

### *Standard for Termination*

The City is entitled to termination of the Settlement Agreement based on Federal Rule of Civil Procedure 60(b)(5), which states in pertinent part that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" where "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b). The Supreme Court has made it clear that the use of the disjunctive "or" in the preceding language demonstrates that a party may obtain relief if any of the listed conditions are met. *Horne v. Flores*, 557 U.S. 433, 454 (2009). Here, the Settlement Agreement should be terminated because the City has substantially complied with its terms, and has demonstrated that the City is unlikely to revert to the behaviors that prompted this lawsuit.

In order to prove that the Settlement Agreement has been "satisfied" under Rule 60(b), the City has the burden of proof. *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011). In undertaking that task, "the relevant standard is 'substantial compliance' with the requirements of the consent decrees." The Supreme Court has explained that because consent decrees have

"many of the attributes of ordinary contracts [and] ... should be construed basically as contracts," the doctrine of substantial compliance, or substantial performance applies. *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975). Substantial compliance "impl[ies] something less than a strict and literal compliance with the contract provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish." *Wells Benz, Inc. v. U.S. for Use of Mercury Elec. Co.*, 333 F.2d 89, 92 (9th Cir. 1964) (alteration added, internal quotations omitted).

Further, "[a] court considering termination of a consent decree in light of performance of its specific terms 'must also consider the more general goals of the decree which the terms were designed to accomplish.'" *Jeff D.*, 643 F.3d at 288 (*quoting Youngblood v. Dalzell*, 925 F.2d 954, 960 (6th Cir.1991)). The question regarding compliance with the general goals of a consent decree is "whether the [defendant] has demonstrated . . .  its good-faith commitment to the whole of the court's decree and to those provisions of law and the Constitution that were the predicate for judicial intervention in the first instance." *Jeff D.*, 643 F.3d at 288 (*quoting Freeman v. Pitts*, 503 U.S. 467, 491, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992)).

It is also important to frame the City's Motion to Terminate in the context of this matter having been brought as "institutional reform litigation." *Horne*, 557 U.S. at 447. The Supreme Court has acknowledged that "injunctions issued in such cases often remain in force for many years, and the passage of time frequently . . . warrant[s] reexamination of the original judgment." *Id*. at 447–48. Federalism concerns are also at play in these types of cases, which "commonly involves areas of core state responsibility." *Id*. at 448. The Court has also noted that "the dynamics of institutional reform litigation differ from those of other cases," where, "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond

what is required by federal law." *Id*. The Court concludes that "[i]njunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." *Id*. at 449.

***City of Miami Police Department Has Substantially Complied with the Settlement Agreement***

Based on the evidence presented, the City of Miami Police Department has substantially complied with the terms of the Settlement Agreement. This case, at the outset, was about a systemic failure on the part of the City of Miami, through its police department, to properly address encounters by City of Miami police officers with the homeless population. The parties negotiated precisely how the City was to bring its police department into compliance with the constitutional rights of the homeless population, even going so far as to negotiate a draft departmental order on the topic that the police department adopted. As is explained in further detail below, the police department has done all that is required of it under the settlement agreement.

The police department has implemented the required training under the Settlement Agreement. Police officers receive training focusing on the causes of homelessness, as well as the circumstances, needs, and rights of homeless persons, both during the academy and in post-academy in service trainings. The City of Miami has, therefore, satisfied Section IV of the Settlement Agreement.

The police department has adopted the departmental order required under the settlement agreement and addendum. The original version of the departmental order was adopted by the City in 1998, as Departmental Order 11, Chapter 9. (Def. Ex. 95A). The chapter was eventually renumbered, and a modified version of the departmental order was adopted in 2014, pursuant to

the addendum to the settlement agreement negotiated by the parties. (Def. Ex. 95). The City of Miami Police Department enforces the departmental order. Police officers found not to comply with the departmental order are subject to discipline, up to an including termination. Reported allegations of instances of noncompliance are investigated by Internal Affairs. Further, the departmental order is modeled after the protocol set forth in Section VII of the settlement agreement. By adopting and enforcing the departmental order, the City has, therefore complied with that section of the Settlement Agreement. The City of Miami has, therefore, satisfied Sections V, VI, and VII of the Settlement Agreement.

