**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 88-2406-CIV-MORENO**

**MICHAEL POTTINGER, et al.,**

     **Plaintiffs,**

**vs.**

**CITY OF MIAMI,**

     **Defendant.**
_____/

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
PLAINTIFFS' MOTION TO ENFORCE THE POTTINGER CONSENT DECREE
AND TO HOLD THE CITY IN CONTEMPT**

**INTRODUCTION AND OVERVIEW**

Some twenty-six years ago, Judge Atkins issued his landmark decision condemning the

City of its policy and practice of systematically violating the constitutional rights of homeless

people in the City of Miami.  *Pottinger v. City of Miami*, 810 F. Supp. 155 (S.D. Fla. 1992).

After appealing Judge Atkins' ruling, and in response to the Eleventh Circuit order to

mediate, Plaintiffs and the City, over the course of some twenty months, negotiated a detailed

settlement of all of Plaintiffs' claims.  The City agreed to, inter alia, a policy of respecting the

rights of homeless persons, including their property rights; a protocol for making contact with or

seeking to arrest homeless persons engaged in "life sustaining misdemeanor conduct" while living

on the streets; and, a scheme to compensate homeless persons for the injuries suffered as a result

of being harassed, wrongfully arrested, and having their property destroyed.  In 1998, after a

fairness hearing, this Court accepted the parties' mediated settlement as a Consent Decree.

Five years ago, the City invoked provisions of the Consent Decree to modify it. Following two day-long mediation sessions, the Plaintiffs agreed to give up certain protections, and to loosen others in the City's favor. This Court again accepted the parties' compromises and entered the parties' amended settlement as a Consent Decree.

The crux of the issues presently before the Court is whether, since approximately January 2018, the City has systematically violated the Consent Decree, as the Plaintiffs allege, by seizing and destroying the Plaintiffs' property, banishing Plaintiffs from certain areas of the City, and engaging and arresting Plaintiffs for "life sustaining misdemeanor conduct" without offering shelter or assistance as required by the Consent Decree.

Injunctions such as Consent Decrees are enforced through the civil contempt power of the trial court. *Reynolds v. G.M. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000). The inquiry of whether the City of Miami should be sanctioned involves the Plaintiffs' first citing the provisions of the injunction they wish to be enforced, alleging that the defendant has not complied with such provisions, and then proving the allegations of non-compliance at the hearing. *Id.* If Plaintiffs do so, the burden shifts to the defendant to show that it has complied with the injunction, or why it should not be adjudged in contempt, or if adjudged in contempt, why sanctions should not be imposed. *Id.* To warrant a finding of civil contempt, the Court must find by clear and convincing evidence that the allegedly violated order was valid and lawful, the order was clear and unambiguous, and the alleged violator had the ability to comply with the order. *Wyatt v. Rogers*, 92 F.3d 1074, 1078 n. 8 (11th Cir. 1996); *CFTC v. Wellington Previous Metals, Inc*., 950 F.2d 1525, 1529 (11th Cir 1992).

Viewed within that framework, the Plaintiffs have demonstrated by clear and convincing evidence that the City violated the Consent Decree's provisions regarding property, provisions

regarding harassment of homeless individuals not observed committing life-sustaining misdemeanors, provisions regarding the City's reporting requirement, and provisions regarding harassment of homeless individuals observed committing life-sustaining misdemeanors. The City, meanwhile, has failed to provide a lawful excuse for noncompliance.

## **FINDINGS OF FACT**

Upon review of the parties' submissions and the evidence presented at the evidentiary hearing, this Court has made the following findings of fact:

### **The Plan to "Clean-Up Hotspots"**

1.      In January 2018, the City of Miami developed a comprehensive plan to "clean-up" specific areas throughout the City where homeless people lived. Pl. Ex. 601-65 at 1-2. The City designated these targeted areas as "hotspots." Video, Pl. Ex. 578-42E-1 at 0:37–0:51.

2.      The City's plan originated in the City Manager's Office. Pl. Ex. 601-65 at 1-2. Shortly after being appointed in January, City Manager Emilio Gonzalez made homelessness a top priority. This policy decision was in large part a response to constituent complaints about the presence of increasing numbers of homeless people in the newly developed downtown City core. Sept. 24 Tr. 287:22-24; Sept. 25 Tr. 133:10-15. The City Manager's Office executed the plan which entailed a coordinated effort among several City departments, including the Department of Veterans Affairs and Homeless Services, the Police Department, the Neighborhood Enhancement Team ("NET"), and Solid Waste. Pl. Ex. 601-65 at 2.

3.      The objective of the plan was to clear the "hotspots" throughout the City where homeless people stayed and to make sure the homeless would not return to those places. As one City official put it: "What is expected now and as we move forward with the manager's directives, is once those sites are clear is for people never to return." Email from Sergio Torres, Director of

Department of Veteran Affairs and Homeless Services, to Senior Executive Police Assistant James Bernat, February 24, 2018, Pl. Ex. 601-65 at 2.

4.        The plan, according to City's own description, was "ambitious." *Id.* To achieve its goal of permanent removal of the homeless from the targeted areas, the plan required the police to "periodically check to deter people from returning" and "to consistently monitor the sites after." *Id.* It was "imperative" that "the plan developed by the Homeless Outreach Staff" be "coordinated with Police and these locations and be patrolled in the future to ensure that homeless individuals do not return to these locations." Email from Milton Vickers, Special Assistant to the City Manager, to Police Chief Jorge Colina, February 27, 2018, Pl. Ex. 601-65 at 1. The plan was unambiguous in its design to use police action to deter homeless people from returning to the targeted areas. Continuous police presence and patrol were essential. The "Manager's instructions were very clear on that point." *Id.* at 2. As Sergio Torres, the Director of the City's Veterans and Homeless Affairs Department, confirmed, "in order to deter people from returning, it has to be communicated to homeless people some way that they're not wanted to stay there." Sept. 24 Tr. 266: 9-12.

5.        The nature and scope of the plan raised a red flag within the City Attorney's Office in terms of whether such a "clean-up" operation crossed the line and violated the terms of the Pottinger Consent Decree. On March 16, 2018, Deputy City Attorney Barnaby Min wrote to Assistant City Attorneys Harrison, Wysong, Perez and Greco in an email: "Are you aware of a task force made up of Milton [Vickers], police, net, etc? It sounds like they are 'cleaning' up areas and monitoring areas. Please follow up with Milton and make sure there are no [P]ottinger issues." Pl. Ex. 601-4. This email proved to be prescient.

6.      In response to the notification by the ACLU on April 6, 2018, that the City and City workers were conducting police sweeps and destroying property, Milton Vickers himself acknowledged the potential for abuse the clean-up operations posed and stated, "we are finding it extremely challenging to address many of our issues while simultaneously taking the agreement into consideration."  Pl. Ex. 601-60 at 1.

