UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case No. 88-2406-CIV-MORENO**

MICHAEL POTTINGER, PETER CARTER
BERRY YOUNG, CAROLE PATMAN, and
DAVID PEERY,

        Plaintiffs,

vs.

CITY OF MIAMI,

        Defendant.

_____/

<u>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE CITY OF MIAMI'S MOTION FOR TERMINATION, OR, ALTERNATIVELY, MODIFICATION OF THE POTTINGER CONSENT DECREE**</u>

**Introduction**

1.      Before the Court is the City of Miami's Motion for Termination, or, Alternatively, Modification of the *Pottinger* Consent Decree, filed on May 30, 2018, DE 566. The City agreed to be bound by the Consent Decree after a landmark ruling by Judge C. Clyde Atkins, in which this Court found the City to have systematically and deliberately violated the Fourth, Fifth, Eighth and Fourteenth Amendments rights of homeless people not to be arrested or have their property destroyed because they are homeless. ***Pottinger v. City of Miami***, 810 F. Supp. 1551, 1561-65, 1575-77, 1578-83, 1570-73 & n.30 (S.D. Fla. 1992). The Court found that the Plaintiffs' homeless status was involuntary—people "rarely choose to be homeless," ***id***. at 1564—and that accordingly, they were forced to conduct harmless, life-sustaining activities in public places.  ***Id***. at 1566-68.

1

This ruling followed several years of litigation, which included a ruling holding the City in contempt for violation of a preliminary injunction not to deliberately destroy Plaintiffs' property. *Id*. at 1555-56; DE 142.

2. In fashioning a remedy in 1992, Judge Atkins recognized its limited role.  Although "the ideal solution would be to provide housing and services to the homeless, . . . assembling and allocating such resources is a matter for the government – at all levels – to address, not for the court to decide." *Pottinger*, 810 F. Supp. at 1583.  Instead, the court's job was to protect the Plaintiffs from arrest or harassment or property seizure for conducting innocent, involuntary acts in public.

3. After the City's appeal to the Eleventh Circuit and a remand to determine if circumstances had changed, *Pottinger v. City of Miami*, 40 F.3d 1155 (11th Cir. 1994), this court concluded, following a week-long bench trial, that while there had been improvements in local services for those experiencing homelessness, the situation had not changed fundamentally: "a large number of homeless people still have no place to go," the City had continued to arrest homeless individuals and destroy their property, and the City had failed to demonstrate that it was unlikely to do so in the future. DE 360:11-12.

4. Upon the City's subsequent appeal, the Eleventh Circuit ordered the parties to mediate. *Pottinger v. City of Miami*, 76 F.3d 1154 (11th Cir. 1996).  Following 20 months of intensive negotiations, the City and ACLU entered into a comprehensive agreement. It mandated a police Departmental Order reflecting the terms of the Consent Decree, along with training, and put in place a law enforcement protocol that restricted police authority to arrest homeless persons for living in public. Among other things, the law enforcement protocol provided that police could not

arrest or threaten to arrest any homeless person for committing "life-sustaining conduct misde-meanors" unless they first offered a bed in a shelter in the City of Miami (or within one mile of it) and the individual refused it. The settlement also required police and all other City employees to respect homeless individuals' property rights.  And it also provided compensation for those whose rights had been violated, and put monitoring and compliance mechanisms in place.

5.      This court approved the settlement in 1998.  Final Order Approving Settlement and Dismissing Case, Pottinger v. City of Miami, No. 8802406-CIV-MORENO, at 2, 10 (Oct. 1, 1998). DE 398. The Consent Decree has the same effect and finality as judgment of this Court, and is subject to modification only under Fed.R.Civ.P. 60(b). ***Rufo v. Inmates of Suffolk County Jail***, 502 U.S. 367, 378 (1992).

6.      As the Court noted in 1998, the Consent Decree represented "a fair and equitable resolution" of the case, one that "protects the interests of the Plaintiffs, the City, and the public." DE 398. As it also noted, support for the Consent Decree was "widespread among the community." DE 398:8. The responses of the City, the County, and other community leaders to the lawsuit—including the creation of a trust funded by 1% meals tax and other contributions to provide shelter and other services—had represented a genuine improvement in the provision of services to those experiencing homelessness.

7.      The Consent Decree is modest and respectful of local authority. It does not give the Court control of local governmental institutions; rather, it adopts the classic form of limited judicial relief, enjoining the government from engaging in specified conduct. The Consent Decree neither imposes obligations to raise taxes nor controls how public monies are spent. It leaves resource issues entirely in local hands. It mandates no particular policy approach to the challenge of ending

homelessness, leaving it to the multiple public agencies and private actors who must work together to rise to that challenge.

8.      In 2013, the City asked the Court to approve modifications to the Consent Decree. The City described its proposed modifications as limited; Plaintiffs asserted they would eviscerate it. DE 464;17-18, DE 477:2-3. Both sides agreed, however, that during the years the Consent Decree had been in place, downtown Miami had thrived, with significant increases in the number of people living and working downtown, and growth in cultural, dining, and other entertainment venues. DE 464:12-13; DE 477:3, 21-22.

9.      This Court ordered the parties to enter into mediation. DE 516. The parties subsequently agreed upon a limited set of modifications, which this Court approved in 2014 as "fair, adequate, reasonable, and not the product of collusion." DE 544:1. Among other things, these modifications eliminated certain misdemeanors from the list of life-sustaining conduct misdemeanors and revised the treatment of some others, permitted the police to offer a mat in a shelter as well as a bed in lieu of arrest, allowed property to be seized if it posed an "obvious safety issue," removed registered sex offenders or predators from the protection of the Consent Decree, strengthened the monitoring provisions, and revised the section on enforcement and mediation. DE 525-1.

10.     As modified in 2014, the Consent Decree has three sets of fundamental protections. The first is a detailed protocol that governs City of Miami police interactions with those experiencing homelessness. City police may not approach a homeless individual who is not observed committing any crime unless the approach is to offer services. VII.14.A, DE 525-1:2-3.[1] This provision protects those experiencing homelessness from informal harassment such as orders by an

---

[1] The Decree as agreed by the parties and approved by the court is at DE 382 and 397-1. Portions were modified in 2014. (In addition, in 2000, upon joint motion of the parties, the court approved a minor modification to the Consent Decree in connection with administration of the compensation

officer to "move on" or leave an area. With certain exceptions, the police may not arrest or threaten to arrest any homeless person for committing "life-sustaining conduct misdemeanors," or warn the individual that he or she is committing such a misdemeanor, unless they first offer the individual an available space in a shelter within city limits or a mile of it, and the individual refuses that offer. VII.14.C, DE 525-1:3-5. Upon refusal, the homeless person's status is no longer "involuntary" and he or she is subject to arrest like any other Miami resident. The life-sustaining conduct misdemeanors are listed in detail in the Consent Decree; they are misdemeanors which those who are living on the streets with no place else to go find nearly impossible to avoid committing. The Consent Decree does not prohibit police from arresting individuals for misdemeanors that are not life-sustaining conduct misdemeanors, but does make provisions for offering shelter in lieu of arrest. VII.14.D, DE 525-1:5-6. No offer of shelter is required for felony offenses. VII.14.E, DE 525-1:7.

11.     The second is the protection of homeless individuals' property. The Consent Decree requires all City employees (including, but not limited to, the police) to respect homeless individuals' property, and with certain specified exceptions, to secure it in the case of arrest, to follow internal procedures for taking custody of personal property, and not to destroy personal property reasonably recognizable as belonging to a homeless individual. VII.14.F, DE 525-1:7-8.

12.     The third is a system of compliance, monitoring, and dispute resolution. In the Consent Decree itself, the City "adopts a policy as provided for herein to protect the constitutional rights of homeless persons, to prevent arrests and harassment of these persons, and the destruction

---

fund. DE 459, 459-1.) The 2014 modifications are embodied in an Addendum to the Consent Decree, DE 525-1. The Addendum did not reproduce the entire Consent Decree, but only the provisions that were modified. In referring to provisions of the Consent Decree, the court will cite the original Consent Decree for provisions not reproduced in the Addendum, and otherwise cite the Addendum.

of their property, inconsistent with the provisions" of the Decree. VI.9, DE 382:5. Police officers must undergo training in the requirements of the Consent Decree and are subject to discipline for violating it. *Id*. The City is required to have in place a Police Departmental Order that mirrors those requirements of the Consent Decree that apply to police conduct. Except where the Consent Decree is modified by court order (as it was in 2014), this Departmental Order may be changed only in "technical (non-substantive)" ways. V.7, DE 382:5. Police must document every interaction with a homeless person in which services are offered, or in which an arrest or threat of arrest is made or a commitment is made under the Baker Act. VII.14.A-E, DE 525-1:2-7. Documentation by "Field Information Cards" (FICs) filled out by the police must be provided every six months to Plaintiffs' Counsel. VIII.15(f), DE 525-1:8. The parties may seek enforcement or modification of the Consent Decree in court, but are required to mediate before going to court, unless doing so would result in irreparable injury. X.25.a, DE 382:28-29; X.25b, DE 525-1:8. The Consent Decree also has provisions regarding attorneys' fees. IX.25, DE 382:27-28; X.25a, DE 382:28-29; X.25b, DE 525-1:8.

13.     On April 6, 2018, Plaintiffs' counsel emailed counsel for the City, notifying the City that they had received reports of violations of the Consent Decree, including reports of multiple incidents of City workers taking the property of homeless people and throwing it into garbage trucks, and ordering the homeless individuals to leave the area.  Pl. Ex. 583-14.  Plaintiffs requested that the City instruct its employees to respect the requirements of the Consent Decree and to arrange a meeting between counsel for both parties to discuss the matter.  The City acknowledged receipt of the email, but otherwise did not respond.  Pl. Ex. 583-15.

14.     On April 12, 2018, Plaintiffs' counsel again emailed the City, invoking the mediation provision of the Consent Decree, X.25.a, DE 382:28-29, requesting a mediation. Pl. Ex.

583-15.  The first mediation session occurred on April 24, 2018 with mediator Angel Cortiñas, and the second session occurred on May 17, 2018.  No settlement was reached, and the mediator filed a Notice of Impasse on May 30, 2018.  DE 564.  On that same date, Plaintiffs and the City filed their Motions. DE 566; DE 568.

15.     Asserting that it has fully achieved the basic purpose of the Decree and that conditions have significantly changed, the City seeks to terminate the Consent Decree entirely, and in the alternative proposes four modifications to it. Two of these modifications are the same or nearly the same as two modifications it proposed in 2013. One would exclude what the City calls the "chronically homeless" from the Consent Decree, and the other would permit a shelter space anywhere in Miami-Dade County to be offered in lieu of arrest for a life-sustaining conduct misdemeanor, rather than only a shelter within the city limits or one mile thereof, as is currently the case. Without suggesting specific language, the City proposes two other modifications: prohibiting the storage of homeless persons' personal belongings on public property, and exempting from the Consent Decree actions taken by the City in cleaning public areas. DE 566:21-24.

