UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case No. 88-2406-CIV-MORENO**

MICHAEL POTTINGER, PETER CARTER
BERRY YOUNG, CAROLE PATMAN, and
DAVID PEERY,

    Plaintiffs,

vs.

CITY OF MIAMI,

    Defendant.
_____/

**PLAINTIFFS' RESPONSE TO THE CITY OF MIAMI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE CITY'S MOTION FOR TERMINATION, OR, ALTERNATIVELY, MODIFICATION OF THE POTTINGER CONSENT DECREE**

Plaintiffs, by and through undersigned counsel, hereby respond to the City's Proposed Findings of Fact and Conclusions of Law (DE 664).[1]

**Factual Background and Procedural History**

The City's description of the history of the complaint, litigation, and Consent Decree at pages 3-5 of its Proposed Findings is seriously deficient. The City's assertion at page 3 that prior

---

[1] The City filed these Proposed Findings of Fact and Conclusions of Law solely in relation to its Motion for Termination, DE 566. The Court's clear instructions were that each party would submit two proposed findings and conclusions (one for each motion) and then each side would respond to each. Oct. 25 Tr. 112:23-25 to 113:1-12. Since the City did not file proposed findings of fact and conclusions of law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and to Hold the City in Contempt, DE 568, Plaintiffs are unable to respond to any argument raised with respect to that Motion. Thus, to the extent that the City's forthcoming Response raises new issues or arguments, Plaintiffs reserve the right to respond, and may seek the Court's permission to file an additional response limited to those issues.

1

to the filing of the complaint, City police "would view a homeless individual as would any other individual that they encountered committing violation in public" directly conflicts with what this Court found. On the contrary, as Judge Atkins held in 1990, the police and other City employees would conduct sweeps specifically targeted at homeless individuals in which they seized those individuals' belongings and destroyed them – conduct Judge Atkins called "innately offensive and repulsive" as he ordered the City to cease such activities.  Order on Plaintiffs' Second Application for Preliminary Injunction, No. 8-2406-CIV-ATKINS, at 2 (April 26, 1990). Further, the City's account omits the fact that in 1991 the Court held the City in contempt for the City's police harassment of homeless individuals and its destruction of their property, in violation of the Court's 1990 order. Order Finding City of Miami in Civil Contempt of Court's April 26, 1990 Order and Providing Further Injunctive Relief, No. 8-2406-CIV-ATKINS, at 23-24 (March 18, 1991). This Court's holding in 1992 – that the City had a "pattern and practice of arresting homeless people for the purpose of driving them from public areas," and had "fail[ed] to follow its own written procedure for handling personal property when seizing or destroying the property of homeless individuals," **Pottinger v. City of Miami**, 810 F. Supp. 1551, 1554 (S.D. Fla. 1992) – hardly fits the City's claims that prior to the lawsuit it treated those experiencing homelessness like "any other individual."

The City's description also omits Judge Atkins' criticisms of the City for seriously misrepresenting the limitations of the Consent Decree to the public. This omission is significant because the City has continued to do the same thing today, undercutting its assertion of good faith compliance. Plaintiffs' Proposed Findings, ¶ 99, DE 667 at 37.

2

*Progress on the Issue of Homelessness in the City and County*

The City asserts at page 7 that the City Police Department "completely overhauled its policies and procedures with respect to the treatment of homeless individuals." But although the City promulgated the Departmental Order on homelessness that was required by the Consent Decree, the cited portions of the transcript contain no evidence of this alleged "overhaul." Chief Colina simply testified that City police officers currently have "training as it pertains to the homeless." Sept. 24 Tr. 51:3.

Similarly, the City's assertion at pages 7-8 about the drop in the number of homeless individuals is incomplete. While the number has fallen since 1988, it has remained relatively constant for the last several years, as Plaintiffs explained in their Proposed Findings. DE 667 at 20-21.