Specifically with respect to the property of homeless individuals, the City of Miami Police department has complied with the Settlement Agreement. The Settlement Agreement and adopted departmental order contain specific directives to the police department as to how the property of homeless individuals should be handled in different circumstances. (Def. Ex. 1, 95, 95A). The Court would note that although the testimony of the Plaintiffs often reflects the presence of police officers during the alleged incident, there is no testimony reflecting that any City of Miami police destroyed or seized plaintiffs' property. Further, there are no reports to internal affairs with regard to police seizure of property reflected on the record.

The police department has adopted a policy to document and record interactions by the City of Miami police officers with homeless individuals. (Def. Ex. 100). Police officers fill out field information cards when they interact with homeless individuals, and those forms are maintained subject to the Florida public records law. The City of Miami has, therefore, complied with Section VIII of the Settlement Agreement.

With respect to Sections IV through VIII of the Settlement Agreement—those sections that pertain to the policies and procedures of the City of Miami Police Department, the

Settlement Agreement has been "satisfied" under Rule 60(b). *Jeff D.*, 643 F.3d at 283. The Police Department has undergone the type of "institutional reform" that was the original goal of this lawsuit. Department personnel are trained on the issue of homelessness, and there appears to be a culture of sensitivity to the needs of the homeless population that was lacking when this case began.

### The Alleged Violations by the Police Department Do Not Indicate Lack of Substantial Compliance

With respect to the City of Miami Police Department, only two witnesses testified that as to any even arguable violations of the Settlement Agreement by City of Miami Police Department employees. (T3: 151-60; T5: 6-15). Both Java Brooks and Rafael Villalonga testified that City of Miami police officers told them to move from where they were sleeping late at night, with no cause, and without first offering them shelter. *Id*. Ms. Brooks recorded the incident on her cellular phone, and the video was played in court. (D.E. 578-40-A). Assuming for the sake of argument that the incidents described in the testimony of these two witnesses constituted a violation of the Settlement Agreement—neither witness testified that they were arrested or cited for one of the enumerated life sustaining misdemeanors—these incidents do not negate the Court's conclusion that the City of Miami Police Department has "substantially complied" with the Settlement Agreement. Substantial compliance "impl[ies] something less than a strict and literal compliance with the contract provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish." *Wells Benz, Inc.*, 333 F.2d at 92. Evidence of two potential violations over the twenty-year period since the adoption of the Settlement Agreement does not evince the type of deviation that this Court would require to find "intentional" noncompliance on behalf of the City. Stated differently, the alleged actions of a handful of police officers does not constitute

non-compliance by the City government. Further, Chief Colina testified the incident involving Ms. Brooks was under investigation by Internal Affairs, showing that the City takes compliance with the terms of the Settlement Agreement seriously. (T1: 87-88).

***Other City Departments Have Substantially Complied with the Settlement Agreement***

Based on the evidence presented, the City has substantially complied with the terms of the Settlement Agreement. As noted above, the primary goal and focus of the Settlement Agreement was the reform of the City of Miami Police Department. (Def. Ex. 1). In fact, the class certified by Judge Atkins includes "homeless persons . . . who have been, expect to be, or will be arrested, harassed, or otherwise interfered with by members of the *City of Miami Police Department* for engaging in the ordinary and essential activities of daily living in public due to the lack of other adequate alternatives." *Pottinger*, 720 F. Supp. At 960 (emphasis supplied). Clearly, the City of Miami Police Department was the primary subject of this lawsuit. And this is reflected in the Settlement Agreement, which focuses almost entirely on the police department, and on implementation of training, policies, and procedures to ensure that the police department engaged with the area homeless population humanely and within the bounds of the constitution. (Def. Ex. 1).

There are only three sentences in the Settlement Agreement that address property of homeless individuals, and are written in terms that encompass City departments outside of the police department. Under the "Law Enforcement Protocol" portion of the Settlement Agreement is a section titled "Disposition of Property Belonging to Homeless Person Who Is Arrested" that states:

> The CITY shall respect the personal property of all homeless people. The Miami Police Department (and all other Departments including but not limited to Parks and Recreation and Solid Waste) shall follow their own internal procedures for taking custody of personal property. In no event shall any city official or worker

> destroy any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e., bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned), except as is permissible by law and in accordance with the department's operating procedure, or if the property is contaminated or otherwise poses a health hazard to CITY workers or to members of the public.