7.       That this aggressive plan posed a significant risk of violations of the Pottinger Consent Decree was also recognized within the Miami Downtown Development Authority (DDA), a City agency.  In response to the Notice of Violations served by the ACLU on the City on April 6, 2018, Elena Bondarenko, a staff attorney with the DDA, emailed Alyce Robertson, the Executive Director: "I told you this would happen . . . and my thought was to talk to this professor at my law school a few months ago . . . to see where they stand.  I didn't, but was sure whatever is happening in downtown will cause a law suit and major $ spent for the city."  Pl. Ex. 578-62 at 1.

8.      The City's "real push" to clean up the various "hotspots" occurred between February and May 2018.  *Id*. at 0:37–0:51.   During that time, there was an "uptick" in clean-up operations to address the hot spots.  Sept. 24 Tr. 296: 23-25 – 297: 1-8.  These operations were in addition to the daily cleanings of the City's Sanitation Department.  *Id*.

9.      As detailed herein, Plaintiffs presented the testimony of thirty-six homeless people. Cumulatively, those thirty-six people testified about forty-two specific incidents where the police and City workers either illegally seized their property or harassed them in violation of the Pottinger Consent Decree.  Of those forty-two incidents, thirty-six occurred between February and early June 2018.[1]

---

[1] The other incidents occurred in July (1) and August (5).

**Plan Targeted Locations City-Wide**

10.     The City's plan was a comprehensive effort to conduct the clean-up operations City-wide. Pl. Ex. 601-57 at 2. The City's Veterans Affairs and Homeless Services Department worked with Police Commanders to identify the areas to be "cleaned"—places where homeless people congregated—and set up a schedule to coordinate the police presence at the operations. *Id.* at 2-3.

11.     Many of the operations were conducted at the downtown area known as Lot 16, a municipal parking lot east of the Miami River under the I-95 underpass that is bounded by the Miami River on the east, SW 1st street on the north and SW 3rd street on the south. Sept. 24 Tr. 214:14-25 – 215:1; *Id.* at 42:13-16; *Id.* at 15:6-11. At the hearing, homeless witnesses testified about sixteen incidents that occurred in the Lot 16 area.[2]

12.     Many other clean-up operations occurred in Overtown under the I-395 overpass, on NW 11th and 13th streets between NW 1st and 2nd avenues. The homeless witnesses described ten incidents where their property was taken in that specific section of Overtown.[3]

13.     But the operations were by no means confined to those two areas. There were seven incidents where homeless people testified that they either lost property or were harassed while sleeping in the area of the old Macy's store on Flagler street;[4] four testified they lost their property

---

[2] Rob Rhodes, Sept. 26 Tr. 21; Michael Donald, *Id.* at 38; Stephen Allen, *Id.* at 47; Eli Harter, *Id.* at 59; Willie Richardson, *Id.* at 100; Herman Deveaux, *Id.* at 167; Pablo Herrera, *Id.* at 225; Cathedral Beauford, *Id.* at 251; Leonel Frage, *Id.* at 255; Malik Saluki, *Id.* at 260; Early Pierce, *Id.* at 271; Roberto Ruiz, Oct. 25 Tr. 16; Rafael Villalonga, *Id.* at 6; Rafael Aguilar, Oct. 24 Tr. 87.
[3] Wilbur Cauley, Sept. 26 Tr. 87; William Starling, *Id.* at 127; Maxie Daniels, *Id.* at 172; Jeffrey Stanley, *Id.* at 178; Michael Johnson, *Id.* at 189; Charles McCoy, *Id.* at 242; Malik Saluki, *Id.* at 260; Morris White, *Id.* at 276.
[4] Terry Fluker, Sept. 26 Tr. 83; Guthrie Chibanguza, *Id.* at 94; Dennis Sinclair, *Id.* at 207; Brandon Massey, *Id.* at 219; Robert Sproulls, *Id.* at 265; Java Brooks, *Id.* at 151; Ashley Self, 10/24 Tr. 83.

on NW 6 street near the new Brightline station;[5] three on NW 14 and 18 streets off NW 7th Avenue;[6] one near the Government Center;[7] and, one person testified his property was taken near Peacock Park in Coconut Grove.[8]

14.    In addition to the locations identified by Plaintiffs' witnesses, Milton Vickers told the City Commission "that 17th street which is in Commissioner Gort's district, we've addressed that in the last two months or so, that has been relatively clear, but I can tell you, many of the areas including those in Commissioner Russell's district and Commissioner Carollo's district and Jose Marti, those areas have been relatively cleared out, the police department has been patrolling them." Pl. Ex. 578-42E-1 at 0:2 – 0:34.

**Seizure of Property**

15.    Special Assistant to the City Manager Vickers' description that in certain areas of the City the homeless had been "cleared out" pursuant to the clean-up operations was not a mis-statement. In practice, the "clean-up" operations followed a consistent pattern which resulted in the unwarranted seizure and destruction of homeless people's property and the dispersal of the homeless population.

16.    Particularly in the Lot 16 area, the operations began as early as 5:00 to 6:00 a.m. with the police rolling up in squad cars next to where people were sleeping on the sidewalk. Sept. 26 Tr. 12:21-25. Homeless people were "startled awake and petrified." *Id*. at 12:22. City workers known as "green shirts" accompanied the police in pick-up trucks. The officers sounded loud buzzers, shined bright lights, and ordered the homeless by loudspeaker to leave the area because

---

[5] Wilbert Hill, Sept. 26 Tr. 186; Barry Alston, *Id*. at 200; Lew Johnson, *Id*. at 211; Jackie Wright, *Id*. at 107.
[6] Donald White, Sept. 26 Tr. 78; Richard Pryor, *Id*. at 118; Derrick Brown, *Id*. at 161.
[7] Willie Grant, Sept. 26 Tr. 235.
[8] William Starling, Sept. 26 Tr. 127.

the sidewalks were going to be cleaned.  *Id*. at 76:3-22; Oct. 25 Tr. 9:7-23.  The police also told people that they had to "move on" and that they could not stay at that location any longer.  Sept. 26 Tr. 12:21-25; *Id*. at 42:1-3.  In only a few instances, signs were posted notifying people of the operations, but frequently, the police and City workers showed up on days different from the date posted on the notices.  Sept. 26 Tr. 15: 6-11.  Despite the City's repeated claims that the homeless were given prior notice of the clean-up operations, their own witness, Officer Galvez, who participated in many clean-ups, testified that notices were *not* given wherever they were going to do a clean-up.  Sept. 24 Tr. 219:11-12.