16.     For the reasons given below, the Court finds that the City has failed to meet its burden in justifying either termination or modification of the Consent Decree. The City's substantial violations of the Decree preclude termination, and its basic purpose has not been fully achieved. There has been no change in significant circumstances that would justify termination or modification of the Consent Decree, and in any event the City's proposed modifications are not suitably tailored to the changes in circumstances it alleges. Accordingly, the Court will deny the City's Motion for Termination, or Alternatively, Modification of the Pottinger Consent Decree in its entirety.

**I. Findings of Fact**

17.     As set out below, the Court finds that the City's decision to seek termination or modification of the Consent Decree was a response to mounting political pressure to address the problem of homelessness, without input from relevant staff. The evidence offered at the hearing does not support the basis for termination or modification originally proffered by the City for its motion – a fundamental change in circumstances with the growth in downtown Miami, an increase in services to those experiencing homelessness, and implementation of a Police Departmental Order tracking the law enforcement protocol in the Consent Decree. Nor does it support the reasons presented at the evidentiary hearing – that the Consent Decree imposes a stigma on the City and inhibits City employees from performing legitimate functions. Further, the circumstance most relevant to evaluating the City's motion – the existence of a large gap between the number of homeless persons and the space available for them in shelters, so that there are many people who have no place to go – remains unchanged. The City's significant violations of the Decree, set out in the Court's Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Consent Decree, preclude a determination that termination or modification is appropriate. Finally, the proposed modifications would accomplish nothing, based on the evidence presented to the Court.

      **A.**    <u>The City's Decision to Seek Termination or Modification of the Consent Decree</u>

18.     At the time the City Commission addressed this issue, the political pressure to do something about the homeless situation had been mounting for some time, reflected in the complaints from residents about homelessness.  *See* Pl. Ex. 578-56, 601-16, 601-2, 601-28, 601-31, 601-40, 601-48, 601-66, 601-84.  *See also* Sept. 25 Tr. 127:16-19; 129:10-14; 133:4 – 134:18 (citizens would express their concerns to City Manager Emilio Gonzalez about homelessness).

19.     In an April 2017 email, Milton Vickers, then Senior Advisor to the City Manager, in response to a citizen complaint, agreed that the City's "old strategy" on homelessness was not working, and stated that "I believe we need to look into re-thinking the Pottinger Agreement."  Pl. Ex. 601-55.

20.     A series of emails from local businessman James Clavijo to the City Attorney and Sergio Torres (Director of the Department of Veterans Affairs and Homeless Services) exemplified the political pressure and was the occasion for the final decision to seek termination. Pl. Ex. 601-14.  Mr. Clavijo's June 11, 2017 email stated, "I don't think the city is doing enough to stop the homeless, vagrants sleeping all over the miami sidewalks. Who is policing this matter?" *Id*. at 3.[2]   Mr. Clavijo's November 2, 2017 email said, "Why are people allowed to sleep on the streets and make camps?  Have you been by Macys in downtown.  It's a free for all there with drugs and everything else. You as commissioners should be ashamed."  *Id*. at 2.

21.     Mr. Torres' response to Mr. Clavijo blamed Pottinger: "It is just a matter of approaching the enforcement in a way that does not expose the city to more liability based on the limitations imposed by the Pottinger settlement."  *Id*.  Finally, a March 1, 2018 email from Mr. Clavijo included a link to a story about a homeless encampment in Los Angeles entitled "'National Disgrace': Community fights back as California overrun by homelessness, human waste, needles." *Id*. Mr. Clavijo wrote: "Downtown Miami is headed down this same path."  *Id*. at 1.  The City Attorney forwarded the email to the City Manager Emilio Gonzalez, who responded with two

---

[2] Interestingly, a Miami Assistant City Attorney responded, focusing on the actual root of the problem, rather than Pottinger: the lack of available shelter and housing.  Pl. Ex. 601-49 ("As long as there is not adequate shelter space in the City of Miami for the homeless population there will be the unfortunate instance of homeless persons sleeping on the streets and sidewalks.").  He suggested that a solution would be to contact the Homeless Trust about more shelter space.  *Id*.

words:  "Let's file." *Id*.  This was an instruction to the City Attorney to file a motion to terminate

Pottinger.  Sept. 25 Tr. 135:13 – 136:22.

22.     At a City Commission meeting on April 12, 2018, the Pottinger Consent Decree

was discussed.  Pl. Ex. 578-42D.  Commissioners expressed frustration that the 75 "Pottinger beds"

that the City had purchased from Camillus House for placement of homeless individuals were not

being adequately utilized.  *Id*. at 37-39.  They expressed frustration with what they perceived to be

homeless encampments that had developed throughout the City.

23.     Commissioner Gort misconstrued the Pottinger Consent Decree, stating, "the

problem what's happening is a lot of people are using the Pottinger Agreement to commit criminal

activities."  *Id*. at 41. City Manager Emilio Gonzalez opined that Pottinger puts "the City of Miami

. . . at a decided disadvantage."  *Id*. at 167.  He claimed that he had heard that other cities are

dropping homeless people off in the City of Miami, and that Pottinger "ties our hands."  *Id*.

24.     In response to the Commissioners' complaints about homeless people, Mr. Vickers

explained that the City was attempting to address the problem: "In the last 60 days, I would say,

we have had a real push in terms of trying to address our homeless issues in various areas that

we're calling 'hot spots' around the City."  *Id*. at 40.  Mr. Vickers also addressed the issue of

individuals engaging in drug use on the streets.  *Id*.

25.     Commissioner Carrollo claimed the situation was "out of control."  *Id*. at 41.  He

said that he had been getting complaints from many private businesses about homeless people.  *Id*.

at 166.  He concluded by stating, "What I am saying is, let's take action.  If someone's going to

say, 'no,' then let it be a federal judge."  *Id*. at 167.  The Commission instructed the City Attorney

to take any necessary action and draft a resolution instructing the City Attorney to return to this

Court to attempt to end Pottinger.  *Id*. at 105.

26.     At the April 26, 2018, Commission meeting, the City Commission unanimously approved the resolution directing the City Attorney to seek termination or modification of the Consent Decree.  Pl. Ex. 578-43C at 19.

27.     The Court finds that the City Commission decided to seek termination and/or modification of the Consent Decree in response to mounting political pressure to address the homeless situation.

### B.      The Reasons for Termination the City Provided in Its Motion

28.     In its Motion for Termination or Modification, the City posited several factual circumstances it claims justifies termination or modification. DE 566. They include 1) the City has provided a broad range of services and assistance to homeless people (including the Homeless Trust, Continuum of Care, Coordinated Outreach, the Chapman Partnership, an increase in the overall number of beds in the Continuum of Care in Miami-Dade County, the Homeless Assistance Program, the new campus of Camillus House, the 75 Pottinger beds at Camillus House, the Donation Meter Program, the Jail Diversion Program, the Department of Veterans Affairs and Homeless Services, the Lazarus Project); 2) the Police Departmental Order and trainings; 3) demographic changes (an increase in people and businesses downtown); 4) safety and security concerns (terrorist attacks and overdoses).  DE 566.  However, the City failed to explain how these circumstances were relevant to its decision to seek termination or modification.

29.     Many of the circumstances the City cites occurred before 1998 (the year the Consent Decree was entered), which is the relevant date for comparison purposes, not 1988 (the date the case was filed).  These include the establishment of the Homeless Trust (1993), the Chapman Partnership (1993), the opening of the Homeless Assistance Centers (1995, 1998), and

the Homeless Assistance Program (1991).[3]  *Id*. at 7-8.  Similarly, the Departmental Order was promulgated in connection with the 1998 Consent Decree and was incorporated into the Decree. Under the Consent Decree, the City may make only "technical (non-substantive) changes in police procedures" on matters covered by the Decree. V.7, DE 382:5.

30.     Moreover, under the rules that govern City of Miami police Departmental Orders generally, those orders can be changed by the administration.   Sept. 24 Tr. 74:13-15.  Recently, the City has had a new police chief every couple of years.  *Id*. at 74:25.

31.     That downtown Miami has changed since 1998 is undisputed, although the City has not presented evidence to support the numbers it cites regarding the scope of the changes.  But this change, and others, were actually anticipated by the City at the time of the entry of the Consent Decree (in fact, since at least 1991).  Pl. Ex. 583-1.  Similarly, even in the 1980s there were plans relocate the Camillus House facility.  Pl. Ex. 583-23.

32.     Moreover, the growth of downtown Miami in no way indicates that Pottinger should be terminated.  Oct. 24 Tr. 29:11-16.

### C.     The Reasons for Termination that Emerged at the Evidentiary Hearing

33.     In contrast to the reasons given at the City Commission meetings and discussed internally by City, and the reasons given in the City's motion, at the evidentiary hearing the City presented only two reasons for seeking termination: 1) The City feels the Decree casts a "stigma" over it, creating "discomfort" among staff, and 2) eliminating the Decree would put the City in "parity" with other cities, allowing it to achieve homelessness solutions through negotiations with these cities.  Neither reason is supported by the evidence.

---

[3] Although there may be no record evidence of these dates, for these purposes the Court accepts the dates set forth in the City's Motion.

34.     When Police Chief Jorge Colina testified, the only reason he gave for wanting to terminate Pottinger was that, in his mind, it creates a "stigma" for the City, and that "it just doesn't seem fair" that the Consent Decree doesn't apply to other cities.  Sept. 24 Tr. 58:16-25.  But Chief Colina also admitted that Pottinger does not inhibit police officers from fulfilling their responsibilities.  *Id*. at 72:16-18. Under Pottinger, the police can already approach a homeless person to offer services under any circumstances.  *Id*. at 69:25 – 70:18.  He gave no other reason for wanting to end the Decree, and did not inform the Court about anything City police officers would do differently in the absence of Pottinger.  In fact, he testified that City police had no plans to change it practices with respect to homeless people.  Sept. 24 Tr. 53:21 – 54:1.

35.     Chief Colina also acknowledged that any problems that an officer has approaching a homeless individual can and should be addressed by proper training, as each officer must follow the policies regardless of how they feel about them.  Sept. 24 Tr. 73:3-21.  The Court finds that such training can adequately address this perceived problem by the City police.

36.     Although the police have a Departmental Order addressing homelessness, it applies only to the police, not to any other City agency.  Def. Ex. 95. And in fact, the City has no written criteria for how to determine whether property belongs to homeless individuals or is abandoned, Sept. 24 Tr. 261:6-10, or whether property is contaminated.  *Id*. at 262:5-11.

37.     James Bernat, the former homeless coordinator for the police department, also testified about a perceived stigma that the Pottinger brings.  Sept. 24 Tr. 118:5.  But he also testified that he and the City would do nothing differently if Pottinger were terminated.  Sept. 24 Tr. 117:14-19; 133:3-5.  And he acknowledged that the elimination of Pottinger would have no effect on those refusing shelter because, even without Pottinger, the police cannot force someone to go to a shelter.

*Id.* at 124:21 – 125:4.  Moreover, Mr. Bernat is no longer the homeless coordinator, as the police department eliminated the position in March of 2018.  *Id.* at 110:4-7.

38.      Similarly, Sergio Torres testified that the outreach workers (the "green shirts") would do nothing differently in their outreach efforts if Pottinger were vacated, and that Pottinger in no way impedes their jobs.  Sept. 24 Tr. 258:11-18.