The City's assertion at page 8 that a majority of the unsheltered homeless population is chronically homeless and is "shelter resistant" is wrong. The only testimony cited for this is from Ron Book, the Chair of the Homeless Trust. While Mr. Book, an attorney and lobbyist, has experience as Chair, the City offered no evidence that he had studied this issue in detail. In fact, the actual counts conducted by the Trust show that *only 135* of the 1105 unsheltered individuals – by the federal definition that Mr. Book himself cited in his testimony – could be labeled chronically homeless, or roughly 12%. Pl. Ex. 578-133B at 16; Sept. 25 Tr. 193:1-5. The Trust's own numbers belie Mr. Book's claim.

Similarly, there was no evidence beyond Mr. Book's unsupported assertion that this population is "shelter-resistant," and in fact the evidence showed the opposite.[2] Despite numerous

---

[2] Judge Leifman estimated that forty percent of homeless individuals have serious mental health and substance abuse issues, but he did not assert that they are all "shelter resistant." Oct. 24 Tr. 21:23-25.

opportunities, the City presented no concrete evidence of homeless individuals refusing services, or any attempt the City has made to quantify that phenomenon in a way that would indicate an actual problem. Although City outreach workers are supposed to complete a Refusal of Services form every time someone refuses, Sept. 24 Tr. 262:12-22, the City entered none of those forms in evidence. If the City were correct, there would likely be dozens of Refusal forms from the same individuals. But there are none. In contrast, there was testimony from homeless services providers that there is almost no unsheltered homeless person who would refuse shelter. Oct. 24 Tr. 61:5-10; Nov. 1 Tr. 19:7-16. Moreover, Hilda Fernandez, CEO of Camillus House and former Executive Director of the Homeless Trust, testified that there were effective ways to deal with homeless individuals with severe mental illness (especially through Housing First, Sept. 25 Tr. 86:4 – 87:4, 87:23-88:5, but also intensive engagement through the Lazarus project, *id*. 84:3-20), and that more arrests or more property destruction would make Camillus House's work more difficult, *id*. 88:11 – 90:3.

Although the City claims at pages 9-10, 22-23, and 31-34 that there are "protocols" for handling the property of homeless people, it is important to note that there are no written policies or procedures governing this. Sept. 24 Tr. 261:6-7. Mr. Torres admitted that there were no written criteria for determining whether property belongs to a homeless person or is contaminated. *Id*. 261:6 – 262:11. He made no mention of any written procedures that generally cover the protection of the rights set out in Section VII.F.

Yet the Consent Decree requires written policies and procedures. It is simply not possible in such a large bureaucracy to ensure that these protocols are actually followed when no written procedures exist. This is why the City memorializes policies in Standard Operating Procedures or Departmental Orders. It is why, in the original litigation, the City argued that it had "written

procedure[s] regarding personal property that has been found or seized." ***Pottinger***, 810 F. Supp. at 1570; *id*. at 1570-73 (finding that notwithstanding the written procedures, the City had a policy of seizing and destroying the property of homeless individuals). It is why, as noted in Plaintiffs' Proposed Findings of Fact and Conclusions of Law on the City's Motion to Terminate, the City originally asserted it would provide as an exhibit the "City's storage procedures concerning abandoned/seized property belonging to homeless persons," but later withdrew that exhibit when it came time to actually produce it. DE 667 ¶ 86, at 31-32. Not to have written protocols "for taking custody of personal property," or for the procedure for destroying property that recognizably belongs to a homeless individual, VII.F, DE 525-1:7, is itself a violation of the Decree.

      Further, these written policies and procedures must be consistent with the Consent Decree. The City argues that the simple fact of having procedures is sufficient, on the theory that it is up to the City to "balance[e] the interests of the homeless against the interests of the City in maintaining sanitary and safe conditions on the streets" (page 33). This cannot be so. The City is not automatically in compliance simply by following its own procedures; the procedures must be consistent with Section VII.F. The City could not, for example, adopt a protocol that provided that any property left on the sidewalks for more than a few minutes will be seized and destroyed as "abandoned." This would violate the requirement that an individualized assessment be made of property to determine if it was "organized or packaged together in a way indicating it has not been abandoned," Section VII.F.1, DE 525-1 at 7. Further, they must be consistent with the fundamental purpose of the Consent Decree to protect the belongings of those who have no choice but to live on the streets. In this regard, any procedure that allowed for the seizure of property that was the equivalent to destroying property—expressly prohibited by the Consent Decree—would be in

violation of the Consent Decree. Taking property without notice and without a truly functioning method of retrieving it amounts to destruction.