(Def. Ex. 1 at 6-13). This sections essentially places two requirements on all City departments with regard to the property of homeless individuals: (1) all departments must "follow their own internal procedures for taking custody of personal property" and (2) no City employee may destroy property belonging to homeless individuals "except as is permissible by law and in accordance with the department's operating procedure, or if the property is contaminated or otherwise poses a health hazard to CITY workers or to members of the public." *Id.*

The City Department of Veterans Affairs and Homeless Services has adopted policies with regard to the property of homeless individuals. (T1: 235-36; 248-49). First, the department has a procedure in place for addressing the property of homeless individuals who accept shelter from the City outreach worker, in which bulkier items that the homeless individual cannot take to a shelter but wishes to store for later use is inventoried and stored by the outreach team. (T1: 254). The department also has a protocol for examining and either storing or discarding abandoned property, depending on whether any items are contaminated or pose a health or safety risk. (T2: 248-49). Finally, with regard to cleanup operations, the City protocol for executing such cleanups is to provide posted notices at least seven days prior to the cleanup, and to conduct increased outreach to offer shelter and services to the individuals in the area of the planned cleanup in the week leading up to the cleanup, to attempt to move as many people as will voluntarily go to a shelter. (T1: 235-36). If the outreach workers encounter unattended property the day of the cleanup, they sort through it to identify anything important—such as identification cards or medications, and then they either inventory and store the property or discard it,

1083146

depending on whether it is determined to be contaminated. (T2: 248-49). The outreach workers leave a notice for any property they have taken to store, indicating where the property can be retrieved. *Id.* The Department of Veterans Affairs and Homeless Services maintains a storage facility for this purpose. (T1: 254).

The Department of Veterans Affairs and Homeless Services also trains members of other relevant City departments, such as Parks & Recreation, the Neighborhood Enhancement Team, and the Police Department. (T1: 232-34). Materials used for such trainings with the Department of Parks & Recreation demonstrate that the training includes background information on homelessness, as well as protocol for employees of that department to engage homeless individuals or address abandoned property inside the City parks. (Def. Ex. 39). The various scenarios illustrated in the "Engagement Tactics – Homeless Assistance Process Flowchart" show that employees of the Department of Parks & Recreation are required to call on the City of Miami Police Department or the City Homeless Assistance outreach workers to assist them in dealing with both homeless individuals and property of homeless individuals. *Id.*

With respect to Section VII(F) of the Settlement Agreement—the only section that pertains to the policies and procedures of other City of Miami departments besides the City of Miami Police Department, the Settlement Agreement has been "satisfied" under Rule 60(b). *Jeff D.*, 643 F.3d at 283. That section requires all City departments to "follow their own internal procedures for taking custody of personal property" of homeless individuals. The evidence reflects that the City has implemented protocols aimed at balancing the interests of the homeless individuals against the interests of the City in maintaining sanitary and safe conditions on City streets. (T1: 248-49, 254). Under those protocols, bulky property of homeless individuals is stored upon request when a homeless person accepts shelter from City outreach workers. (T1:

254). There is a protocol for addressing unattended or abandoned property. (T2: 248-49). Under that protocol, property is assessed to determine whether it is something the needs to be inventoried or stored or is something that can be discarded because it is contaminated or otherwise poses a threat to public safety or health. *Id*. And there are similar protocols for addressing property during cleanup operations. (T1: 235-36).

### The Alleged Violations by Other City Departments Do Not Indicate Lack of Substantial Compliance

With respect to City departments aside from the Police Department, there was non-hearsay testimony as to only seven instances of alleged improper seizure of property of homeless individuals. (T3: 52-67, 82-85, 87-94, 107-117, 261-65; T4: 83-86, 87-94; T5: 35-56).[2] These instances all took place during cleanup operations in areas the City has identified as sanitation concerns. *Id*. In most of the instances testified to, the homeless individual had left their property unattended during the cleanup operations, which had been noticed by the City in advance of execution. *Id*. In such circumstances, City protocol requires that outreach workers assess the unattended property to determine whether the items should be inventoried and stored or can be discarded. (T2: 248-49). It is undisputed that the City had heightened sanitation and health concerns regarding the areas where Plaintiffs left their property unattended. (T1: 281-82, 287-89). The alleged incidents described by Eli Halter, Terry Fluker, Ashley Self, and Rafael Aguilar all took place near the Macy's department store in downtown, an area identified by the City as an area of sanitation concern. (T1: 288). The single incident described by Wilbur Cauley and David Peery, and partly shown in a video to the Court (D.E. 578-40-A), took place in the area in Overtown underneath the I-395 overpass, the area described as of concern by the City and

---

[2] Although eight witnesses presented non-hearsay testimony about such alleged improper seizure and destruction of property, class representative David Peery testified about the same alleged instance as class member Wilbur Cauley.