17.     On some occasions, a fleet of trucks appeared at the scene – a water pressure cleaning truck, pick-up trucks, and a street sweeper – and a team of City workers to clean up under the watchful eye of the police.  Sept. 24 Tr. 216:3-9.  In other instances, the operation was somewhat simpler, limited to the police, the "green shirts," and a pick-up truck.  In the Lot 16 area, this routine was carried out twice a week for two months.  Sept. 24 Tr. 214:14-25–215:1; *Id*. at 42:13-16; *Id*. at 15: 6-11.

18.     The initiation of the clean-up process was often sudden, hurried, and chaotic.  People testified that they were told by the police and City workers to move their things out of the way quickly, or even "immediately."  The time between the warning and commencement of the of the clean-up was typically just a few minutes.  As Willie Richardson told the Court, "Like if you don't pick up things in an amount of time, they throw it in the truck."  Sept. 24 Tr. 101:12-14.  As described above, the police and City workers routinely showed up before sunrise while people were sleeping on the sidewalk.  People were startled and woken up out of a sound sleep and told to pack up their things and leave, "now!"  Even for Michael Donald, a battle-tested Iraqi war veteran, "it was somewhat disconcerting.  No one seemed to be violating the law to have something

8

like that happen."  Sept. 26 Tr. 42:4-7.  The pre-dawn operations were not limited to just the Lot 16 area.  At the former Macy's building in downtown Miami, Terry Fluker was awakened at 6:00 a.m. when police cars, vans, and a pick-up truck pulled up to where he was sleeping.  Immediately, City workers took his bag and threw it in the back of the pick-up truck.  *Id.* at 83:12-20.

19.     City workers moved in quickly to gather up for disposal property which obviously belonged to homeless people—i.e., items which were neatly organized and stacked, out of the way so they did not obstruct the sidewalk.  *See* photo, Pl. Ex. 578-41A.  During the operations, people's belongings were kicked around, thrown into piles, and then loaded into the trucks to be carted away as trash.  Sept. 26 Tr. 90:1-12.

20.     Every homeless person who lost their property testified that they had left it in either a backpack, bag or suitcase and positioned the item out of the way and in such a manner that any reasonable person could tell that it was personal property belonging to someone living on the street. Police Officer Galvez confirmed that it was routine for homeless people to put their property off to the side when they left and that it was common knowledge on the street that such belongings were not abandoned, but rather the personal possessions of homeless people.  Sept. 26 Tr. 226:8-25–227:1-8.

21.     Nonetheless, as numerous people testified in court, the property of anyone who happened to be away at the time of the operation was routinely thrown away.  This happened even though the individuals left their property out of the way and neatly organized.  And, it happened even where one homeless person had asked another individual to watch over it ("keep an eye on it"), a practice common on the street which was known to the police and the City work crews. Sept. 24 Tr. 227:6-8.

22.     Despite this, during the clean-ups the police and City workers routinely did not allow homeless people to retrieve and save the property of another from disposal. *Id*. at 76: 12-18. As Eli Halter, a Marine veteran, testified, if you were not there, "It [your property] went into the pickup, they threw it away in the back of the pickup truck.  I don't know where they'd take it, but it was just like thrown, like you would throw it away.  It just got chucked in.  It wasn't like orderly put in, it was just thrown in."  Sept. 26 Tr. 76:14-18.  Others witnessed the same practice. *See* Rhodes, Sept. 26 Tr. 15: 11-15 ("guy was sitting next to me was not there, he ran and got a Diet Coke, and I went to grab his stuff.  And the police said, you can't take his stuff."); Allen, *Id*. at 50: 1-11 ([I]"actually witnessed them taking other people's things, throwing them away . . . I seen it at three different locations here in Miami, unfortunately.  Being homeless you do travel a bit."); Richardson, *Id*. at 101: 14-17 ("Every time they come around through there at that present time, they'd throw a lot of guys' things away."); Deveaux, *Id*. at 169: ("the City of Miami Police and his co-workers stated that I wasn't there, so they removed all my property."); Beauford, *Id*. at 253: 19-24 ("She got her stuff, but they told her – the police told her not to take my stuff."); Ruiz, Oct. 25 Tr. 18: 3-8 (for the people who were not there, "they would just put it [their property] in the back of the truck.").

23.     Individuals who witnessed their property being piled up or who saw it already in the back of a City truck pleaded to be allowed to retrieve it, but to no avail.  The City treated people who returned to their property in the middle of a clean-up operation as too late.  Early one morning, Ashley Self returned to her spot near Macy's after using a nearby bathroom and discovered her bags in the back of a City truck.  She cried and begged the City worker for their return but was denied and lost her possessions, including her medications for multiple sclerosis and asthma.  "I knew those were my things – I could prove it because my ID was in there."  Oct. 25 Tr. 65:8-13.

Donald White, who suffers from congestive heart failure and has a prosthetic leg, returned from getting food and saw City workers throw his property into the back of a City truck. He testified, "[s]o I was trying to get to them quick enough, so I managed to stop them and said, you all have my property. I have my belongings there, my medication, heart medications and things like that, my high blood pressure pills and other things, my clothes." Sept. 24 Tr. 80:21-25. The City workers would not give him his property back. "They said I couldn't get it back. At the same time they was trying to ride off. I can only do so much because I can't hardly move, you know." *Id*. at 81:9-11.

24.    Others suffered a similar fate. Cathedral Beauford, a diabetic who has difficulty holding her urine, woke up and saw the police down the block "taking everybody's stuff, throwing it in a truck." *Id*. at 253:14-15. She urgently went to a nearby bathroom and asked a friend to watch her property. When she returned, she saw her possessions in the back of a City truck. "So my stuff was there and I asked the police officer, can I get my stuff? They wouldn't let me get my stuff, so I left." *Id*. at 253:23-24. Malik Saluki and a friend came upon the City workers in Overtown and they saw their property in the back of a City truck. Mr. Saluki tried to get his property back but "they wouldn't let me get my stuff back, nothing." *Id*. at 263:23-24. The City also refused to allow his friend to get his property back. "I witnessed the same thing, and my friend, the Green Shirt people, they actually grabbed him to keep him from getting his stuff and I'm standing right there. I tried to be slick and go behind him to get my stuff, and they told me, no, I couldn't get it. I couldn't have it." *Id*. at 264: 1-5.

25.    Requests for the return of property were denied entirely, and sometimes threateningly. Terry Fluker saw a City worker throw his backpack into the back of a City truck

and asked him why he took his backpack.   The City employee replied, "we owe you no explanations," and would not let Mr. Fluker get his bag back.   Sept. 26 Tr. 83:12-20.