39.      The only reason Mr. Vickers gave for wanting to end the Consent Decree is that it would give City employees a "heightened level of comfort" that they don't feel they have.  Sept. 24 Tr. 304:11-16. But in fact, just like all other City witnesses, Mr. Vickers testified that City funding for homeless services would remain unchanged if Pottinger were vacated.  Sept. 24 Tr. 286:3-9.  *See also* Nov. 1 Tr. 59:15-25 (City employee David Rosemond testified that Pottinger does not prevent City from offering services, that outreach workers would continue their efforts regardless of whether Pottinger was vacated, and that he believed eliminating Pottinger would only enable the City to be more efficient).

40.      Finally, as noted above, any discomfort is the result of inadequate training and/or misinformation about the requirements of Pottinger, and can be cured with the proper training. Indeed, the City has misinterpreted the requirements of the Consent Decree at times, believing that is prohibits them from taking certain action that it does not prohibit.  Oct. 24 Tr. 27:8-10.  *See also id.* at 34:20-21 ("So I don't think you need to get rid of Pottinger.  I think you just need to understand what it does and doesn't do.") (Judge Steve Leifman).  In fact, as the City Manager acknowledged, Pottinger doesn't prevent the police from helping people.  Sept. 25 Tr. 139:22-25.

41.      As the Court noted during the evidentiary hearing, whatever action the Court takes, it can do nothing about the City's perceived stigma, discomfort, or pride.  Sept. 24 Tr. at 118:11-14; 120:5-7.

42.     The only evidence for the second reason—the "parity" issue—came from City Manager Emilio Gonzalez. Sept. 25 Tr. 130:11-12. Specifically, he stated that ending Pottinger would give him leverage to engage with other cities, who currently have no incentive to discuss homeless solutions with him. *Id*. at 130:14-23. The Court finds that this would not be the case for two reasons. First, Pottinger has not stopped the County from engaging in constructive solutions to homelessness, in conjunction with the City. In fact, just the opposite. Oct. 24 Tr. 33:1-4 ("So I think what has happened is it has forced all the other municipalities in the County to be more sensitive so they are not doing those things under Pottinger.") (Judge Leifman). Indeed, "one of the things Pottinger has done so well is created this amazing collaboration where it forced the different stakeholders to work together." Oct. 24 Tr. 35:1-3. And the City has gone to great lengths to show how homeless services have flourished even with the Decree in place. Even Milton Vickers, then Senior Advisor to the City Manager, and slated to become Director of the City's new Department of Human Services, Sept. 24 Tr. 274:23-24, 276:5-8, testified that Pottinger does not prevent the City from engaging in discussions with other jurisdictions to try to find solutions. Sept. 24 Tr. 301:21-24.

43.     Second, ending the Pottinger Consent Decree will not have the effect that the City Manager predicts. If other cities (especially those with few if any persons experiencing homelessness) have little incentive to engage with the City on homelessness issues, and simply contribute to the Homeless Trust, Sept. 25 Tr. 143:2-10; 143:22 – 144:6, that is unlikely to change with termination. The City has said that, even if the Consent Decree is terminated, it will continue to treat homeless individuals exactly the same and will continue to fund homeless services at the same level. Sept. 25 Tr. 131:17-23. That means that even if the Manager were correct that the Consent Decree means other local jurisdictions have no incentive to cooperate with the City, they

would still have no incentive after termination, knowing that the City of Miami intends to continue its efforts unabated – unless the City planned to use the termination of the Decree as the occasion for "dumping" homeless individuals in jurisdictions that did not cooperate it. Such a strategy, however, would be inconsistent with the City's professed intent to continue to respect the protections of the Decree after termination.

44.     Although Mr. Vickers testified that the decision to seek termination of Pottinger was made entirely by the City Commission without the involvement of City staff, that is only partially true. Sept. 24 Tr. 298:16 – 299:10.  It is true in the sense that, in reaching the decision to seek termination, the City Commission sought no information from its relevant staff, conducted no study on the necessity of terminating Pottinger, and engaged in no reasoned decision-making process.  In fact, the decision was made without consulting with Sergio Torres, the director of the City's Department of Veterans Affairs and Homeless Services.   Despite Mr. Torres being responsible for the City's policy and practice on homelessness, Sept. 24 Tr. 257:19 – 258:1, he had nothing to do with the decision, and no one asked for his input. Sept. 24 Tr. 258:2-8.  (If they had consulted him, he likely would have said that eliminating Pottinger would make no difference, as he would do nothing differently if Pottinger were vacated. Sept. 24 Tr. 258:11-18). But it is not true that staff were completely uninvolved.  As demonstrated at the City Commission meeting, City Manager Gonzalez had been in communications with Commissioners' staff members, had accompanied Commissioner Carollo on a ride-along, and even directed the City Attorney to file the motion.  Pl. Ex. 601-14 at 1.

45.     The decision to seek termination of Pottinger was a political one, made by the City Commission in response to complaints by residents, and without input from its relevant staff.   This reinforces the necessity of the Consent Decree.   It prevents the City (when it complies) from

16

bowing to political pressure and resorting to criminalization, harassment, and deterrence as a way of addressing homelessness. It has not prevented the City from expanding its services to homeless people, does not prevent the City from exercising its police powers for the safety and well-being of its residents, and does not prevent collaboration amongst government agencies or administrations. The City presented no evidence showing that Pottinger was hindering its ability to do so. In fact, quite the opposite. City officials testified that their approach to homelessness would not change if the Consent Decree were vacated.

46. The City presented no admissible and credible evidence that other municipalities are "dumping" homeless people in the City of Miami. While this rumor has spread through City government, it is supported by, at best, anecdotal evidence. Dr. Pedro Greer testified that this was a common misconception. Nov. 1 Tr. 21:19-23. The court notes that the City initially listed as an exhibit, "Documentation of outside municipalities and agencies dropping off homeless people within the City of Miami," DE 580, Ex. 93, but presented no such documentation at the hearing, DE 657. The Court finds that this practice has not happened.

47. In addition, Mr. Bernat testified that no homeless person in his ten-year career had ever told him that they came to Miami because of the Pottinger agreement. Sept. 24 Tr. 178:14-23. And Mr. Bernat could not say how many had come to Miami because of the services offered, id. at 178:24 – 179:2, but this would make no difference in any event because all City employees testified that there would be no change in services if Pottinger were vacated.

48. The vast majority of people who are homeless in Florida lived in the state for more than a year before becoming homeless. Pl. Ex. 583-21. Indeed, Miami's rate of homelessness is lower than the State average. *Id.*

### D. **Substantial Compliance**

49.     The Court hereby incorporates the findings of fact regarding the violations of the Consent Decree from its order adjudicating Plaintiffs' Motion to Enforce the Consent Decree, and will not repeat them here.  Given the number and scope of violations that the Court has found elsewhere, the Court finds that the City has not substantially complied with the Consent Decree.

50.     The City has also engaged in other actions over the years that preclude the Court from finding that the City has been in substantial compliance and has acted in good faith.

51.     In 2009, the City decided to clear out an encampment of homeless sex offenders, with City police threatening them with arrest for trespassing even though they did not (and could not) offer shelter. Pl. Ex. 578-126. In 2014, Plaintiffs informed the City of serious violations of the recently modified Consent Decree in the Brickell Avenue Bridge and Riverwalk area. Pl. Ex. 578-111, 578-112, 578-113.

52.     In 2015, the City undertook serious consideration of a proposed "anti-camping" ordinance that would have outlawed being homeless. Nov. 1 Tr. 25:1-4.  As originally proposed the Ordinance would have made it illegal to "live temporarily in a camp facility or outdoors" on public property. Pl. Ex. 578-117. Even apart from that provision, the ordinance would have made it illegal to "camp" outdoors on public property, with camping defined as using camp paraphernalia, and camp paraphernalia included (in the first version) blankets, pillows, and sleeping bags, among other things. *Id*. In sum, the ordinance would have practically outlawed sleeping in public. No draft of the ordinance included any recognition of the City's obligations under the Pottinger Consent Decree. Although ultimately it was not adopted, it did reach the second reading stage.

E.      **The Number of Homeless Individuals and Available Shelter Beds**

53.     Notably, despite the City's claimed increase in available shelter beds, that circumstance has not changed in any relevant respect because a) there are still not enough available shelter beds to house all homeless individuals in Miami-Dade County on any given night, and b) even if there were, all of the available beds are almost always full.  Thus, although the City claims that changed factual circumstances "have alleviated almost all of the homeless issues that necessitated the filing of this lawsuit[,]" that is simply not the case.  DE 566 at 7.  As explained below, despite the increase in funding and services, the core factual premise upon which the original Consent Decree rested remains in place:  There are still homeless individuals living on the streets with nowhere to live, and there are inadequate shelter spaces to house them.  The City does not disagree with this.  Pl. Ex. 601-49. *See also* Nov. 1 Tr. 23:6-10 (Dr. Greer would not consider terminating Pottinger, even though some things have changed, in part because the underlying problem still exists).

54.     Although the City implied that there may be dozens of unsheltered individuals who simply prefer living on the street and consistently refuse shelter, there was no evidence to substantiate this.  In fact, Plaintiffs presented credible evidence that very few people are voluntarily homeless, and the Court so finds.  Oct. 24 Tr. 61:5; Nov. 1 Tr. 19:7-16.

55.     Evian White de Leon testified for Plaintiffs regarding the number and availability of shelter beds.  Sept. 25 Tr. 157 – 200.[4]  She prepared a Report, which is Plaintiffs' Exhibit 622-1, summarizing the numbers of homeless individuals and available shelter beds in Miami-Dade County, and explaining her methodology in reaching those numbers.  The Court credits her

---

[4] The City moved to exclude the testimony of a number of Plaintiffs' expert witnesses. DE 604. The court deferred ruling on the motion, and now denies it for the reasons set out in Plaintiffs' Response to the Motion, DE 611.

testimony and fully adopts the numbers and information contained in the Report as the Court's finding of fact. Several factual items that are particularly relevant to this case are as follows.

56.     The number of homeless individuals is derived from the Miami-Dade County Point-in-Time (PIT) Counts, which is a process conducted by the Homeless Trust wherein workers, twice per year, canvas the County attempting to count the number of unsheltered individuals experiencing homelessness. Pl. Ex. 622-1; Sept. 25 Tr. 160:1-9. According to the August 2018 PIT Count, the number of unsheltered homeless individuals in Miami-Dade County was 1,105. Pl. 622-1 at 1. Of those, 631 were in the City of Miami. *Id.* Moreover, it is widely accepted that the PIT count severely undercounts the true number of unsheltered individuals; the true count is at least double that number. *Id.* at 7-8; Sept. 24 Tr. 293:4-12; Sept. 25 Tr. 163:10-25; Oct. 24 Tr. 60:1-4; Nov. 1 Tr. 19:22 – 20:12. In fact, HUD formerly required, and the Homeless Trust formerly utilized, a multiplier of 2 when counting unsheltered individuals. Sept. 25 Tr. 162:12 – 163:9. But this multiplier was no longer used in Miami-Dade County after 2005. Pl. Ex. 622-1 at 7-8.