The absence of any written protocols makes it difficult to judge whether the City's conduct reflects a set of procedures that is substantively at odds with the Consent Decree, or a failure to follow those procedures, or both. For example, Donald White and Ashley Self testified that they saw their belongings on a City truck when they returned to the site where they had left them, and asked to have them back, and their requests were refused. Sept. 26 Tr. 43:15- 44:2 (White); Oct. 24 Tr. 84:9 – 85:22 (Self). Nowhere did the City offer any testimony about a procedure for handling such instances. Whether these instances occurred because the City's procedures never allowed return of property that has already been placed on a truck (which would be inconsistent with the Consent Decree), or because the City did not follow its own procedures, is impossible to tell. Similarly, although the City claimed that it provides advance notice of clean-up operations, it did not do so consistently, and did not necessarily show up on the posted dates when it did. *See infra* pages 12-13. Whether these instances reflect a set of procedures that give insufficient protection to the Consent Decree's property protections or a failure to follow them is not possible to tell on the evidence the City presented. The City cannot be said to have satisfied its burden of showing that it has complied with the Consent Decree under these circumstances.

In any event, even making the unsupported assumption that the City had adequate procedures, the evidence shows that these unwritten procedures were *not* in fact followed in the vast majority of instances. Although David Rosemond testified about this supposed protocol, he admitted that he was not physically present when notices were posted, he never personally posted a notice, was not present for every cleanup operation, and in fact was only in the field for 30-40% of his time. Nov. 1 Tr. 64:14 – 65:20. He also acknowledged that there were no copies kept of

the notices that were allegedly posted, and that there was no log or record of any of these notices. *Id*. at 67:1-6. Further, no outreach workers ("green shirts") testified, and no City witness testified that they actually participated in the notice process. And other than two pictures, none of these supposed notices are in evidence. Even if they were, they are certainly not having their intended effect, as homeless individuals almost never come to claim their property; Sergio Torres testified that it only happens less than once a month. Sept. 24 Tr. 264:4-13. And numerous homeless witnesses testified that they never saw any such notices. Sept. 26 Tr. 19:20-25-20:1. *See* **Kincaid v. City of Fresno**, No. 106CV-1445 OWW SMS, 2006 WL 3542732 at *14 (E.D. Cal. Dec. 8, 2006) (discounting City Manager's claim that City provides advance notice of sweeps when he hadn't personally seen the notices, homeless witnesses testified they saw no such notices, and the notices were not offered in evidence). Thus, there is no basis for the Court to conclude that the City has satisfied its burden of establishing good faith compliance when the City has failed to introduce the most basic evidence on written procedures to protect "the worldly possessions of a vulnerable group in our society." **Lavan v. City of Los Angeles**, 693 F.3d 1022, 1033 (9th Cir. 2012), *cert. denied*, 570 U.S. 918 (2013).

Plaintiffs have refuted the City Manager's claim cited at page 13 that eliminating Pottinger would give the City "parity" with other cities, supposedly providing more leverage for discussion, at pages 15-16 of Plaintiffs' Proposed Findings. DE 667. Although the City notes this testimony, it does not argue that the Consent Decree should be terminated for this reason.