1083146

identified by the Florida Department of Health as the location of an HIV and Hepatitis C "cluster" and a "sanitary nuisance" under Florida law. (D.E. 658-1; D.E. 658-2).

Although the credibility of the various witnesses was not uniform, this analysis will presume that the incidents testified to—in which City employees seized and discarded some homeless property—in fact took place. Even given that assumption, however, there is not enough evidence presented here to demonstrate a lack of "substantial compliance" with the Settlement Agreement. The City exercises valid police power in taking action to address the sanitation and public health concerns created by large groupings of homeless congregating and living in certain areas within the City. The video presented by the City during the evidentiary hearing (Def. Ex. 30), as well as testimony presented by Milton Vickers and Judge Leifman all support the City's decision to conduct cleanup operations in these locations. Milton Vickers testified about both the area by the Macy's in downtown and the area in Overtown underneath the I-395 overpass. (T1: 281-82, 287-89). Judge Steve Leifman testified that the area in Overtown underneath the I-395 overpass was "a public health crisis," adding that "it was pretty horrible. It was dangerous to put anything on the ground. You had to step around the needles and the rats that were all over the place." (T4: 16, 39). It is not unreasonable to assume that much of the allegedly discarded property here would have been considered contaminated by the City outreach workers determining whether to inventory and store or discard the items.

Further, several City witnesses testified credibly that notice of these cleanup operations was posted approximately a week prior to execution of the cleanup. (T1: 235-36; 216-17). Sergio Torres testified that during the week leading up to the operations, outreach workers would engage those homeless individuals living in the area in an attempt to place them in shelters and to tell them that the cleanup was going to take place. (T1: 235-36). Even Plaintiffs' witness Eli

Halter admitted that homeless individuals were given an opportunity to move their belongings prior to the pressure cleaning on the day of cleanups, stating: "if you were there, you had a chance to move your stuff." (T3: 76). The premise that a handful of homeless individuals' unattended property was mistakenly characterized as contaminated by City outreach workers assisting in cleanup operations of areas that have been identified as particularly egregious in terms of sanitation and public health concerns, does not negate the conclusion that the City has substantially complied with the Settlement Agreement. Even assuming that this has taken place, these incidences of noncompliance would be unintentional and, given that this Motion to Enforce is the first complaint about noncompliance with the Settlement Agreement in the twenty years since it was adopted, simply do not "defeat the object which the parties intend to accomplish." *Wells Benz, Inc.*, 333 F.2d at 92. Contrary to the arguments of the Plaintiffs, these cleanup operations are a far cry from the police behavior of seizing and summarily discarding homeless property that Judge Atkins addressed in his original findings. *Pottinger*, 810 F. Supp. at 1555–56 (describing an incident in which "City police officers awakened and handcuffed class members, dumped their personal possessions—including personal identification, medicine, clothing and a Bible—into a pile, and set the pile ablaze.").

### *The City of Miami Has Demonstrated a Good-Faith Commitment to the Goals of the Settlement Agreement*

The substantial evidence presented also demonstrates the City's "good-faith commitment" to the goals of the settlement agreement. *Jeff D.*, 643 F.3d at 288. As detailed above, the overall goal of this litigation and the Settlement Agreement was the "institutional reform" of the City of Miami Police Department with regard to its encounters with the homeless population. Both the Police Department and the City as a whole have undergone substantial institutional reform in the time since the Settlement Agreement was adopted. The Police

Department has implemented the training, policies, and protocols required under the Settlement Agreement. The Police Department also now aims to foster a compassionate approach to the area homeless, one aimed at getting homeless individuals in the City the services and treatment they need. Aside from the Police Department, however, the City has demonstrated a true dedication to humanely addressing homelessness. The City created the Department of Veterans Affairs and Homeless Services (now incorporated into the newly formed Department of Human Services), with an aim towards outreach and assistance for the homeless, even in situations where law enforcement was not a concern. The City also dedicates a substantial budgetary allocation to various homeless services. No evidence has been presented that would call the City's dedication to alleviating the plight of the homeless population into question.