26.     The City's callousness and reckless disregard for the property of the homeless was epitomized and vividly proven by the seizure of the property of Wilbur Cauley, a U.S. Army veteran.   On April 17, 2018, the City conducted a clean-up where Mr. Cauley was sleeping on the sidewalk in Overtown at NW 13th Street and 1st Court under the expressway overpass.   City workers and the police arrived early that morning and told people to move their things from under the overpass because they were going to do a cleaning of the sidewalk.   Mr. Cauley complied and moved his property from under the overpass and put it up the block and against a fence, neatly bundled.   Plaintiffs introduced a photograph of the property which showed its position, organization, and contents, which included a personal bag.   Pl. Ex. 578-41A.   After moving his property, Mr. Cauley went to a nearby store.   Sept. 26 Tr. 88:15-25; 89:4-13.

27.      In the meantime, while Mr. Cauley was briefly away, a City worker looked over the stacks of homeless people's property that had been moved from under the overpass and were bundled against the fence, and then announced to the people nearby, "Okay, now we're going to throw this shit away."   Oct. 25 Tr. 43:9-21.   He then began to move and to kick the property, including Mr. Cauley's, from its position against the fence into one big pile in the gutter.   Video, Pl. 578-40A.   When viewed together, the photograph, Pl. Ex. 578-41A, and the video, Pl. 578-40A, clearly show that Mr. Cauley's property was moved, put into a pile, and co-mingled with other property, including a contaminated mattress.

28.     Mr. Cauley returned to the scene, saw his property in the pile and tried to rescue his bag from the pile.   The City worker grabbed Mr. Cauley by the arm and did not allow him to retrieve his property.   Video, Pl. 578-40A.   Mr. Cauley pleaded with the City worker and a NET

supervisor but was not allowed to get his property, which was thrown into a garbage truck and hauled away. Sept. 26 Tr. 43:9-21. The video evidence of that incident also showed another woman crying and screaming as her belongings were put into the pile for disposal. Video, Pl. Ex. 578-40A. The video continued and showed that after the woman pleaded with the City worker, he gave the woman a pair of shoes that was in the pile. *Id.* The City worker's actions thus indicate that personal property was indiscriminately co-mingled with contaminated refuse, and that City workers made little if any effort to segregate and protect uncontaminated personal property of persons experiencing homelessness.

29.     The police role in the clean-up operations was central and pervasive. Nothing began or occurred until the police arrived. The police used the threat of arrest to get people to move and scatter and then provided cover for the city workers who seized the property. Sept. 26 Tr. 13:8-19; *Id.* at 42:8-25. When people appealed to the police to try to get their property back after being denied by the City workers, the police failed to intervene and brusquely dismissed their complaints. When he tried to get his property back, William Starling was told by the police, "what can I tell you buddy, if you wasn't here, they removed the items, you know. If you wanted them, you should have took them with you or whatever. Because you weren't here, you're not allowed to claim them." *Id.* at 135:23-25–136: 1-2. *See also* Aguilar, Oct. 24 Tr. 90:15-18 ("I said officer, that is my bag; I have my medication and phone number – my clothes, everything. And he just goes, get the fuck out of here before I arrest you. And then I just out of there.").

30.     At trial, Plaintiffs presented the testimony of thirty-six homeless people; thirty-four of them testified that their property was taken. Of those thirty-four witnesses, fourteen testified that they personally witnessed either their own or other people's property being seized by

City workers.[9]  From that group of fourteen, three people testified that they witnessed their property taken twice.[10]  The Court finds the homeless witnesses who actually saw property taken to be credible.

31.     Plaintiffs also presented the testimony of twenty homeless individuals who testified that their property was taken when they were away from where they had left it and that it was gone when they returned.[11]  While the circumstances of each of their accounts are different, there are certain factual elements which are consistent and render this testimony reliable.  First, their testimony is consistent with and corroborated by the testimony of those who *did* witness their property being taken by City workers.  Second, their testimony is consistent with the pattern established by the other testimony.  In almost all cases, these witnesses related an incident which occurred at the same locations and during the same time frame as when the City ramped up its efforts to clean-up the "hotspots."  Third, the accounts of these witnesses are internally consistent.  Their testimony was almost always the same:  the person left for work or an appointment, left their property in the care of another, and when they returned their property was gone.[12]

---

[9] Rob Rhodes, Sept. 26 Tr. 21; Stephen Allen, *Id*. at 47; Eli Halter, *Id*. at 59; Donald White, *Id*. at 78; Terry Fluker, *Id*. at 83; Wilbur Cauley, *Id*. at 87; Willie Richardson, *Id*. at 100; Jackie Wright, *Id*. at 107; William Starling, *Id*. at 127; Cathedral Beauford, *Id*. at 251; Malik Saluki, *Id*. at 260; Roberto Ruiz, Oct. 25 Tr. 16; Ashley Self, Oct. 24 Tr. 83; Rafael Aguilar, *Id*. at 87.

[10] Malik Saluki, Roberto Ruiz and Rafael Aguilar.

[11] Guthrie Chibanguza, Sept. 26 Tr. 94; Richard Pryor, *Id*. at 118; Derrick Brown, *Id*. at 161; Herman Deveaux, *Id*. at 167; Maxie Daniels, *Id*. at 172; Jeffrey Stanley, *Id*. at 178; Wilbert Hill, *Id*. at 186; Michael Johnson, *Id*. at 189; Barry Alston, *Id*. at 200; Dennis Sinclair, *Id*. at 207; Lew Johnson, *Id*. at 211; Brandon Massey, *Id*. at 219; Pablo Herrera, *Id*. at 225; Willie Grant, *Id*. at 235; Charles McCoy, *Id*. at 242; Leonel Frage, *Id*. at 255; Robert Sproulls, *Id*. at 265; Early Pierce, *Id*. at 271; Morris White, *Id*. at 276.

[12] Although the witnesses clearly wanted to testify that they were told by others that City workers had taken their property, the Court sustained timely objections on hearsay grounds to testimony relating to what the homeless person was told by another regarding who took their property.

32.     The Court finds the testimony of these twenty witnesses to be more than a mere coincidence.  Many of these witnesses gave detailed, compelling factual accounts of how they found their property missing.  Leonel Frage returned to his spot in Lot 16 and saw that not just his property was missing, but so was everyone else's.  "I see everything is empty.  I was kind of shocked . . . I couldn't see nothing."  Sept. 26 Tr. 258:14-17.  He immediately realized that everyone who was not there when the clean-up occurred had also been victimized.  "And then I see people complaining, people was crying, people was running."  *Id*. at 256:25--257:1.  Robert Sproulis found it "unusual" that when he returned from church to the spot where he and fifteen others were staying, that nearly everyone else's property was also missing.  Sept. 26 Tr. 270:1-15.  Moreover, numerous individuals (including City witness Officer Galvez), testified that it was a routine practice among homeless people to ask another person to watch their property when they left to go about the business of their day.  Given that these individuals had engaged in this practice for so long without incident, the Court finds that by the greater weight of the evidence, their property was taken by City workers as part of the cleanup efforts.