57.     All shelter beds in Miami-Dade County are almost always full. Pl. Ex. 622-1. Sept. 25 Tr. 195:17-25. When an individual calls the Homeless Helpline, there is generally a lengthy waiting period of weeks to months to get into a shelter. Pl. Ex. 622-1 at 3; Sept. 24 Tr. 259:4-14; Sept. 25 Tr. 170:11-21; Oct. 24 Tr. 62:2 – 63:16. Thus, the single best measure of the "needs gap," i.e., the number of additional beds needed to house all homeless individuals, is the number of unsheltered homeless people: 1,105. But, as stated above, the true number is at least double that.

58.     The PIT counts show that the number of unsheltered homeless people in the County has decreased since 1988, but has remained relatively constant for some time. The number was roughly 8,000 in 1988, then decreased sharply over the next 10 years to 4,980 in 1998. Pl. Ex. 622-1 at 19. It then remained relatively constant until 2005, when there was an apparent drop from

3,964 in April 2004 to 1,989 in January 2005. *Id.* This apparent drop, however, was due to the abandonment of the multiplier, not a true drop in homelessness. It then remained relatively constant until August 2010, when it dipped to 759. *Id.* Since then, it remained relatively constant until January 2015, when it began to creep up again, hitting 1,007. *Id.* at 20. Thus, while there has been a downward trend in the last 30 years, the unsheltered homeless population has remained relatively constant since approximately 2010, and has actually increased since 2015.

59. To derive the number of sheltered homeless individuals, the Homeless Trust relies on data collection software known as HMIS (Homeless Management Information System). Sept. 25 Tr. 165:12-21. The service providers self-report the number of individuals living in emergency shelter, transitional housing, hotels/motels, safe haven, or cold weather emergency shelter, and then that data is reported to HUD. Pl. Ex. 622-1 at 7. The earliest available data for this is October 1998, when there were 2,220 sheltered individuals. *Id.* at 19. That number has remained relatively constant since then: it was 2,759 in September 2005, 3,084 in September 2010, 3,103 in August 2013, and 2,738 in August 2018. *Id.* at 19-20.

60. The total number of homeless people (sheltered and unsheltered) in Miami-Dade County has also remained relatively constant. It was 4,806 in February 1998, 5,056 in September 2005, 3,930 in September 2010, 3,951 in August 2013, and 3,843 in August 2018. *Id.* at 19-20.

61. The number of shelter beds available in Miami-Dade County is derived from the annual HUD Housing Inventory Count (HIC). *Id.* at 8; Sept. 25 Tr. 171:17-19. At the time of the hearing, the most recent data available was from July 2017. This information is reported from the Homeless Trust, which receives it from the service providers. Pl. Ex. 622-1 at 12. The information provides a snap shot of the existing beds at that time, without regard to funding. *Id.*

62.     As of the most recent HIC, the total number of beds was 8,694. *Id.* at 9. But this does not accurately represent the true number of shelter beds available to house persons living on the street.   First, the bulk of the inventory is permanent supportive housing (4,631), which is generally reserved for formerly homeless people who are exiting the shelter system. *Id.* at 10-11; Sept. 25 Tr. 174:15-20.  In addition, rapid rehousing (844) and reentry (80) beds are also longer term solutions that are generally unavailable on an emergency basis. Sept. 25 Tr. 174:21 – 175:1. Similarly, transitional housing beds (1,045) are generally provided for people transitioning out of emergency shelter beds, and are thus are largely unavailable for currently unsheltered individuals, with the exception of youth experiencing homelessness. Pl. Ex. 622-1 at 10-11; Sept. 25 Tr. 173:24 – 174:2. Thus, the only beds that are truly "available" to unsheltered homeless adults are Emergency shelter (1,848), Hotel/Motel (218), and Safe Haven (28)—and even then, Hotel/Motel and Safe Haven are reserved for specific populations (families and domestic violence survivors, respectively). Pl. Ex. 622-1 at 10-11; Sept. 25 Tr. 173:21-23, 174:3-14.  Further, even within the Emergency shelter category, roughly half are reserved for special populations such as youth, families, and veterans. Pl. Ex. 622-1 at 10-11.

63.     Other factors obscure the accuracy of these numbers. Sept. 25 Tr. 177:9 – 178:4. First, as mentioned previously, all beds are generally full all of the time.  Second, because of the Coordinated Entry process, a homeless individual generally cannot walk from the street into a shelter; they have to call the Homeless Helpline and be referred to an appropriate placement.  Pl. Ex. 622-1 at 12-13; Sept. 25 Tr. 10:8-11, 21:25 – 22:16, 78:7-11, 168:1-18. Third, not all beds are available to everyone.  In fact, very few of them (986) are available as emergency shelter to a single adult male living on the street, which comprises the vast majority of the unsheltered

homeless population.  Pl. Ex. 622-1 at 9; Sept. 25 Tr. 176:17-21.  The City agrees with this characterization of the numbers.  Sept. 25 Tr. 183:6 – 184:1.

64.     Even if all beds were open and available for all populations, there are still not enough shelter beds in Miami-Dade County to house all homeless individuals.  In August 2018, there were 3,843 sheltered and unsheltered homeless individuals.  In July 2017 (the most recent data available), there were 3,139 available shelter beds, yielding a shortage of 704.  Pl. Ex. 622-1 at 15.  (This count of beds omits permanent supportive housing, rapid rehousing, and reentry beds because individuals occupying those beds do not meet the HUD definition of "homeless" and are therefore omitted from the count of sheltered homeless individuals).  Sept. 25 Tr. 198:19 – 199:4.  There are simply not enough beds in the system to shelter all the people living on the street, even if every bed was fully funded all of the time.  Oct. 24 Tr. 60:19-21.

65.     And even if one discounts the approximately 309 "chronically homeless" individuals under HUD's definition—which is improper because it does not mean "service resistant"—there are still not enough beds for everyone who might want one.[5]  Pl. Ex. 578-133B at 16; Sept. 25 Tr. 193:1-5.  Similarly, only roughly 40% of the unsheltered homeless individuals in Miami-Dade County have a serious mental illness or substance abuse issue.[6]  Oct. 24 Tr. 21:23-25.  Thus, exempting those individuals does not erase the needs gap.

---

[5] For the small number of individuals who could truly be labeled "shelter resistant," an effective approach is to offer them permanent housing. Sept. 26 Tr. 304:20 – 309:22. This "Housing First" approach has been adopted by the federal government as the preferred approach. *Id.* 290:13-17; Sept. 25 Tr. 84:3-20, 86:4-11, 87:23 – 88:4.  Housing First faces challenges gaining traction in Miami because of the lack of affordable housing, where it is more expensive than the traditional shelter system.  Sept. 25 Tr. 23:15 – 24:10. Other options include intensive outreach through the Lazarus project, Sept. 25 Tr. 52:1-13, or residential treatment programs, *id.* 86:20 – 87:4.

[6] The Decree is all the more critical for those with mental illness given the enormous lack of mental health services in Miami-Dade County. There are roughly 177,000 adults and 55,000 children with serious mental illness, and only about 1 percent of them get services through the public system. Oct. 24 Tr. 13:1-7.

66.     Importantly, the main cause of homelessness is lack of affordable housing, not mental illness or substance abuse.  Sept. 26 Tr. 288:24 – 289:10.

F.     **The City's Proposed Modifications**

67.     The City proposes 4 modifications: 1) exempting "chronically homeless" from the Consent Decree altogether (with the City defining that term as someone who refuses services three times in six months, in contrast to the federal Department of Housing and Urban Development (HUD) definition); 2) expanding the definition of "available shelter" to include a shelter anywhere within Miami-Dade County; 3) a prohibition on storing personal belonging on public property to avoid "hazardous conditions"; and 4) a vague request to clean public property that may include being allowed to dispose of property deemed a "safety issue."  DE 566 at 18-25.

68.     Regarding the first proposed modification, the City has presented no evidence of how many homeless individuals they deem to be chronically homeless under the City's definition.[7]

---

[7] Using the actual definition provided by HUD, only 309 chronically homeless individuals (including sheltered and unsheltered) were identified in all of Miami-Dade County in the July 2017 count, or roughly 8% of the total homeless population.  Of these, only 135 were unsheltered. Pl. Ex. 578-133B at 16; Sept. 25 Tr. 193:1-5. The HUD definition is "(1) A "homeless individual with a disability," as defined in section 401(9) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(9)), who:

> (i) Lives in a place not meant for human habitation, a safe haven, or in an emergency shelter; and
> (ii) Has been homeless and living as described in paragraph (1)(i) of this definition continuously for at least 12 months or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described in paragraph (1)(i). Stays in institutional care facilities for fewer than 90 days will not constitute as a break in homelessness, but rather such stays are included in the 12-month total, as long as the individual was living or residing in a place not meant for human habitation, a safe haven, or an emergency shelter immediately before entering the institutional care facility;
> (2) An individual who has been residing in an institutional care facility, including a jail, substance abuse or mental health treatment facility, hospital, or other similar facility, for fewer than 90 days and met all of the criteria in paragraph (1) of this definition, before entering that facility; or

In fact, despite the City's claims that many homeless individuals consistently refuse services, there was little if any evidence presented to support that.  Although City outreach workers are supposed to complete a Refusal of Services form every time someone refuses, Sept. 24 Tr. 262:12-22, none of those forms are in evidence, and therefore the Court cannot find that refusal is a common occurrence.  In fact, there was testimony, which the Court credits, from homeless services providers that there is almost no unsheltered homeless person who would refuse shelter.  Oct. 24 Tr. 61:5; Nov. 1 Tr. 19:7-16.

69.     More importantly, the Court finds that making this modification will have no effect on homelessness or the City's approach.  Exempting the City police from the Consent Decree will simply allow individuals experiencing homelessness to be arrested for committing life-sustaining conduct misdemeanors, and will allow City police and other employees to confiscate their property, without constraint by any written, uniform policies.  Putting aside the Fourth and Eighth Amendment problems with this, even the City agrees that this will do nothing to get these individuals into a long-term shelter, and will in fact be harmful by disrupting their lives and discarding their critical possessions.  Moreover, City officials testified that they will not alter their approach at all, claiming that they will not be arresting individuals or confiscating property even if legally permitted to do so.  The necessity of this proposed modification is unsupported by the record.

70.     Regarding the second proposed modification, the City proposes to modify the definition of "available shelter" to include a shelter anywhere in Miami-Dade County.  This will

---

(3) A family with an adult head of household (or if there is no adult in the family, a minor head of household) who meets all of the criteria in paragraph (1) or (2) of this definition, including a family whose composition has fluctuated while the head of household has been homeless. 24 C.F.R. § 91.5.

not help the City, however, because all of the shelter beds in the County—including those outside the City of Miami—are consistently full.  Pl. Ex. 622-1; Sept. 25 Tr. 195:17-25.  Moreover, there is only one shelter with emergency shelter beds that is outside of one mile of the City limits, and that is the Chapman Partnership South in Homestead.  Sept. 24 Tr. 121:1-21.  Not only are those beds consistently full, the City's own director of the Department of Veterans Affairs and Homeless Services testified that this would not help, because it was simply not practical to ask a City of Miami employee to drive an individual to Homestead.  Sept. 24 Tr. 266:13-23.

71.     Another factual premise the City provided to support its request for this modification—the fact that inmates are released from the downtown Pretrial Detention Center jail facility rather than Turner Guilford Knight (TGK) facility (which is outside the City of Miami)—has been undermined.  Miami-Dade County Corrections officials now release people from TGK.  Oct. 24 Tr. 47:23 – 48:2.