### *The Modification*

The City's description of the modification events in 2013-2014 at pages 14-15 and 36 is inaccurate and incomplete. It states that "there had not been a single complaint or issue with the City's compliance or enforcement of its terms," but it ignores the complaints the ACLU made to

7

the City regarding violations of the Consent Decree in 2009 and 2014. Plaintiffs' Proposed Findings, ¶ 51, DE 667 at 18. *See also* Oct. 25 Tr. 69:21 – 70:8 (testimony of David Peery as to observation in late 2014 or early 2015 of Green Shirts taking property). It also ignores the City's serious consideration of an anti-camping ordinance within a year of the modification, in 2015, which would have virtually outlawed being homeless in public, and to which Plaintiffs objected as inconsistent with the Consent Decree. Plaintiffs' Proposed Findings, ¶ 52, DE 667 at 37. The City's description also omits, among other things, the fact that the parties agreed to strengthen the monitoring provisions, now providing the Field Information Cards every 6 months. VIII.15, DE 525-1:8. Previously, the only way that Plaintiffs could obtain them was through public records act requests, which are expensive and time-consuming in practice. The change reflects the importance of the Consent Decree's monitoring.

*Sanitation and Public Health*

The City's citation, at pages 16 and 23-24, to the Florida Department of Health letter and report sent to the City regarding the Overtown area is improper, as that document is not in evidence. It should not be the subject of judicial notice, as Plaintiffs will argue more fully in their forthcoming Response to the City's Request to Take Judicial Notice, DE 658. Moreover, the regrettable encampment that developed—well after the violations complained of here—was in no way caused by the Pottinger agreement, as Judge Leifman testified. Oct. 24 Tr. 27:18-21. In the first place, as this Court stated, these issues will arise "with or without the Pottinger agreement." Oct. 24 Tr. 20:4-7, 27. Moreover, as Judge Leifman also testified, although Pottinger was not "developed to address mental health and substance abuse issues[,]" it "gave all of us a greater sensitivity as to those mental health and substance abuse issues." *Id*. at 20:8-17. Finally, the ensuing operation to address the situation demonstrates that cleaning an area can in fact be done

without running afoul of the Consent Decree. Oct. 25 Tr. 80:7-22. This is in contrast to the earlier cleaning operations the City engaged in that area, in which it blatantly violated the Decree. *See* DE 666 at 12, 66; Oct. 25 Tr. 34:3 -47:12. In short, Plaintiffs do not dispute that the encampment required appropriate intervention, but the problems were not caused by Pottinger, and Pottinger did not impede the City's efforts to address it.

## **Findings of Fact**

The City's statement at page 17, paragraph 3, that the "chief aim of the settlement agreement was the institutional reform of the City of Miami Police Department" is belied by the history of the litigation and the terms of the Consent Decree itself.[3] The same is true of the claim at page 28 that the lawsuit was about the police department, and at page 31 that "the primary goal and focus of the Settlement Agreement was the reform of the City of Miami Police Department." The initial litigation was occasioned by massive sweeps in which the police *and other City employees* systematically seized and destroyed homeless individuals' property. In Section VI.9 the City adopts a policy to protect the rights of homeless persons; in so doing Section VI.9 also provides that "[a]ny activities by a CITY police officer or other employee of the CITY that are contrary to this policy shall cease immediately." DE 382 at 5. It further calls for disciplinary measures against "any CITY employee or other employee of the CITY" who violates the policy. *Id*. And it states that the policy "shall be read by all other CITY employees with responsibilities regarding homeless people within 30 days of its issuance." *Id*. As the City itself acknowledges, Section VII.F has express provisions protecting the property rights of homeless individuals against *all* City employees, not just the police. DE 525-1 at 7-8. It provides that "[t]he CITY" – not just

---

[3] Plaintiffs set out the basic purpose of the Consent Decree in their Proposed Findings, ¶¶ 83-89, DE 667 at 30-33.

the City police – "shall respect the personal property of all homeless people," and goes on to impose specific obligations on all City employees in all contexts.[4] In any event, even if the police Departmental Order fully implemented the police-related provisions of the Consent Decree (which it does not), it does not implement the other provisions regarding the protection of property rights against all City employees. Plaintiffs' Proposed Findings, ¶ 87, DE 667 at 32-33. Further, Mr. Torres testified that the Department of Veterans Affairs and Homeless Services considers the "written criteria" for determining whether property may be seized as contaminated to be the Consent Decree itself. Sept. 24 Tr. 262:1-8. This means that if the Consent Decree is terminated, there will be no such criteria.