Which is not to say that there is not more that can be done to achieve that goal. It is undisputed that there are insufficient shelter beds and affordable housing in the City and County. Ronald Book and Constance Collins both testified that their respective organizations are always in need of additional funding, and that they do the best they can, given their budgetary constraints. (T2: 12-13, T4: 54). None of this changes the analysis with regard to the City's "substantial compliance" with the Settlement Agreement, or its "good-faith commitment" to the goals of the agreement. This case was never about solving homelessness, and the Settlement Agreement does not, nor could it, place such a burden on the City. Instead, this case is about the institutional reform of the City with respect to its treatment of the homeless population. That goal has been accomplished. Given that consent decrees are not supposed to stay in place in perpetuity, the time has come to release the City from the Settlement Agreement, and from the judicial oversight of its behavior towards the homeless population that is no longer necessary.

## CONCLUSION

WHEREFORE, THE City of Miami respectfully requests that this Court enter an order

terminating the Based upon the foregoing Settlement Agreement, as modified in 2014.

Respectfully submitted,

| | |
|---|---|
| **THOMAS E. SCOTT, ESQ.** | **VICTORIA MÉNDEZ**, City Attorney |
| Cole, Scott & Kissane | **JOHN A. GRECO**, Deputy City Attorney |
| Co-Counsel for **City of Miami** | **CHRISTOPHER A. GREEN,** |
| 9150 South Dadeland Boulevard | Sr. Assistant City Attorney |
| Suite 1400 | **GEORGE K. WYSONG**, Sr. Assistant City Attorney |
| Miami, FL 33156 | **DOUGLAS A. HARRISON**, Sr. Assistant City Attorney |
| E-mail: thomas.scott@csklegal.com | **CARLOS H. GAMEZ**, Assistant City Attorney |
| | **J.C. PEREZ**, Assistant City Attorney |
| | **KERRI L. McNULTY**, Senior Appellate Counsel |
| | Attorneys for **City of Miami** |
| | 444 S.W. 2nd Avenue, Suite 945 |
| | Miami, FL  33130-1910 |
| | Tel.: (305) 416-1800 |
| | Fax: (305) 416-1801 |
| | Email:            klmcnulty@miamigov.com |
| | Secondary Email:    YIllescas@miamigov.com |
| | |
| | By:  */s/ Kerri L. McNulty* |
| |     KERRI L. McNULTY |
| |     Florida Bar No. 16171 |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 7, 2018, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is

being served this day on all counsel of record or pro se parties identified on the attached service

list in the manner specified, either via transmission of Notices of Electronic Filing generated by

CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to

receive electronically Notices of Electronic Filing.

By:   */s/ Kerri L. McNulty*
KERRI L. McNULTY
Senior Appellate Counsel
Florida Bar No. 16171

1083146

## SERVICE LIST

**Benjamin Waxman, Esq.**
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel.: (305) 371-6421
E-mail: benji@benjaminwaxmanlaw.com
**Attorneys for Plaintiffs**

**Ray Taseff, Esq.**
Florida Justice Institute
100 S.E. 2nd Street, Suite 3750
Miami, FL 33131
Tel.: (305) 358-2081
Email: rtaseff@floridajusticeinstitute.org
**Attorneys for Plaintiffs**

**Stephen J. Schnably, Esq.**
Miami ACLU Cooperating Attorney
University of MiamI School of Law
1311 Miller Drive
Coral Gables, FL  33146
Email: schnably@law.miami.edu

**Dante P. Trevasani, Esq.**
Florida Justice Institute
100 S.E. 2nd Street, Suite 3750
Miami, FL 33131
Tel.: (305) 358-2081
Email: dtrevisani@floridajusticeinstitute.org
**Attorneys for Plaintiffs**

**Valerie Jonas, Esq.**
Weitzner and Jonas
1444 Biscayne Blvd., Suite 207
Miami, FL  33132
Email: valeriejonas77@gmail.com
**Attorneys for Plaintiff**

**Arthur J. Rosenberg, Esq.**
601 NE 56th Street
Miami, FL  33137
Email: tacajr@bellsouth.net
**Attorneys for Plaintiff**

*Nancy Abudu, Esq.*
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL  3134
Email: nabudu@aclufl.org
*Attorneys for Plaintiff*

*Thomas E. Scott, Esq.*
Cole, Scott & Kissane
9150 South Dadeland Boulevard, Suite 1400
Miami, FL 33156
E-mail: thomas.scott@csklegal.com
*Co-Counsel for Defendant*

1083146