33.     The Court cannot dismiss or discount this testimony out of hand because the witnesses did not see the actual taking of their property.  The City conceded, in large part, that these witnesses were credible.[13]  The Court finds by the greater weight of the evidence their testimony to be credible and consistent with that of those witnesses who actually saw their property being taken by City employees.

---

[13] THE COURT:  Okay.  There's no dispute, is there, that stuff was taken?  Is there?  You think every single person who has come is lying?
MR. HARRISON:  I wouldn't say that, Your Honor.  Sept. 26 Tr. 141:13-16.
THE COURT:  I'm still going to have some that, maybe even you would concede, are telling the truth that their stuff was taken.  Would you agree?
MR. HARRISON:  Absolutely, Your Honor.  *Id*. at 145:15-18.

**Harassment and Orders to Leave and Not Return**

34.     Particularly in the Lot 16 area, but not only there, the police ordered homeless individuals not just to move out of the way during the "clean-up," but to leave the area entirely and stay away.  Rhoads, Sept. 26 Tr. 12: ("get out, you can't stay in this location"); Allen, *Id*. at 49: 25 – 50: 1 ("they told us we had to move"); Aguilar, Oct. 24 Tr. 91:16-17 ("He [police officer] said, you'd better get out of here before I arrest you, and so I got out of there.").  As Michael Donald testified, "it did have the purpose to run everyone off, [it] did a good job."  Sept. 26 Tr. 42: 15-16.  As a result, many homeless people were forced to leave and permanently relocate at another location.

35.     City officials knew that the clean-up operations and the follow-up patrols had the effect of forcible removal and relocation of the homeless.  Special Assistant Vickers told the City Commission, "[t[he problem becomes they move from one place and you're dislocating them and you're putting them in another location."  Pl. Ex. 578-42E-1 at 0:2–0:34. Nonetheless, the City pushed forward with the operations with the goal of permanently removing and deterring homeless people from being in those areas.

36.     Consistent with that strategy, the City plan directed that after the clean-ups occurred, the police were required to follow up and patrol the area as a means of keeping homeless people from returning.  Pl. Ex. 601-65 at 1-2.  Apart from the clean ups, there were multiple instances of police officers ordering homeless individuals to leave the area and not return, without citing any claimed violation and without offering shelter.  Homeless people who were sleeping on the sidewalk and not blocking or obstructing the sidewalk were told to "move on," and "you can't stay here anymore."  For example, Rafael Villalonga testified that he was sitting alone on the sidewalk one evening in the Lot 16 area when a police officer drove up and told him, "You cannot

be here, you have to leave." Oct. 25 Tr. 10:20.[14]  Fearing arrest, Villalonga complied, even though

the order was unlawful.  Guthrie Chibanguza testified, "So we went by the bus stop and they

[police] told us, too, we couldn't stand by the bus – sit by the bus stop, a public one, I showed him

my bus card.  They still wouldn't let us even sit at the bus stop."  Sept. 26 Tr. 96: 10-13.  In the

Lot 16 area, Willie Richardson testified, "They [police] came through quite a few times, but like I

said I'm over by the administration building and they make me get up and, you know, just leave,

you know, quite a few times."  Sept. 26 Tr. 101:24-25–102:1.

37.     The video and testimony of Java Houston vividly document the arbitrary conduct

of a squad of Miami police officers on bicycles who rode up to Ms. Houston and surrounded her

as she was about to go to sleep on the sidewalk near Macy's.  One of the officers told her, "you

need to get your stuff and you need to leave, I don't have time to play with you!"  When she asked

where she could sleep, a second officer told her, "where ever you need to, just not here."  Finally,

while she began to gather up her things, yet another officer told her emphatically, "You need to

take your stuff, now, I'm not going to tell you anymore."  Video, Pl. Ex. 578-39.

38.     One constant in the clean-up operations and the police orders to leave-and-don't-

come-back was the fact that no one was offered shelter.  When the police accosted Rafael

Villalonga and told him to move, they did not offer shelter.  Oct. 25 Tr. 8:25-9-1.  Whenever a

homeless person raised the issue and asked for shelter, they were re-buffed and told to move on.

The bicycle officers who ordered Java Houston to leave from where she had put her things down

to sleep for the night, did not offer her shelter.  Just the opposite.  When *she* asked about shelter,

---

[14] Villalonga also testified that on many early mornings, from where he slept on the sidewalk on SW 2nd Avenue, he could hear the police in the Lot 16 area order homeless people through loudspeakers to get up and move on, and that they could no longer stay there.  Oct. 25 Tr. 9:17-23.

the officers became even more agitated and told her there was none and yelled at her to leave immediately.  Video, Pl. Ex. 578-39.

39.     Perhaps one of the clearest examples of the police failure to follow the *Pottinger* protocol were the arrests of Chetwyn Archer and Tabitha Bass.  As the arresting officers' body-cam videos vividly show, Officer H. Gonzalez made no offer of shelter prior to his arrest of Mr. Archer for the life-sustaining conduct misdemeanor of obstruction of the sidewalk.  Officer H. Gonzalez got out of his squad car, walked directly to where Mr. Archer was sleeping, and ordered him to get up.  Archer complied, and the officer immediately arrested him.  When Archer questioned Officer H. Gonzalez about the arrest, the officer told him that the court "can throw it out tomorrow, that's up to them."  Pl. Ex. 578-38.

40.     Just like Mr. Archer, Ms. Bass was not offered shelter prior to being arrested.  In her case, the arresting officer, also named Gonzalez, C., arrived at the scene while Archer was being handcuffed.  Officer M. Gonzalez directed her to arrest Bass for the same offense, obstruction of the sidewalk.  Following his direction, Officer C. Gonzalez immediately went to Bass and told her she was under arrest without ever offering her shelter. Pl. Ex. 578-37.  The Court notes that there was no Field Information Card filled out in respect of either arrest, as is required by the Consent Decree, Section VII.14.A.

**Effects on Homeless Individuals**

41.     The property losses had devastating effects on Plaintiffs.  The factual record is replete with evidence showing that homeless people lost their medications, Florida ID cards, social security cards, birth certificates, legal papers, immigration documents, military records, lists of phone numbers, phones, computers, clothes, shoes, jackets, toiletries, dentures, food, cash,

eyeglasses, and blankets.  The list of basic survival items that people need to live on the streets and which the City threw away is endless.