72.     The third and fourth proposed modifications are vague and the City provided no specific language for how the Consent Decree should be modified in these respects.  Banning the storage of items on public property would amount to a ban on homelessness—many homeless people have important property (including clothes, food, documents, identification, medications, eyeglasses, family photographs, personal journals, and the like) that they have nowhere to keep but on public property.  And there is nothing in the Consent Decree that prohibits the City from temporarily moving a homeless person's property to clean the streets, as long as the property is returned to its location—not confiscated, stored, or thrown away—and the homeless individuals are not told to leave the area permanently.

73.     The City presented no facts at the hearing demonstrating a need for these modifications.  In fact, the evidence showed that, for the most part, the City began cleaning the

streets in a manner consistent with the Consent Decree after Plaintiffs filed their Motion to Enforce, demonstrating that it can be done.  Oct. 25 Tr. 60:8-13.

### G.   Plaintiffs' Evidence

74.   In addition to the lack of support for the City's requests, there was substantial evidence submitted that the Consent Decree is still very much necessary to protect the rights of homeless people.

75.   Judge Steve Leifman, who has extensive experience in addressing the needs of populations who are homeless, mentally ill, and/or struggling with substance abuse, testified that under no circumstances should Pottinger be terminated; in fact, he called it a "Godsend."  Oct. 24 Tr. 10:16-18. More importantly, he decisively testified that it was still very much needed in this community, because it continues to serve as a necessary protection for homeless people, and continues to incentivize cities to take constructive approaches to homelessness, instead of resorting to criminalization and harassment.  *Id*. at 10:19-24. And, he said, if Pottinger is terminated, the City may very well revert to that posture.  *Id*. at 20:14-15.  In fact, he stated that "I am afraid that if [Pottinger] goes away we would slide back because the pressure would not be on us to keep vigilant to protect these very vulnerable populations."  Oct. 24 Tr. 24:25 – 25:2.  *See also id.* at 29:8-10 ("All of that [revenue for homelessness services] is because of Pottinger; which caused us to do all of that.  It keeps a lot of pressure in the right places to keep moving forward.").  As he stated, "[t]hings change; we are not here forever.  So you need to make sure that message stays with everyone that this is the right thing to do."  Oct 24. Tr. 36:15-18.  Pottinger "is something that really should be celebrated.  I think it makes the City a better place to live because of it."  Oct. 24 Tr. 46:7-9.  The Court fully credits his testimony.

76.     As an example, Pottinger prevented the City from acting too quickly in addressing a recent situation in Overtown wherein an encampment of opioid users developed.  Without Pottinger, the City would have likely arrested the individuals living there to clear the area in response to the community outcry.  This would have contributed nothing to a permanent solution, and would have resulted in the scattering of the individuals, making it nearly impossible to find and treat them, and the likely spreading into the community of HIV and Hepatitis C.  Rather, the City heeded the advice of public health experts and worked for weeks to get as many individuals as possible into drug and mental health treatment, a far more successful and sustainable outcome. Oct. 24 Tr. 18:3-19.

77.     All parties and witnesses, including the City, agreed that arresting and jail is never an effective way to deal with homelessness; it actually makes things worse.  *See, e.g.,* Oct. 24 Tr. 7:19-23.

78.     Dr. Pedro Greer, who served as an expert in the original Pottinger proceeding and who has extensive experience with treating homeless individuals in Miami, testified that it was necessary for Pottinger to remain in place.  Nov 1. Tr. 16:24 – 18:23.  He reaffirmed that it does not prevent the City from providing services to the homeless.  Nov. 1 Tr. 19:4-6.

79.     Similarly, Constance Collins, the founder of Lotus House, one of the largest women and children's shelter in the country and who has extensive experience interacting with and assisting individuals and families experiencing homelessness, testified that Pottinger was necessary to protect their rights. Oct. 24 Tr. 70:3-13.

## II. Conclusions of Law

### A.     The City's Motion to Terminate the Consent Decree

80.     The *Pottinger* consent decree is an institutional reform decree. Thus, the "grievous wrong" standard of *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932) ("clear showing of grievous wrong by new and unforeseen conditions"), does not govern termination or modification of the decree. Instead, as the Eleventh circuit ruled in *U.S. v. City of Miami*, 2 F.3d 1497, 1503-04 (11th Cir. 1993), termination or modification is governed by the more flexible approach in *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237 (1991), and *Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992)*. *Horne v. Flores*, 557 U.S. 433 (2009), is also relevant. These decisions require that the finality of judgments be protected, but provide for some flexibility to allow termination or modification when a return to local control is warranted. *See id*. at 450-451.

81.     In moving for termination of the consent decree, the City has the burden of showing that its "basic purpose" has been "fully achieved." *U.S. v. City of Miami*, 2 F.3d at 1505 (quoting *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 247 (1991)).

82.     The basic purpose of the Consent Decree is *not* to bring an end to homelessness or otherwise solve the policy challenges that homelessness poses. There is nowhere to be found in the text of the Consent Decree any obligation to appropriate funds; nor are there any requirements, obligations, or restrictions relating to the City's coordination with other private and governmental entities; nor is there any requirement to adopt any one particular policy option over another (*e.g.*, a shelter-oriented policy versus a Housing First policy), so long as the policy does not violate constitutional rights. *Cf. Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are

29

heightened when . . . a federal-court decree has the effect of dictating state or local budget priori-ties."); ***Rufo***, 502 U.S. at 392; ***Dowell***, 498 U.S. at 248.

83.     The basic purpose of the Consent Decree *is* to put in place a concrete substantive and procedural framework for the protection of the First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights of individuals who are forced to live in public. The Consent Decree establishes a comprehensive protocol governing all police interaction with homeless individuals, including arrest and non-arrest encounters. It also sets out rules governing all City employees' handling of the property of homeless persons. It imposes particularized monitoring requirements that police must observe in each of their encounters with any person who is homeless. It establishes a media-tion procedure for addressing complaints by Plaintiffs that City employees have violated their rights. By means of this substantive and procedural framework, the Consent Decree protects home-less individuals against the criminalization of their status more effectively than does the general possibility of filing an action in federal court to vindicate rights under 42 U.S. § 1983.

84.     The City is correct that the even if the Consent Decree were terminated, Plaintiffs would still be protected by the Constitution and, in the immediate aftermath, City of Miami Police Departmental Order 11 Chapter 10 (Def. Ex. 95).[8] That does not mean, however, that terminating the Consent Decree would have no impact on the legal position of Plaintiffs. As ***Rufo*** observes, a consent decree may go beyond the constitutional minimum, and provide more specific and effec-tive relief than what a court, ruling solely on the basis of the Constitution, could provide. ***Rufo***,

---

[8] Significantly, the City does not claim any change in decisional law. On the contrary, the primary Supreme Court decisions on which Judge Atkins relied – ***Robinson v. California***, 370 U.S. 660 (1962), and ***Powell v. Texas***, 392 U.S. 514 (1968) – remain valid precedent. The Ninth Circuit recently affirmed the basic holding of ***Pottinger*** in ***Martin v. City of Boise***, 902 F.3d 1031, 1048-49 (9th Cir. 2018). *See also **Lavan v. City of Los Angeles***, 693 F.3d 1022 (9th Cir. 2012), *cert. denied*, 570 U.S. 918 (2013).

502 U.S. at 389. The "constitutional floor" is not the standard by which the case for termination or modification is to be measured. *See id*. at 391; *Mayberry v. Maroney*, 558 F.2d 1159, 1163-64 (3d Cir. 1977) (abuse of discretion by district court to treat new self-imposed rules by state regarding prison conditions as a change of condition justifying modification of consent decree). In ruling on the City's Motion to terminate the Consent Decree, this Court must take account of the fact that doing so would leave the Plaintiffs without the protections the decree provides beyond the constitutional floor.

85.     Termination of the Consent Decree would materially change Plaintiffs' legal position in at least five respects. First, the Consent Decree is the vehicle by which the City has chosen to formally adopt policies to respect the constitutional rights of homeless individuals, and these formal policies would be ended with the termination of the Consent Decree. Section VI.9 of the Consent Decree states, "The CITY hereby expressly adopts a policy as provided for herein to protect the constitutional rights of homeless persons, to prevent arrests and harassment of these persons, and the destruction of their property" inconsistent with the Consent Decree. DE 382:5. Section VII.F.1 has a similar formal policy: "The CITY shall respect the personal property of all homeless people." DE 525-1:7. Formal policies do not by themselves ensure protection of rights, but a solemn governmental commitment to protect them as to a vulnerable class (one which the City acknowledges it has wronged in the past, DE:566:10; DE 589:10) has real significance. The City has pointed to no City Commission resolution or other binding instrument which would continue the formal commitments embodied in Sections VI.9 and VII.F.1 upon termination of the Consent Decree.

86.     Second, the Consent Decree requires that there be internal or departmental procedures for the handling of homeless individuals' property (*e.g*., in determining whether property

belongs to a homeless person or is abandoned or contaminated, or in providing notice if the City takes custody of it). Section VII.F.1, DE 525-1:7. The existence of procedures may not guarantee that rights will not be violated, but it does provide an important safeguard against violations. The City has not submitted into evidence any written procedures relating to the disposition of homeless persons. The Court takes note of the fact that the City initially listed as exhibits, "City's storage procedures concerning abandoned/seized property belonging to homeless persons," DE 580, Ex. 97; DE 585, Ex. 37, but did not provide such written procedures, DE 657. With the termination of the Consent Decree, the requirement that there even be procedures would be lost.

87.     Third, Police Departmental Order Order 11, Chapter 10, even if kept in place, is no substitute legally for the protections of the Consent Decree. First, it does not apply to City agencies other than the police. Second, even as to the police, the formal commitments it makes in respect of *rights* are no substitute for the commitments embodied in the Consent Decree, Section VI.9, DE 382:5.  Section 10.1 of the Departmental Order speaks of "sensivit[ity]" to the needs and rights of homeless persons, not a policy to respect and protect them. Section 10.2 refers to not criminalizing homelessness, but purely as a policy, without any reference to rights. Def. Ex. 95, at 1. Third, while the Court also recognizes that the City has implemented a substantial formal program of training of police officers regarding the Consent Decree, Def. Ex. 580-040, the Consent Decree's require-ment that police officers be trained (see IV.7, DE 382:3-5) is not embodied in Departmental Order 11, Chapter 10, Def. Ex. 95. Finally, § 10.5.1.2 of Departmental Order 11, Chapter 10, Def. Ex. 95, at 1, is not even on its face in conformity with Consent Decree VII.11, DE 525-1:2. The Con-sent Decree requires, that in order to be "available," a space in a shelter must be "for a period of

at least 24 hours." Departmental Order 11, Chapter 10, Def. Ex. 95, fails to reflect that require-ment.[9]

88.     Fourth, termination of the Consent Decree would deprive Plaintiffs of the monitor-ing provisions of the Consent Decree. So long as Departmental Order 11, Chapter 10 remained unchanged, police officers would still be required to fill out Field Information Cards to document their encounters with persons experiencing homelessness. *Id*. §§ 10.6, Def. Ex. 95, at 2-4. But nothing in that Order requires the City to provide the Field Information Cards to Plaintiffs on a regular basis. Terminating the Consent Decree would end that obligation. See VIII.15(f), DE 525-1:8.