The City's statement at page 19, paragraph 11, that it is "undisputed" that the Departmental Order codifies the law enforcement protocol set forth in Section VII is inaccurate. *See* Plaintiffs' Proposed Findings, ¶ 87, DE 667 at 32-33. It is also incomplete in that a key related provision – routinely making the FICs available to Plaintiffs' counsel – is not contained in the Departmental Order.

The City's proposed finding at page 20, paragraph 16, that the City has a "policy of enforcing" the Departmental Order completely ignores the arrests of Chetwyn Archer and Tabitha Bass that were captured on video, demonstrating blatant violations of the Consent Decree. Pl. Ex. 578-38 & 578-37. Rather than respecting the clear terms of the Decree, the officers simply ordered

---

[4] The placement of the property provisions within the law enforcement protocol makes drafting sense. As Plaintiffs pointed out in their Proposed Findings, ¶ 102, DE 667 at 38, the police role in clean-ups is typically central and pervasive (as it was in the clean-ups earlier in 2018 in which Plaintiffs' rights were violated). ***Cf. In re G-I Holdings, Inc***., 755 F.3d 195, 203 (3d. Cir. 2014) ("The title of a section cannot contradict or rewrite the plain language of the contractual provisions within that section."); ***In re TOUSA, Inc***. 598 F. Appx. 761, 766 n. 6 (11th Cir. 2015) (unpublished opinion) ("longstanding contract interpretation principles make clear that we are not bound by the headings and labels created by the drafter, and instead interpret the document as a whole to determine the parties' intent.")

these homeless individuals to stand up and put them under arrest for sidewalk obstruction without offering shelter.

The City also ignores the fact that police officers can violate the Departmental Order—and hence the Consent Decree—just by *threatening* an arrest.  It would make little sense to prohibit arrests without an offer of shelter, but permit officers to order individuals to disperse, implicitly on pain of arrest, without the same protection.  As explained more fully in Plaintiffs' Proposed Findings at pages 16-18 (DE 666), Plaintiffs offered the testimony of numerous witnesses who testified that that is precisely what happened. *See, e.g.*, Sept. 26 Tr. 12, 49:25 – 50:1; Oct. 24 Tr. 91:16-17; Sept. 26 Tr. 42:15-16.   On this record, the Court should not conclude that the City has a "policy of enforcing" the Departmental Order.

Similarly, the City's claim at page 21, paragraph 20, that the Field Information Cards (FICs) demonstrate compliance with the records requirement is also wrong.  As explained in Plaintiffs' Proposed Findings, DE 666 at 26, witnesses testified about numerous police interactions with homeless people that went undocumented.

***Testimony About Violations of the Consent Decree***

The City is wrong in its assertion at page 24 that only ten homeless individuals witnessed the incidents at issue in this case.  In fact, eight individuals personally witnessed their own property seized by the City (or personally saw it on City trucks and were refused the opportunity to retrieve

it), with some also witnessing the City's seizure of others' property,[5] and eight additional individuals personally observed only others' property seized.[6]

Of these fifteen witnesses who saw property violations occur in front of them, eight – not two – testified to witnessing police officers' active involvement in the seizures, and thereby testified to the police department's violations of its own Departmental Order's Section 10.7.[7] Notably, the police ordered homeless individuals not just to move out of the way during the "clean-up" property seizures, but to leave the area entirely and stay away.[8]

Four more witnesses testified to police officers' issuing them "move on" orders without offering shelter, violating the Consent Decree and the Departmental Order's Section 10.6.2.3.[9] And the City omits the Chetwyn Archer and Tabitha Bass arrests, where the City police officers failed to offer shelter prior to arresting them for allegedly obstructing the sidewalk, as two more blatant Consent Decree and Departmental Order violations. Pl. Ex. 578-38.