42.     For many, the loss of their property made their perilous situation even more difficult to face life's daily challenges.  In describing how difficult it was to recover from losing his laptop, Stephen Allen lamented, "It's an old laptop but, Lord, it had my whole life on it."  Sept. 26 Tr. 56:10-11.  For Richard Pryor, an electrician, the loss of his tools made it impossible for him to work and further set him back in his attempt to find his own place.  Sept. 26 Tr.118:2-23.  As a result of his loss, Rob Rhodes stated, "I carry everything I own.  I am too terrified to lose everything I ever had again.  It's like my house burned down.  I don't know if you know that feeling, but it's terrible."  *Id*. at 27:14-16.  Even when the items were not essential for survival, their loss was real – irreplaceable family photos, books, radios, head phones, personal papers and a journal.

43.     The many homeless people who testified that they lost their IDs a result of the City's seizures faced enormous challenges in replacing it.  Without identification, many people lost their lifeline to food, medicine, and essential benefits. Ashley Self lost her out-of-state birth certificate, which caused a considerable delay in getting replacement medication for her diabetes and multiple sclerosis.  "It took forever to get my medication because I was from Ohio.  I had to get Medicaid and stuff down here."  Sept. 24 Tr. 86:5-6.

44.     Given the frail physical health of many homeless people, the loss of medication for medical and mental health conditions was particularly damaging.  Barry Alston's two-week loss of his AIDS medication threatened to severely compromise his health.  Sept. 26 Tr. 205:2-18.  For Willie Grant, who lost a leg and uses a wheelchair, the loss of medication aggravated his asthma condition and raised the risk of blood clots in his other leg. *Id*. at 240:18-21.  Michael Donald, a veteran who suffered traumatic brain injury from his service in Afghanistan, was in agony after

his migraine medication was taken.  *Id.* at 40:22-25, 41:1-3, 12-17.  The City's destruction of Jeffrey Stanley's property on a day when he went to the hospital for the removal of a cyst made his recovery more difficult and humiliating.  Mr. Stanley suffered from depression and a bladder disorder and the taking of his property left him without suitable underwear for his bladder condition.  *Id.* at 182:17-25–183:1-13.

45.    The upheaval resulting from property loss and dislocation exacted a heavy psychological toll on the homeless.  This was dramatically demonstrated by the emotional testimony of Eli Halter, a veteran of the U.S. Marine Corps, who could not complete his testimony without breaking down and crying.  *Id.* at 60:15-20.

46.    The injuries suffered by those who were subjected to arbitrary orders to move and don't come back are of a different nature, but just as real.  As Rafael Villalonga testified, living on the street made him want "to keep invisible."  Oct. 25 Tr. 8:9.

**City's Failure to Protect and Inventory Property of Homeless**

47.    Sergio Torres, the Director of the City's Veterans and Homeless Affairs Department, testified that the City had no written criteria as to what constituted "abandoned" or "contaminated" property.  Sept. 24 Tr. 261:8-25-262:1-8.  As a result, City workers were left on their own and made on-the-spot decisions which were often arbitrary based on what "looked like" contaminated property.  *Id.*

48.    As admitted by City personnel, notices of a clean-up were only posted when targeting a large encampment.  Sept. 24 Tr. 263:7-9.  Thus, the Court finds that there were numerous occasions when property was taken with no notice given.

49.     David Rosemond, the First Assistant to Director Sergio Torres and the only person to testify about this alleged notice process, testified that he did not personally participate in the

providing of such notices.  Nov. 1 Tr. 65:1-25.  Moreover, he was not working for the city from 2010 to the beginning of 2018.  *Id*. at 62:12-14. Thus, he had very little actual knowledge about how it happened.

50.     Despite its claims that City workers left handwritten "notes," or forms, at the scene where they seized property to notify homeless people that their property had been taken, the City did not offer a single such note into evidence, other than a few hastily-taken photographs, even though the City insisted they were posted every single time.  Nov. 1 Tr. 68:19-21.

51.     Homeless witnesses testified that they never saw any note left behind after the clean-up operations.  Sept. 26 Tr. 19:20-25-20:1.  Nor did the City ever explain how such handwritten paper notes could be posted or left without being quickly compromised or destroyed by natural elements.

52.     The City did not present as evidence and admitted that there was no log or record of any inventory form showing that a homeless person's property had been taken and stored.  Nov. 1 Tr. 67:7-16.

53.     David Rosemond acknowledged that the City kept no copies, logs or records of the handwritten notes.  Nov. 1 Tr. 67:1-6.  Nor did the City have a centralized system where some record of the notes was kept.  *Id* at 67:14-16.  Further, there was no formal mechanism for City workers to notify or report to their supervisors that such notes had been left on the street.  *Id*. at 66:5-9.

54.     The absence and/or ineffectiveness of the City's alleged "note" system was evidenced by the testimony of Director Torres who testified that it would not happen, "not even once a month," that a homeless person would come to the office and make a claim for their

property.  Sept. 24 Tr. 264:4-13.  *See also* Rhodes, Sept. 26 Tr. 17:15-25-18:1-9 (homeless witness

went to claim property but was told "it's not here, wouldn't be here if you don't have a form.").

## CONCLUSIONS OF LAW

**Property Seizure and Destruction**

55.     The conduct by police and City employees described in the preceding paragraphs

is inconsistent with the commitments the City made to "respect the rights of homeless people,"

Section V.7., of the Consent Decree, and to "protect the constitutional rights" of all class members,

Section VI.9.

56.     Strikingly, that conduct is remarkably similar to the City's actions that Judge Atkins

condemned in 1990.  Order, April 26, 1990, at 1-2.  That conduct was a pattern of police sweeps

in which City police and workers systematically seized Plaintiffs' belongings, including

identification, medication and clothing and other personal items which are vital for survival, piled

them up, and destroyed them.  *Id*. at 2.  In 1991, this Court found that City police would go to areas

where homeless people stayed and sounded alarms to rouse them.  Order, March 18, 1991, at 23-

24.  The police ordered homeless people to leave immediately, giving them insufficient time to get

their things.  The property of anyone who was gone when City workers moved in, even if neatly

bundled, was destroyed.  *Id*. at 6-9, 13.  Unfortunately, history has repeated itself.

57.     Plaintiffs have shown by clear and convincing evidence that the City has violated

the property safeguarding provisions in Section VII.14.F of the Pottinger Consent Decree.  Section

VII.14.F of the Consent Decree, both in its original and amended form, commits City employees

to respect the personal property of the homeless, and, absent a health or obvious safety issue, to

not destroy personal property known to belong to a homeless person or readily recognizable as

belonging to a homeless person.

58.     The Court finds that City officials and workers, in contravention of the Consent Decree, destroyed personal property known to belong to a homeless person, or personal property readily recognizable as property of a homeless person during the targeted "clean-up" operations which occurred from January through June 2018 in numerous locations in downtown Miami.