89.     Fifth, termination would eliminate the right that Plaintiffs have to participate in any change to the basic protections that the Consent Decree provides in respect of modification. Even if Police Departmental Order 11, Chapter 10, provided the same protections as the Consent Decree (which it does not), upon the termination of the Decree, Police Departmental Order 11, Chapter 10, could be repealed or changed at will by the City. Findings, *supra*, ¶ 30. In contrast, Section V.7 of the Consent Decree requires that there be such a departmental order and prohibits any other than "technical (non-substantive) changes" that would deviate from the Consent Decree. More generally, the Consent Decree can be changed only by court order after a process that allow rep-resentation of Plaintiffs, or by agreement, which includes safeguards such as a fairness hearing and ultimate approval of the court.

90.     Given the potential impact on Plaintiffs of terminating the Decree, the City must, as noted, establish that the basic purpose of the Consent Decree has been fulfilled. To do this, the

---

[9] This means that termination of the Consent Decree would bring about an immediate change in the definition of "available shelter."

City could show that it has complied with the decree in good faith and is unlikely to "return to its former ways," *U.S. v. City of Miami*, 2 F.3d at 1505 (quoting *Dowell*, 498 U.S. at 247), in which case the decree would no longer be necessary to remedy the violations that prompted it, *id*. at 1508. Or the City could show that in light of changed circumstances, the decree is "outmoded, or even harmful to the public interest," *id*. at 1506 (quoting *In re Pearson*, 990 F.2d 653, 659-60 (1ˢᵗ Cir. 1993)); *Salazar by Salazar v. District of Columbia*, 896 F.3d 489, 492 (D.C. Cir. 2018) ("A change in the facts qualifies as significant if it makes compliance with the decree 'substantially more onerous,' 'unworkable because of unforeseen obstacles,' or "detrimental to the public interest.") (quoting *Rufo*, 502 U.S. at 384).

91.     The City correctly accepts the burden in making these showings is a heavy one. DE 566:2 (acknowledging that to justify termination, the City must show "compliance with both the letter and the spirit" of the Decree); *id.* (treatment of homeless must be "fundamentally different" from earlier conduct); *id*. (there should be "no policy or practice of constitutional violations"). *See Horne v. Flores*, 557 U.S. at 447 ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief"). The Court concludes that the City has failed to carry its burden as to either showing.

92.     First, the City has not met its burden of showing that it has complied with the consent decree in good faith and that is unlikely to return to its former ways. On the contrary, the evidence establishes that the City has a recent record of systematic violations of the consent decree. Particularly from January 2018 onwards, the City has engaged in the seizure or destruction of plaintiffs' property in violation of Section VII.F of the Consent Decree. These violations took place in the course of organized "clean-ups" of designated areas.

93.     Typically, in these carefully planned clean-up operations, police arrived early in the morning, sounded loud buzzers and shined bright lights to rouse homeless people. The City brought in trucks to power wash streets and sidewalks, and other trucks to take materials that City employees decided to throw away. In these operations, City employees, working with City police, seized homeless individuals' vital or irreplaceable property such as clothes, medicine, ID, and personal journals and photographs. These seizures had traumatic effects on a number of the affected individuals. Some of the seizures took place even as the owner or someone watching over the property pled with City workers not to throw it away. Further, City police on some occasions ordered homeless persons to move on, and effectively cleared certain areas of homeless people entirely, such as the "Lot 16 area."  Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, ¶¶ 15-33.

94.     Further, the arrests of Tabitha Bass and Chetwyn Archer for obstructing the sidewalks were in blatant violation of the Consent Decree. They were not given a warning, as the Consent Decree requires, nor were they offered shelter in lieu of arrest. Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, ¶¶ 39-40, 69.

95.     A small number of technical violations of the Consent Decree might not preclude termination, particularly if the City had taken the initiative to identify them on its own and remedy them. The Court, however, rejects the City's assertion that *U.S. v. City of Miami* allows termination even when "some noncompliance persist[s]." DE 566: 15. There, the court held that "*nothing* in the record to our knowledge … indicates that the City" had violated the consent decree issue

since it was first approved. ***City of Miami***, 2 F.3d at 1507 (emphasis added).[10] Here, however, thirty-four homeless witnesses testified, establishing a pattern of conduct. The Court finds that the nature of the homeless population and the difficulty of securing their participation as witnesses makes it likely that other members of the class were similarly affected. The Court finds that their testimony, taken as a whole, makes it highly unlikely the violations were isolated, technical, or "rogue" instances.

96.     Further, the Court concludes based on the evidence before it that the "clean-up" operations in which many of the violations took place were the product of careful planning. Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, ¶¶ 1-8. The then-senior advisor to the City Manager acknowledged publicly that there had been a "a real push in terms of trying to address our homeless issues in various areas that we're calling 'hot spots' around the City." *Id.* at ¶ 8; Findings, *supra*, ¶ 24. Under the Consent Decree, the City had a duty to ensure that in undertaking to keep the streets and sidewalks clean, it respect the property rights of those who have no place to live but the streets. The City, however, proceeded without the proper regard for the Consent Decree, and plainly violated it. Moreover, the City was at the very same time planning to seek termination or modification of the Consent Decree, indicating its keen awareness of the constraints the consent decree imposes.

97.     These violations alone preclude any finding of substantial compliance with the Consent Decree. Further reinforcing the conclusion that the City has failed to carry its burden in

---

[10] Similarly, in other cases the City cited, DE 566:16, the courts found virtually full compliance with only *de minimis* violations. ***R.C. v. Walley***, 270 F. App'x 989, 993 (11th Cir. 2008) ("highly successful execution" of consent decree); ***Labor/Cmty Strategy Ctr. v. Los Angeles County Metro. Trans. Auth.***, 564 F.3d 1115, 1123 (9th Cir. 2009) (defendant "complied fully" with only *de minimis* violations).

moving for termination of the Consent Decree is its failure to establish that it is unlikely to return to its former ways. Promises of future compliance are not sufficient to establish this. *Dowell,* 498 U.S. at 249 (cautioning against "accept[ing] at face value the profession" of a defendant that it will commit no future violations).

98. No party moving to terminate a consent decree can adequately establish that it is unlikely to return to its former ways when in fact it has recently returned to them, as this Court finds based on the evidence before it. Findings, *supra*, ¶ 49. Indeed, the Court finds that the City's conduct earlier in 2018 was virtually identical to the conduct that led to the lawsuit in the first place, and for which this court held the City in contempt in 1991. DE 568: 11-13. *See also* DE 566:17, 25 (acknowledgment by City that it had a "policy of harassment" at the time of the law-suit). In 1990, this Court found that the City had conducted sweeps of homeless encampments and ordered homeless people to stand aside while it seized and destroyed their belongings – conduct he described as "innately offensive and repulsive." DE 568: 12. Judge Atkins ordered the City to cease such activities. Instead it continued to engage in them, and he held the City in contempt. DE 568: 12.

99. Equally significant is another aspect of the City's conduct: its consistent history of misrepresenting the obligations of the Consent Decree. In 1995, Judge Atkins observed that "City employees have been misusing the Injunction and misrepresenting it to the public in ways the court is shocked to think about." DE 360, at 12-13. *See* DE 477:32-33. City officials have continued to do the same thing today, as in the 2018 Commission discussion of the Consent Decree. Findings, *supra*, ¶ 23, 21.

100. It is also telling that the City asserted in its Motion for Termination that the growth in services to the homeless means that it now has an alternative to "arresting homeless persons and

systematically destroying their property," thus obviating the need for the Consent Decree. DE 566:11. This assertion overlooks the fact that even when there were fewer services for the homeless, it did have an alternative: It could simply respect the constitutional rights of people who are involuntarily homeless, and *not* arrest them or destroy their property. While the Court commends the City for its candid admission that it did violate the Constitution, the City's basic argument the growth in services somehow gives it a new alternative to criminalization of homelessness undercuts its argument that it will not return to its old ways.

101.    In addition, as noted in the findings earlier, Plaintiffs confronted the City about violations of the Consent Decree in 2009 and in 2014. Findings, *supra*, ¶ 51. Equally telling is the serious consideration the City Commission gave (through a second reading) to a proposed anti-camping ordinance in 2015, which would have criminalized homelessness by making it unlawful to "live temporarily … outdoors" on public property. Findings, *supra*, ¶ 52. While the Court does not find that these instances constituted violations, they are relevant to the question of whether the City has met its burden in showing that it is unlikely to return to its former ways.

102.    Also relevant is the question of City's compliance with the obligation under the Consent Decree to document its interactions with homeless persons. The Consent Decree requires police to document approaches involving police officers (alone or with other City employees) to homeless individuals when services or assistance is offered. VII.14.A, DE 525-1:2.  The cleaning of public areas is a service to all citizens, including of course those who have no place but to live in public. The police role in these clean-ups was central and pervasive, in which the background threat of arrest was central. Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, ¶¶ 34-38. This threat was itself a violation of the Consent Decree as to individuals committing no crime. As

a police encounter with homeless individuals, moreover, the incidents should have been documented in Field Information Cards (FICs). VII.14.A, DE 525-1:2-3. Yet the City, which has the burden of proof in its motion to terminate, has not pointed to any FICs filed with respect to the incidents of property seizure or warnings to "move on" or not interfere with City employees as they disposed of homeless individuals' property in which the thirty-four Plaintiffs testified. While there is no doubt that City police have in many instances documented their interactions with homeless individuals, Pl. Ex. 583-8 (FICs), Def. Ex. 100 (summary), these omissions are troubling, and provide further evidence against any conclusion that the City has substantially complied with the Consent Decree.

103.    Even as to other police matters, the City's attention to the Consent Decree has been incomplete. The Court takes note of another Police Departmental Order 4, Chapter 6, submitted by the City, Body Worn Camera (BWC), Def. Ex. 95C. It simply does not address police encounters with homeless individuals, except as such encounters may fall within other general categories (*e.g.*, arrests or searches of people). The Consent Decree does not require body cams to be used during all the police actions governed by the Consent Decree, but the City's failure even to address this in Departmental Order 4, Chapter 6, is inconsistent with its claims that it has fully turned a corner. Further, the Standard Operating Procedure on Civil Citations, Def. Ex. 95B, gives police discretion not to arrest individuals for five specified misdemeanors, but to issue a civil citation instead. One of these is littering, which is covered by the Consent Decree. VII.14.C.3.g, DE 525-1:5.[11]  Yet the SOP makes no mention of the specific restrictions under the Consent Decree, and leaves the police with ultimate discretion to arrest ("While an officer may exercise discretion and

---

[11] The others relate to illegal use of dairy crates, theft of shopping carts, and possession of cannabis or drug paraphernalia.

issue a Civil Citation in lieu of arrest, these offenses are still misdemeanor crimes and violators are subject to arrest.").

104.    The City has also failed to meet its burden in showing that in light of changed circumstances, the Consent Decree is "outmoded, or even harmful to the public interest," *City of Miami*, 2 F.3d at 1506 (quoting *In re Pearson*, 990 F.2d 653, 659-60 (1st Cir. 1993)).