Also contrary to the City's position at page 25, signs were posted notifying people of cleanup operations only in a few instances. Frequently, the police and City workers showed up on

---

[5] Halter, Sept 26 Tr. 59:20-64:19; Fluker, *Id*. at 83:14-23; Cauley, *Id*. at 89:4-90:12; Wright, *Id*. at 113:1-11; Saluki, *Id*. at 262:10-263:14; White, *Id*. at 80:18 – 81:13; Self, Oct. 24 Tr. 84:9-85:22; Aguilar, *Id*. at 90:5-18, 92:10-17. In addition, William Starling found his property gone when he returned to Peacock Park and City employees told him that it was a policy that he was not allowed to claim his items. Sept. 26 Tr. 135:19 – 136: 2.
[6] Rhodes, Sept. 26 Tr. 14:22-15:7; Donald, *Id*. at 43:15-44:2; Allen, *Id*. at 50:7-12, 55:9-24; Richardson, *Id*. at 100:18-101:19; Starling, *Id*. at 135:10-136:20; Beauford, *Id*. at 253:14-24; Ruiz, Oct. 25 Tr. 18:3-25; Peery, *Id* at 43:9-46:12.
[7] Rhodes, Sept. 26 Tr. 12:21-15:17; Donald, *Id*. at 43:20-44:2; Allen, *Id*. at 55:9-24; Halter, *Id*. at 76:3-18; Fluker, *Id*. at 83:14-18; Richardson, *Id*. at 100:18-101:6; Beauford, *Id*. at 252:14-254:1; Ruiz, Oct. 25 Tr. 18:3-25.
[8] Rhodes, Sept. 26 Tr. 12: ("get out, you can't stay in this location"); Allen, *Id*. at 49: 25 – 50: 1 ("they told us we had to move"); Aguilar, Oct. 24 Tr. 91:16-17 ("He [police officer] said, you'd better get out of here before I arrest you, and so I got out of there."). As Michael Donald testified, "it did have the purpose to run everyone off, [it] did a good job." Sept. 26 Tr. 42: 15-16.
[9] Chibanguza, Sept. 26 Tr. 96:10-13; Richardson, *Id*. at 101:24-102:1; Villalonga, Oct. 25 Tr. 8:25-9:1, 10:14; Houston, Video, Pl. Ex. 578-39.

days different from the date posted on the notices. Sept. 26 Tr. 15: 6-11. Despite the City's repeated claims that the homeless were given prior notice of the clean-up operations, their own witness, Officer Galvez, who participated in many clean-ups, testified that notices were *not* given wherever they were going to do a clean-up. Sept. 24 Tr. 219:11-12.

The City's assertions at pages 25-26 that items were left unattended are likewise wrong and unsupported by the evidence. Every homeless person who lost their property testified that they had left it in either a backpack, bag, or suitcase and positioned the items out of the way and in such a manner that any reasonable person could tell that it was personal property belonging to someone living on the street. Police Officer Galvez confirmed that it was routine for homeless people to put their property off to the side when they left and that it was common knowledge on the street that such belongings were not abandoned, but rather the personal possessions of homeless people. Sept. 26 Tr. 226:8-25–227:1-8. Moreover, numerous individuals (including City witness Officer Galvez), testified that it was a routine practice among homeless people to ask another person to watch their property when they left to go about the business of their day.