59.     The Court finds that at the beginning of 2018 in response to the complaints of constituents, the City of Miami devised a comprehensive plan to "clean up" certain "hot spots" where homeless people congregated.  The plan systematically targeted numerous specific areas in the downtown core. The express objective of the plan was to clear the "hotspots" throughout the City where homeless people stayed and to make sure the homeless would not return to those places.

60.     The execution of the City's plan, however, resulted in the unlawful seizure and destruction of the property of homeless people.  Typically, in these carefully planned clean-up operations, police arrived early in the morning without notice, sounded loud buzzers and shined bright lights to rouse homeless people.  In all the operations, City police and workers ordered people to move and told them they could not stay there any longer.  Once the homeless were scattered, the City brought in trucks to power wash the streets and sidewalks, and other trucks to take materials that City employees decided to throw away.  Any property of the homeless that was not attended to by the owner was thrown away.  As testified to by numerous witnesses, some of the seizures took place even as the owner or someone was watching over the property pled with City workers not to throw it away.  City employees, working with City police, seized homeless individuals' vital or irreplaceable property such as clothes, medicine, ID, and personal papers, journals and photographs. These seizures had traumatic effects on the affected individuals.

61.     Despite claiming it had standard operating procedures and protocols for the taking and storage of homeless people's property, the City never offered such written documents into

evidence.  Notice of the clean-up operations was seldom, if ever, given.  And, the City's alleged system of leaving "notes" telling people where they could claim their property was ineffectual to the point of being non-existent.  Not a single note was ever entered into evidence.  The director of City department charged with responsibility of preserving and inventorying property testified that less than a person a month made a claim for their property.  The Court finds that the City did not have in place adequate safeguards for the protection of homeless people's property.

62.     At the hearing, Plaintiffs presented the testimony of thirty-four homeless people who testified that their property was taken.  While the personal circumstances of each of their testimony were different, the Court finds their testimony consistent and corroborative of one another.  Thus, the Court finds the testimony to be credible and persuasive.

63.     Finally, the only written internal procedure addressing the treatment of the homeless and its property is found in the Police Department's Departmental Order 11.  Because that departmental order is essentially a re-writing of the Consent Decree's language without any further specificity, the Court finds that it too was violated by the City's actions described above.

**Orders to Move and Not Return**

64.     Plaintiffs have proven by clear and convincing evidence that the City repeatedly violated Section VII.14.A of the Consent Decree by ordering homeless people to "move on" and threatening them with arrest even though such individuals were not engaged in criminal conduct. Numerous witnesses testified that City police ordered them to leave where they were staying and that they were told that they could not stay at that specific location any longer.  The Court finds that these unlawful "move on" orders were most frequently made during clean-up operations and that the orders were issued without offering the homeless shelter.  The police ordered homeless individuals not just to move out of the way so that the sidewalk could be cleaned, but to leave the

area entirely and stay away.  *See* Sept. 26 Tr. 12:21-25; *Id*. at 42:1-3; Oct. 24 Tr. 91:16-17; Video, Pl. Ex. 578-39.

65.     Moreover, the Court finds by clear and convincing evidence that these unlawful "move on" orders were the result of policy decisions of high-level City officials and were not outlier actions of rogue or ill-informed police officers.  The City's plan was a systematic effort to conduct the clean-up operations City-wide.  Pl. Ex. 601-57 at 2.  The express objective of the plan was to remove the homeless from specific areas and to keep from returning there.  Pl. Ex. 601-65 at 1-2.  "[I]n order to deter people from returning, it has to be communicated to homeless people *some way* that they're not wanted to stay there."  Sergio Torres, Director of the City's Veterans and Homeless Affairs Department, Oct. 24 Tr. 266: 9-12 (emphasis added).  The "move on" orders, harassment, and property seizures were the way the City communicated to the homeless they were not wanted.

66.     Finally, the Court finds that the City had knowledge of and condoned these unlawful actions.  Special Assistant City Manager Vickers described several areas to the City Commission "that have been relatively cleared out, the police department has been patrolling them."  Pl. Ex. 578 42E-1 at 0:2–0:34. Vickers told the City Commission, "[t[he problem becomes they move from one place and you're dislocating them and you're putting them in another location."  *Id*.  With the encouragement and endorsement of the City Commission, the City continued to pursue the operations.  These statements evidence the City's intent to remove the homeless from these areas even when they were not engaged in criminal activity, in clear violation of the Consent Decree, Sections, VII.14.A and C.

67.     The Court also finds that these move-on orders were also unlawful because homeless individuals were not offered shelter, contrary to the dictates of the Consent Decree, Section VII.14.C.  *See* Oct. 25 Tr. 8:25-9:1; Video, Pl. Ex. 578-39.

**Failure to Document Interaction with the Homeless**

68.     Relevant to the police conduct during the clean-up operations is the City's compliance with the obligation under the Consent Decree to document its interactions with homeless persons. The Consent Decree requires police to document approaches involving police officers (alone or with other City employees) to homeless individuals when services or assistance is offered. VII.14.A, DE 525-1:2.  Patrolling city streets and cleaning public areas are services to all citizens, including those who have no place but to live in public. As found above the police role in these clean-ups was central and pervasive, in which the background threat of arrest was central. This threat was itself a violation of the Consent Decree as to individuals committing no crime.  As a police encounter with homeless individuals, moreover, the incidents should have been documented in Field Information Cards (FICs). VII.14.A, DE 525-1:2-3. Yet the City, which has the burden of proof in its motion to terminate, has not pointed to any FICs filed with respect to the incidents of property seizure or orders to "move on."  While there is no doubt that City police have in many instances documented their interactions with homeless individuals, Pl. Ex. 583-8; Def. Ex. 100 (summary), these omissions are troubling and provide further evidence against any conclusion that the City has substantially complied with the Consent Decree.

**Arrests for Life Sustaining Conduct Misdemeanors**

69.     The Court finds that the arrests of Chetwyn Archer and Tabitha Bass for obstructing the sidewalk were in blatant violation of the Consent Decree. They were not given a warning, as the Consent Decree requires, nor were they offered shelter in lieu of arrest.  Nor were FICs filled

out.  The Court finds that with respect to these two homeless individuals, the City violated Sections

VII.14.A and C of the Consent Decree.[15]

**Failure to Provide Lawful Excuse for Noncompliance with the Consent Decree Terms**

70.     With the Plaintiffs having made out the case that the City violated the Pottinger

Consent Decree, the burden shifted to the City to furnish a lawful excuse for its noncompliance.

The City has failed to provide any such evidence.

71.     The City's account of how the clean ups were conducted is simply not supported

by the record. To be sure, the highly planned and deliberate nature of the operations is not in

dispute. The Court rejects the City's position that the clean-up operations were conducted in a

manner consistent with the Consent Decree. The City's claims that the operations were announced

in advance by postings and conducted with scrupulous regard for the belongings of homeless

people are unsupported by the record, as set forth above.