105.    The fact that the Consent Decree has been in effect for twenty years does not make it outmoded. Significantly, the parties chose not to put an expiration date on the Decree. There is no reason to treat this as an oversight. On the contrary, the Consent Decree was agreed upon in 1998 after twenty months of negotiations between the parties – negotiations that followed a decade of litigation. When the parties negotiated modifications to it in 2013, they expressly addressed the question of modification or termination, X.25b, DE 525-1:8, and again chose not to put an expiration date on it.

106.    Moreover, the Consent Decree raises none of the federalism concerns articulated by the Supreme Court in *Horne v. Flores*. It does not "dictat[e] state or local budget priorities," or "take funds away from other important programs." *Horne*, 557 U.S. at 448. On the contrary, the City introduced extensive evidence that it has increased its funding of shelters and other services to the homeless since the Consent Decree went into effect. Further, given the history of contested litigation, this is decidedly not an instance where public officials "refrain[ed] from vigorously opposing" a consent decree in order to do an end run around local political processes. *Id.*

107.    What the Consent Decree does do is remove the option of criminalizing homelessness – an option that is inconsistent with the Constitution, but which political pressure may make attractive to local governments. As the United States Inter-Agency Council on Homelessness has observed, "[r]eflecting the frustration of business owners, community residents, and civic leaders

who feel that street homelessness infringes on safety, attractiveness and livability of their cities, some communities around the country are using, or considering using, the criminal justice system to minimize the visibility of people experiencing homelessness." Pl. Ex. 578-128, at 6. *Id.* (noting that criminalization does not solve the underlying causes of homelessness, harms those experiencing homelessness, and is costly to public budgets). As Judge Leifman testified, the Consent Decree helps counter these pressures in Miami. Findings, *supra*, ¶¶ 75-78.

108.    None of this means that the Consent Decree can never be terminated or modified (and in fact the Court did approve a set of modifications in 2014). Like any other consent decree, the Pottinger Consent Decree is subject to modification or termination at whatever point the City can meet its burden in showing that the standard of ***Dowell***, ***Rufo***, and ***Horne*** has been satisfied. The Court need not decide precisely what evidence might suffice to do so, because it is clear on the facts before it that the City has failed to meet it burden.

109.    The City offers three bases for asserting that the Consent Decree now is harmful to the public interest. First, it claims that the Consent Decree imposes a "stigma" on it. The City, however, offered no persuasive evidence of such a stigma. Findings, *supra*, ¶ 34-41. More important, the alleged stigma of a consent decree is no more a basis for terminating it than would the alleged stigma of a finding a liability be a reason to rule for a defendant. ***See National Labor Relations Board v. Harris Teeter Markets***, 215 F. 3d 32, 36 (D.C. Cir. 2000) ("any 'stigma' attaching to a consent decree do[es] not rise to the level of 'obstacles' envisioned by the Supreme Court as justifying relief nor hardly make[s] the compliance with the decree 'unworkable.'") (applying ***Rufo*** standard).

110.    Second, the City asserts that the Consent Decree has somehow come to actively interfere with important public functions and interests. It makes two claims in this regard. It asserts

that the Decree now inhibits City employees from fully providing services to those experiencing homelessness or from carrying out other municipal functions. The City's evidence is not persuasive on this point. More important, even if there were such a problem, the remedy would be better training for City employees. Findings, *supra*, ¶ 34-41.

111.     The City also asserts that the Consent Decree creates a disparity for the City, because its police are bound by the decree while those of other jurisdictions are not. The City argues that it makes Miami a magnet for homeless individuals, allegedly "dumped" in the City by other jurisdictions, but produced no concrete evidence of such practices. Findings, *supra*, ¶ 46. The disparity argument, however, is an attack on the very idea of a consent decree, which by its nature is limited to a given defendant. Even if the Consent Decree were extended to all of Miami-Dade County, for example, there would then be a "disparity" between Miami-Dade and Broward Counties. In any event, given that the City states that it would continue to observe the substantive provisions of the Consent Decree even if it were terminated, the alleged disparity is irrelevant to the City's Motion for Termination. Further, by the City's own admission, it has cooperated with other local entities and will continue to do. Finally, surveys from the Florida Council on Homelessness show that the majority of individuals who are homeless in Florida lived in residences in Florida for some period *before* becoming homeless. Findings, *supra*, ¶ 48. Nor did the City produce concrete evidence of the alleged "dumping." Even if the practice occurred, relieving the City of the constraints of the Consent Decree would not help it to bargain more effectively with other jurisdictions to contribute more to the provision of services or stop the alleged "dumping" – unless the City has in mind to pressure other jurisdictions by threatening to "dump" homeless individuals in other jurisdictions. Findings, *supra*, ¶¶ 33, 42-43.

112.    Third, the City argues that there has been a significant change in circumstances under **Rufo** and **Horne**. A consent decree does not become outmoded or harmful to the public interest, however, simply because circumstances have changed. The City must show that the changes "make performance of the decree more onerous," **Rufo**, 502 U.S. at 385. None of the changes to which the City points make performance of the Pottinger Consent Decree more onerous. There is no dispute that the City has increased its provision of services to homeless persons, as has Miami-Dade County, and that more people are living and working downtown and going there for dining and other entertainment. Findings, *supra*, ¶¶ 31. It is far from apparent, however, why it would be more onerous to observe the Decree's restrictions on arrest and property destruction when then there are more people living and working downtown or when there are more services for the homeless. The City's own positions contradict this, since it claims that it will continue to observe constitutional limitations on the arrest of homeless individuals and destruction of their property, even as the downtown population and services to the homeless have increased. Further, the City's own planning documents make clear that it was planning on growth in downtown of exactly the sort it now points to, at the very time it originally agreed to the Consent Decree. Findings, *supra*, ¶ 31.[12] It made a judgment, in other words, that compliance with the Decree would be manageable even as the downtown population grew and the City and County came to offer more services to those experiencing homelessness. Nothing in the record before the Court shows that that judgment was wrong.

---

[12] In fact, the increase in services to the homeless individuals was in fact underway well *before* the Consent Decree was negotiated, as Judge Atkins noted in 1995 on remand from the Eleventh Circuit. DE 360. Where circumstances were actually anticipated, a party moving for modification or termination has an especially "heavy burden" under **Rufo**, 502 U.S. at 385. The City has failed to meet that burden here. *See* Section II.B below, ¶¶ 117.

113.    Finally, and most important, the only circumstance that is relevant here has *not* fundamentally changed: there are still individuals who are forced to live on the streets. While the number of homeless people has decreased since 1998, and the number of homeless shelter beds has increased since then, the Court finds that there remains a significant gap of at least 1,105 between the number of homeless individuals and homeless shelter beds in Miami-Dade County. Findings, *supra*, ¶¶ 53-66. This circumstance is relevant, but not because the Consent Decree requires the City to end homelessness. It does not. It is relevant because it shows that there remains a significant group of individuals who, as a practical matter, are vulnerable to wrongful arrest or property seizure simply for being homeless. The political nature of the City's decision to seek termination, see Findings, *supra*, ¶¶ 18-27, 45, underscores this vulnerability.

114.    In sum, the City has failed to meet its burden in establishing a basis for terminating the Consent Decree.

**B.     The City's Motion to Modify the Consent Decree**

115.    The City has moved, in the alternative, for modification of the Consent Decree. Under ***Rufo*** and ***Horne***, a consent decree may be modified only in light of a significant change in circumstances. Those cases require that the changes not only be relevant to the City's obligations, but also significant. ***Horne***, 557 U.S. at 447 (quoting ***Rufo***, 502 U.S. at 384). Where such changes are shown, any proposed modifications must be "suitably tailored to the changed circumstance," ***Rufo***, 502 U.S. at 383, 391.

116.    The City has failed to meet its burden of showing changed circumstances under ***Rufo***. First, changes actually contemplated by the parties at the time the Consent Decree will ordinarily not justify termination or modification, particularly if the party seeking termination or modification has failed to comply with the decree. ***Rufo***, 502 U.S. at 385. The relevant points of

comparison are not 1988, when the lawsuit was filed, but 1998, when the City, after careful consideration, agreed to the Consent Decree, and 2014, when changes were made at the City's initiative. Events that took place before or at the time the Consent Decree was approved, such as the creation of the Miami-Dade County Homeless Trust and the adoption of the 1% meals tax in 1993 to fund it, are simply not relevant.[13]

117.   Equally important, developments that took place after the Consent Decree was adopted cannot constitute changed circumstances if they "actually were anticipated at the time … [the City] entered into a decree." *Rufo*, at 502 U.S. at 385. That is so for most of the "changes" the City cited in moving for modifications. The rise of downtown as a residential, business, entertainment, and tourist venue was fully contemplated and planned by the City at the time it chose to enter into the Consent Decree. Findings, *supra*, ¶ 29, 31. The same is true as to the opening of Camillus House's new facility in 2012, which the City cites as a changed circumstance. Even in the 1980s there were plans to redevelop the area where the old Camillus facility was located and move it. Actual plans for the new facility were being made around the time of the Consent Decree, at least as early as 2003. Findings, *supra*, ¶ 28, 31.

118.   Finally, as noted above, the most relevant circumstance has not changed, either since 1998 or 2014. There are still many people in the City who are involuntarily homeless, with nowhere else to go. Findings, *supra*, ¶ 53-66.

---

[13] Similarly, the Court rejects the relevance of the establishment of the City's Homeless Assistance Program (1991), the creation of the Chapman Partnership (1993), and the opening of the Homeless Assistance Centers (1995, 1998). DE 566: 7-8. Findings, *supra*, ¶ 29. The Eleventh Circuit's Health Project, also cited by the City when it moved for termination, DE 566:9, was created at roughly the same time, in 2000, according to the City. Similarly, the Police Departmental Order 11, Chapter 10, Def. Ex. 95, was required to be put in place by the Consent Decree itself, V, DE 382:5, and so is not a changed circumstance.

119.    For these reasons, the City has failed to meet its burden in showing a significant change in relevant circumstances – *i.e.*, changes in circumstances that increase the burden of compliance in an unforeseeable way. This failure makes the second prong of the test – whether the proposed modifications are "suitably tailored to the changed circumstance," ***Rufo***, 502 U.S. at 383, 391 – irrelevant.

120.    Even if the City had shown a significant change in circumstances, however, the modifications it proposes are not "suitably tailored" to those changes. The City proposes four modifications. The first two are identical in substance to modifications the City proposed in 2013. One would remove what the City calls the "chronically homeless" from the protections of the Consent Decree. The other would permit shelter anywhere in Miami-Dade County to be offered in lieu of arrest. The City does not propose any specific language for the third and fourth modifications, but generally complains of accumulations of trash on public property and health hazards, and urges that the number of items those living on the streets may keep on public property should be limited.

121.    The City proposes to remove "chronically homeless person[s]" from all the Consent Decree's protections, saying it needs "the tools necessary to get the most difficult groups of homeless into a continuum of care and provide them the food, shelter, clothing, beds and medical attention." DE 566:19.[14] It failed to show, however, how exposing them to arrest for being homeless, without the Consent Decree's protections, would help them. The City does not have the power to commit anyone to mental health treatment except through law, such as the Baker Act. Even if the

---

[14] The proposed language, which the City would insert into the definition of "homeless person," Consent Decree VII.10, DE 525:1-2, is:

> An individual is not covered by the provisions of the Pottinger Agreement if the individual is a chronically homeless person. A chronically homeless person is one who refuses services on three separate occasions within a 180-day period; however, multiple refusals in a 24-hour period shall only serve as a single refusal.