## Conclusions of Law

*Substantial Compliance*

The City's assertion at pages 28-30 that it has "done all that is required," "satisfied," or "complied with" Sections IV, V, VI, VII, and VIII of the Consent Decree is wrong for two basic reasons. First, the determination of whether to terminate a consent decree is not done part by part; the test is whether the basic purpose *of the Consent Decree* has been fully achieved. It makes no sense to make this determinations section by section, as if a particular section of the Consent Decree could be struck if, in isolation, a court determined that it had been complied with. For example, Section VII sets out a protocol that Plaintiffs have asserted the City systematically

violated earlier in 2018. If the Court so finds, then that would preclude a finding that the basic purpose of the Decree has been achieved and the City is unlikely to return to its former ways. That in turn would mean that the motion to terminate must be denied, and the training and monitoring requirements in Section IV, V, and VIII would remain in effect even if the Court were generally satisfied that the City's performance in training and monitoring were adequate. Second, as Plaintiffs point out in their Proposed Findings and Conclusions, the basic purpose of the Consent Decree is to put in place a substantive and procedural framework for protecting Plaintiffs' rights more effectively than simple reliance on the constitutional text and the possibility of a lawsuit. Proposed Findings and Conclusions, ¶¶ 83-89, DE 667 at 30-33. If there is any part of this framework that the City has not separately implemented, then it has not fully implemented and achieved the basic purpose *of the Consent Decree*.

Equally important, as set out in Plaintiffs Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, DE 666 at 3-22, the City has systematically violated Section VII, and certainly has not complied with it. A planned course of "clean-ups" in the course of which City employees seized and destroyed Plaintiffs' IDs, medicines, photographs, clothes and the like is by no stretch of imagination "minor and trivial," as the City asserts. The City is also incorrect in saying it has met its burden to show compliance with Section VIII. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce the Pottinger Consent Decree and Hold the City in Contempt, ¶ 68, DE 666 at 26.

*Specific Evidence of Police Department Violations*

Contrary to the City's assertions at pages 30-31, there were not only two Consent Decree violations by the police. The police were present for, were an integral component of, and enforced

the unlawfully-conducted clean-up operations. *See* Sept. 26 Tr. 12:21-15:17; 43:20-44:2; 55:9-24; 76:3-18; 83:14-18; 100:18-101:6; 252:14-254:1; Oct. 25 Tr. 18:3-25. And the City omits mention of the numerous instances of police harassment and illegal "move-along" orders, Sept. 26 Tr. 96:10-13; 101:24-102:1; Oct. 25 Tr. 8:25-9:1, 10:14; and the arrests of Chetwyn Archer and Tabitha Bass. Pl. Ex. 578-38 & 578-37.

***Evidence Regarding Property Seizure and Destruction By Other City Departments***

The City's assertions at pages 34-36 about the evidence on property seizure are incorrect in two major respects. First, the City greatly understates the evidence of personal property seizure. The City says at page 34 that "there was non-hearsay testimony as to only seven instances of alleged improper seizure of property of homeless individuals." The correct number is sixteen. What the City apparently has done is count only those instances in which witnesses testified that they personally observed City employees seize their own property. But there were witnesses who testified that they personally observed City employees seize property that the witness knew belonged to someone who was homeless. *See supra* pages 11-12.

Second, it is important to take account of the context in which the evidence is offered. It is the City's burden to show that it has complied with the Consent Decree in good faith. Relevant to determining whether this burden has been met is not only the pattern of consistent first-hand witness testimony, but the pattern of others who testified that they stepped away from their property and then it was gone when they returned. Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion to Enforce, ¶¶ 31-33, DE 666 at 14-15.

The City attempts to excuse its indiscriminate property seizures at pages 34-35 by claiming that the areas from which property was taken presented a sanitation concern. But the City's implication—that the areas were so dirty that legitimate property was mistaken for trash—simply

15

cannot be accepted. Plaintiffs have never maintained that the City cannot clean the streets, but the City can do so consistent with Pottinger, a fact demonstrated by the City's compliant street cleaning until the "clean-up" plan orchestrated by City officials began in early 2018.[10] The City, bowing to political pressure, changed its behavior and committed numerous indiscriminate property seizures over a several month period, and then ceased after Plaintiffs complained to the Court. This demonstrates precisely why the Consent Decree must remain in place.

Finally, the City has completely ignored its request for modifications of the Consent Decree, and has therefore waived those arguments. And in any event, Plaintiffs have demonstrated why those modifications are unnecessary, counterproductive, and unsupported by the evidence. Plaintiffs' Proposed Findings, DE 667 at 24-26, 44-51.