72.     The testimony of the homeless people who appeared at the hearing was unrebutted

and, as the Court has noted, the City conceded in large part that the witnesses who testified that

their property was taken were telling the truth.  Other than asking whether the witness had been

convicted of a crime, the City did not seriously challenge the testimony of the homeless witnesses.

---

[15] The video of the Archer arrest is important for two other reasons.  First, any claim by the City
that their officers assigned to work with the homeless were thoroughly trained and closely
supervised is seriously undermined by the officer's conduct as captured by his own body-cam.
Not only did Officer H. Gonzalez fail to offer shelter as required by departmental order, but he
also cavalierly manufactured probable cause for another charge by asking Archer without reading
*Miranda* a leading question ("You're going to take it, right?") about an alleged drug pipe found
under his companion who was sleeping nearby.  Second, the video demonstrates that oversight and
accountability were lacking in the City's haste to respond to constituent complaints to clean up the
targeted areas.  As City Manager Gonzalez confirmed, the declarations of sixty homeless people
complaining of misconduct "were never brought to my attention" and thus not investigated.  Sept.
25 Tr. 137:5-25–138:1-11.

73.     The City also claims that even if improper conduct occurred, the City neither sanctioned nor condoned it.  The Court concludes based on the evidence before it that the "clean-up" operations were the product of careful planning and deliberation by high-level City officials.  Moreover, during the time that the operations were in full swing, the City was planning to seek termination or modification of the Consent Decree, indicating its keen awareness of the legal constraints the Consent Decree imposes.

74.     The Court is unpersuaded by the City's arguments that any lack of prior enforcement by the Plaintiffs is indicia that there have not been violations.

75.     Accordingly, for the foregoing reasons, the Court finds that Plaintiffs have met their burden of proof and have shown by clear and convincing evidence that the City has committed substantial violations of the Consent Decree.  The Court hereby finds the City of Miami in contempt for such violations.[16]  Plaintiffs' Motion to Enforce the Pottinger Consent Decree and to Hold the City in Contempt is GRANTED.

76.     As a result of such violation, the Court hereby orders the City to abide by each and every provision of the Consent Decree.  In addition, the City shall pay compensatory damages to Plaintiffs for the loss and destruction of their property; the loss of time needed to replace

---

[16] The Court notes that the City has argued the City cannot be held in contempt because procedurally, Plaintiffs did not file a "rule to show cause."  This argument elevates form over substance and is rejected for the following reasons.  First, Plaintiffs have scrupulously followed the procedure in the Consent Decree to be followed when either party alleges a violation of the underlying agreement.  Second, consistent with *Reynolds v. G.M. Roberts*, 207 F.3d 1288 (11th Cir. 2000), the City has been afforded all the due process protections required in a contempt proceeding.  Styled as Plaintiffs' "Motion to Enforce the Pottinger Consent Decree and to Hold the City in Contempt," DE 568, Plaintiffs served the City its pleading which alleged the exact provisions of the Consent Decree that Plaintiffs claimed had violated.  The motion also contained an extensive statement of facts and an index of thirty-six exhibits.  Finally, pursuant to this Court's Order Requiring Evidentiary Hearing, DE 502, the parties exchanged witness lists and were permitted to take deposition discovery.  The City has thus been provided adequate due process.

identification, medication, and other property necessary to day-to-day living on the streets; and, the emotional pain and suffering caused by the ordeal of having one's property destroyed, being wrongfully harassed, disturbed from one's peace and quiet, or arrested, in violation of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  The City shall also be fined, in order to vindicate this Court's authority and deter the City from future violations.  The procedure for the determination of damages and the fine shall be determined by a subsequent order of this Court.

DONE AND ORDERED in Chambers this _____ day of _____, 2019 at Miami, Florida in the Southern District of Florida.

Respectfully submitted,

Benjamin S. Waxman, Esq.
Florida Bar No. 403237
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel: (305) 371-6421
benji@benjaminwaxmanlaw.com

Stephen J. Schnably, Esq.
Admitted Pro Hac Vice
Miami ACLU Cooperating Attorney
University of Miami School of Law
1311 Miller Drive
Coral Gables, FL 33146
Tel: 305-284-4817
Fax: 305-284-6619
schnably@law.miami.edu

Dante P. Trevisani, Esq.
Florida Bar No. 72912
Ray Taseff, Esq.
Florida Bar No. 352500
Florida Justice Institute
3750 Miami Tower
100 SE 2nd St
Miami, FL 33131-2115
Tel: 305-358-2081
Fax: 305-358-0910
dtrevisani@floridajusticeinstitute.org
rtaseff@floridajusticeinstitute.org

Valerie Jonas, Esq.
Florida Bar No. 616079
Weitzner and Jonas
1444 Biscayne Blvd Ste 207
Miami, FL 33132-1430
Tel: 786-254-7930
Fax: 305-358-0910
valeriejonas77@gmail.com

Arthur J. Rosenberg, Esq.
Florida Bar No. 967580
601 NE 56th St
Miami, FL 33137-2317
Tel:  786-269-6749
tacajr@bellsouth.net

Anna T. Neill
Florida Bar No. 100945
aneill@knpa.com
Kenny Nachwalter P.A.
1441 Brickell Avenue, Suite 1100
Miami, Florida 33131
Tel: 305-373-1000
Fax: 305-372-1861

Isha Kochhar, Esq.
Florida Bar No. 105294
isha@kochharlegal.com
1806 North Flamingo Road, Suite 305
Pembroke Pines, FL 33028
Telephone: 954-292-5787
Fax: 954-620-0042

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 7th day of December 2018, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties identified on the

attached Service List in the manner specified, either via transmission of Notices of Electronic

Filing generated by CM/ECF or in some other authorized manner for those counsel or parties

who are not authorized to receive electronically Notices of Electronic Filing.

BY:    */s/Ray Taseff*
       Ray Taseff

## SERVICE LIST

Victoria Méndez
City Attorney
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
VMendez@miamigov.com

Douglass Harrison
Assistant City Attorney
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
dharrison@miamigov.com

Kerri L. McNulty
Senior Appellate Counsel
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
klmcnulty@miamigov.com

J.C. Perez
Assistant City Attorney
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
jcperez@miamigov.com

John A. Greco
Deputy City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
jgreco@miamigov.com

Carlos Gamez
Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
cgamez@miamigov.com

George K. Wysong
Senior Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
gkwysong@miamigov.com

Thomas E. Scott
Cole, Scott, & Kissane, P.A.
9150 S. Dadeland Blvd., Ste. 1400
Miami, FL  33156
Tel.: (305) 350-5381
Fax: (305) 373-2294
Thomas.scott@csklegal.com

**Attorneys for Defendant City of Miami**