City began to try to force people into shelters, it would run up a currently insuperable barrier: the large shortage of shelter beds. And even if it could force all "chronically homeless" persons into shelters, it could not make them stay there. Shelters are not prisons. Likewise, continually arresting and jailing homeless people, and then discharging them into homelessness, is not a sustainable solution.

122.     The evidence established that the number of "chronically homeless" individuals living in the City of Miami is fairly small, by the HUD definition, Findings, *supra*, ¶ 65. There is no evidence in the record of the number of allegedly "service resistant" individuals, and so no reason to assume that it is large, or indeed that there is anyone who would refuse shelter. Findings, *supra*, ¶ 68. Further, the City has other effective options besides arrest. These include programs like the Lazarus program, which relies on consistent engagement with individuals who are living on the street and have mental health issues, or Housing First. Findings, *supra*, ¶ 65. What approach the City takes is for the City to decide, not this court. Nothing in the evidence before the Court establishes that observing the constitutional rights of those experiencing homelessness, and abiding by the requirements of the Consent Decree, will prevent the City from attempting to develop and implement effective policies.

123.     Further, the City's proposed modification is drafted with such imprecision that the Court cannot accept it. As drafted, the City's proposal would exempt anyone deemed chronically homeless from all the protections of the Consent Decree, *including the property protections and monitoring obligations*. The City's definition (at odds with the federal definition, Findings, *supra*, ¶ 68 & n.7) would even sweep in a person who had been on the streets for only six months and turned down offers of shelter in Homestead (which, under the Consent Decree, may be offered as

a voluntary option, VII.11, DE 525-1:2).[15]  Because the term "services" is not defined in the City's proposal or the Consent Decree, moreover, the City's modification would remove all Consent Decree protections as to someone who had never been offered shelter, only other undefined services, and turned them down three times in 180 days.

124.    The City's second proposal is to eliminate the requirement that shelter offered a homeless person in lieu of arrest be within a mile of the City limits. DE 566:19-21. It misquotes the very provision it seeks to modify, DE 566:20, leaving out language added in 2013 that includes as "available shelter" any shelter in the County "if agreed to by the homeless person." VII.11, DE 525-1:2. Only by omitting this language can the City assert that the Consent Decree "serves as a barrier to family reunification." DE 566:20.

125.    The evidence established that the only other shelter beyond one mile of the city limits is the Homeless Assistance Shelter in Homestead, some 30 miles away from downtown Miami. If a shelter space in Homestead were the only option offered to an individual in Miami in lieu of arrest, this would impose significant hardships on him or her. There are many reasons why homeless individuals' unbelievably difficult lives might be a little less hard downtown: government services, day jobs, public transportation, and medical care. Findings, *supra*, ¶¶ 70-71. Homeless persons, like all individuals, have a constitutional right to travel and against forced travel, as well as the right to live in a municipality of their choosing. ***Pottinger***, 810 F. Supp. at 1578-83. It is ironic, moreover, that the City would complain that other cities "dump" homeless individuals downtown, DE 566:19 – an assertion for which the Court finds no credible evidence, Findings, *supra*, ¶¶ 33, 42-43 – and then in essence seek to do the same itself.

---

[15] Plaintiffs pointed out in detail the many problems with the City's proposal in their 2013 Response to the City's motion for modification. DE 477: 9-10, 11-12, 18-19, 28, 30, 31-32.

126.     Aside from these issues, the City's proposal simply is not practical. Sergio Torres testified that it would not be practical to transport people from downtown Miami to such a far location. And the evidence established that the Homestead shelter, like others in Miami-Dade County, is typically full. Findings, *supra*, ¶ 70. Modifying the Consent Decree as the City proposes would thus accomplish nothing.

127.     The City's third proposal is more difficult to characterize, because the City offered no specific language. The heading to the section of the City's Motion for Termination which covered this proposal was entitled, "Prohibition of Storing Personal Belongings on Public Property." DE 566:21. The City stated that it wanted the Consent Decree to be modified to "prohibit … hazardous conditions" caused by "homeless persons who accumulate items which clutter public sidewalks and prevent pedestrians from being able to use it." DE 566:21-22. If this is a proposal to ban those experiencing homelessness from keeping any of their belongings on public property, including sidewalks, the Court rejects it as not suitably tailored. People living on the streets have nowhere else to store their property. This would amount essentially to a ban on being homeless. The City's proposed modification is similar to the proposed anti-camping ordinance in 2015, and equally inconsistent with the Consent Decree. It is not "tailored to resolve the problem presented." ***City of Miami***, 2 F.3d at 1509.

128.     The City's fourth proposal is equally vague. The City simply states that it "needs to take measures to clean and sanitize … public areas without the threat of Plaintiffs filing an enforcement proceeding pursuant to the ***Pottinger*** Consent Decree." DE 566:24. The City's express desire to conduct clean-ups without any accountability completely undermines its assertion, so earnestly offered in connection with its request that the Court terminate the Decree, that it will follow all the substantive protections of the Decree even if no longer bound by it. To the extent

that the City is simply asserting an interest in public health, sanitation, and safety, Plaintiffs do not contest that interest. Indeed, those living on the streets share that interest. Nothing in the Consent Decree prohibits the City from cleaning up discarded styrofoam containers or used needles, or requiring people to temporarily move their property out of the way while an area is cleaned up. More public bathrooms and trash cans in areas where homeless people live would reduce the need for clean-ups.

129.    What the Consent Decree does prevent is throwing away belongings that are recognizably the property of homeless people. VII.F, DE 525-1:7. Nor does the Consent Decree permit an army of police officers and other City employees to move in so quickly that homeless persons do not have the time to move their belongings out of the way. Nothing in the Consent Decree requires that property that is genuinely abandoned or contaminated be preserved, *id*. What it does not do is permit the indiscriminate seizure and disposal of property that recognizably belongs to a person who is homeless, including at times over the objection of the owner or someone entrusted to watch it, as the has done repeatedly. As Judge Atkins observed, "For many of us, the loss of our personal effects may pose a minor inconvenience. However, … the loss can be devastating for the homeless." ***Pottinger***, 810 F. Supp. at 1559. More recently, the Ninth Circuit reaffirmed the continuing significance of this observation, observing that "'[t]he government may not take property like a thief in the night," which it called a "simple rule [that] holds regardless of whether the property in question is … a Cadillac or a cart." ***Lavan***, 693 F.3d at 1032 (quoting ***Clement v. City of Glendale***, 518 F.3d 1090, 1093 (9th Cir. 2008)). It went on to reject any suggestion that "homeless persons instantly and permanently lose any protected property interest in their possessions by leaving them momentarily unattended." ***Id***. at 1032.

130.    Further, the Consent Decree does not permit the City to "clean up" an area by eliminating homeless people from it. Yet that is the City's aim, as the email from Milton Vickers of February 27, 2018 shows. Pl. Ex. 601-65 ("imperative" that police patrol closed up encampments "to ensure that homeless individuals do not return to these locations"); Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, ¶¶ 3-4. Finally, while the City has a legitimate interest in clean public areas, the Court recalls Judge Atkins' earlier finding that there is a strong public interest in not worsening the plight of homeless individuals by throwing away their belongings or subjecting them to repeated arrests for living in public. DE 568: 12-13.

131.    In sum, the City has failed to carry its burden of demonstrating that there has been a significant change of circumstances meriting modification, or that its proposed changes are suitably tailored to the changed circumstances.

*    *    *

The Court hereby finds that the City has failed to demonstrate either that the basic purpose of the Consent Decree has been fully achieved, justifying termination, or that the Decree should be modified in light of changed circumstances.

Accordingly, for the foregoing reasons, the City's Motion for Termination, or Alternatively, Modification of the Pottinger Consent Decree, is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of _____ 2019.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:
Counsel of Record

51

Respectfully submitted,

Benjamin S. Waxman, Esq.
Florida Bar No. 403237
Miami ACLU Cooperating Attorney
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Blvd., Suite 1300
Miami, FL 33131
(305) 371-6421
benji@benjaminwaxmanlaw.com

Stephen J. Schnably, Esq.
Admitted Pro Hac Vice
Miami ACLU Cooperating Attorney
University of Miami School of Law
1311 Miller Drive
Coral Gables, FL 33146 Tel: 305-284-4817
Fax: 305-284-6619
schnably@law.miami.edu

Dante P. Trevisani
Florida Bar No. 72912
Ray Taseff
Florida Bar No. 352500
Florida Justice Institute
3750 Miami Tower
100 SE 2nd St
Miami, FL 33131-2115
Tel: 305-358-2081
Fax: 305-358-0910
dtrevisani@floridajusticeinstitute.org
rtaseff@floridajusticeinstitute.org

Isha Kocchar
Florida Bar No. 105294
Miami ACLU Cooperating Attorney

180 North Flamingo Road, Suite 305
Pembroke Pines, FL 33028
Tel: (954) 292-5787
Fax: (954) 620-0042
isha@kochharlegal.com

Anna T. Neill
Florida Bar No. 100945
Miami ACLU Cooperating Attorney
Kenny Nachwalter P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel.: (305) 373-1000
Fax: (305) 372-1861
aneill@knpa.com

Valerie Jonas, Esq.
Florida Bar No. 616079
Miami ACLU Cooperating Attorney
Weitzner and Jonas
1444 Biscayne Blvd Ste 207
Miami, FL 33132-1430
Tel: 786-254-7930
Fax: 305-358-0910
valeriejonas77@gmail.com

Nancy G. Abudu
Florida Bar No. 111881
ACLU Foundation of Florida, Inc.
4343 W. Flagler Street, Suite 400
Miami, FL 33137
Tel.: (786) 363-2700
Fax: (786) 363-1108
nabudu@aclufl.org

Attorneys for Plaintiffs
BY:      /s/Dante P. Trevisani
          Dante P. Trevisani

1

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 7th day of December 2018, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties identified on the

attached Service List in the manner specified, either via transmission of Notices of Electronic

Filing generated by CM/ECF or in some other authorized manner for those counsel or parties

who are not authorized to receive electronically Notices of Electronic Filing.

BY:   */s/Dante P. Trevisani*
Dante P. Trevisani

## SERVICE LIST

Victoria Méndez
City Attorney
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
VMendez@miamigov.com

Kerri L. McNulty
Senior Appellate Counsel
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
klmcnulty@miamigov.com
(Secondary email: YIllescas@miami-gov.com)

John A. Greco
Deputy City Attorney
444 SW 2nd Avenue, Suite 945

Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
jgreco@miamigov.com

George K. Wysong
Senior Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
gkwysong@miamigov.com

Douglas A. Harrison
Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
daharrison@miamigov.com

J.C. Perez

Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
jcperez@miamigov.com

Carlos Gamez
444 S 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
chgamez@miamigov.com

Thomas E. Scott
Cole, Scott & Kissane, P.A.
9150 South Dadeland Boulevard, Suite 1400
Miami, FL 33156
Tel.: (305) 350-5381
Fax: (305) 373-2294
Thomas.scott@csklegal.com


**Attorneys for Defendant**