## Conclusion

The City's Motion for Termination or, Alternatively, Modification of the Pottinger Consent Decree should be denied.

---

[10] The City's reference to the opioid encampment that developed in Overtown is irrelevant, since it did not develop until well after the spate of violations Plaintiffs have complained of, the Department of Health letter is not in evidence, and the City cleaned the encampment without running afoul of Pottinger.

Benjamin S. Waxman, Esq.
Florida Bar No. 403237
Miami ACLU Cooperating Attorney
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Blvd., Suite 1300
Miami, FL 33131
(305) 371-6421
benji@benjaminwaxmanlaw.com

Stephen J. Schnably, Esq.
Admitted Pro Hac Vice
Miami ACLU Cooperating Attorney
University of Miami School of Law
1311 Miller Drive
Coral Gables, FL 33146
Tel: 305-284-4817
Fax: 305-284-6619
schnably@law.miami.edu

Dante P. Trevisani
Florida Bar No. 72912
Ray Taseff
Florida Bar No. 352500
Florida Justice Institute
3750 Miami Tower
100 SE 2nd St
Miami, FL 33131-2115
Tel: 305-358-2081
Fax: 305-358-0910
dtrevisani@floridajusticeinstitute.org
rtaseff@floridajusticeinstitute.org

Isha Kocchar
Florida Bar No. 105294
Miami ACLU Cooperating Attorney
180 North Flamingo Road, Suite 305
Pembroke Pines, FL 33028
Tel: (954) 292-5787
Fax: (954) 620-0042
isha@kochharlegal.com

Respectfully submitted,

Anna T. Neill
Florida Bar No. 100945
Miami ACLU Cooperating Attorney
Kenny Nachwalter P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel.: (305) 373-1000
Fax: (305) 372-1861
aneill@knpa.com

Arthur J. Rosenberg
Florida Bar No. 967580
601 NE 56th St
Miami, FL 33137-2317
Tel: 786-269-6749
tacajr@bellsouth.net

Valerie Jonas, Esq.
Florida Bar No. 616079
Miami ACLU Cooperating Attorney
Weitzner and Jonas
1444 Biscayne Blvd Ste 207
Miami, FL 33132-1430
Tel: 786-254-7930
Fax: 305-358-0910
valeriejonas77@gmail.com

Nancy G. Abudu
Florida Bar No. 111881
ACLU Foundation of Florida, Inc.
4343 W. Flagler Street, Suite 400
Miami, FL 33137
Tel.: (786) 363-2700
Fax: (786) 363-1108
nabudu@aclufl.org

BY:   */s/Dante P. Trevisani*
      Dante P. Trevisani

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 14th day of December 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

BY: */s/Dante P. Trevisani*
Dante P. Trevisani

**SERVICE LIST**

Victoria Méndez
City Attorney
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
VMendez@miamigov.com

Kerri L. McNulty
Senior Appellate Counsel
City of Miami
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
klmcnulty@miamigov.com
(Secondary email:
YIllescas@miamigov.com)

John A. Greco
Deputy City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
jgreco@miamigov.com

George K. Wysong
Senior Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
gkwysong@miamigov.com

Douglas A. Harrison
Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
daharrison@miamigov.com

J.C. Perez
Assistant City Attorney
444 SW 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
jcperez@miamigov.com

Carlos Gamez
444 S 2nd Avenue, Suite 945
Miami, FL 33130-1910
Tel.: (305) 416-1800

| | |
|---|---|
| Fax: (305) 416-1801<br>chgamez@miamigov.com | Thomas E. Scott<br>Cole, Scott & Kissane, P.A.<br>9150 South Dadeland Boulevard, Suite 1400<br>Miami, FL 33156<br>Tel.: (305) 350-5381<br>Fax: (305) 373-2294<br>Thomas.scott@csklegal.com<br><br>**Attorneys for Defendant** |