UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

## Case Number: 88-2406-CIV-MORENO

MICHAEL POTTINGER, PETER CARTER,
and BERRY YOUNG,

        Plaintiffs,

vs.

CITY OF MIAMI,

        Defendant.
_____/

## <u>MEMORANDUM OPINION</u>

"[O]ne of the things *Pottinger* has done so well is create this amazing collaboration where it forced the different stakeholders to work together." (Tr. vol. 4, 29).[1] The veracity of Judge Steve Leifman's statement was evident in this proceeding as this Court heard time and again about the myriad of programs and aid available to the homeless in this community. There can be no doubt that in the twenty years this Consent Decree has been in place, the City of Miami has endeavored to eradicate homelessness. Although Miami has made significant inroads, homelessness unfortunately persists, as it does in all cities in America. Yet, the City continues daily to mitigate the effects in a manner consistent with the *Pottinger* Agreement. The issues in these proceedings are whether the City has substantially complied with the *Pottinger* Consent Decree such that federal court oversight should come to an end after 20 years or whether the City's treatment of the homeless requires this Court to continue its oversight and even to hold the City in contempt.

---

[1] References to the transcripts of the six-day evidentiary hearing are as follows:
        Tr. vol. 1 refers to September 24, 2018 transcript
        Tr. vol. 2 refers to September 25, 2018 transcript

# I. BACKGROUND

The world has changed dramatically since the original filing of this complaint 30 years ago and the City of Miami is no exception. In 1988, Judge C. Clyde Atkins entered an injunction to prevent the arrest of the homeless for being homeless and the seizure of their property. After 10 years of litigation, a settlement was reached between the homeless Plaintiffs led by Mr. Pottinger and the City of Miami, and the undersigned entered the Consent Decree commonly referred to as the *Pottinger* Agreement.[2]

The 1998 *Pottinger* Agreement was later modified with the agreement of both parties in 2014 to exclude sexual offenders from the protected class of the homeless. In the twenty years of the *Pottinger* Agreement, the City of Miami police department instituted departmental policies that prohibited the police officers' past practices of arresting the homeless without cause. As a direct consequence of the excellent work done by the attorneys for the American Civil Liberties Union representing the homeless, the *Pottinger* Agreement led to, not only a change in the City's police department, but also contributed to a total cultural change in the way the homeless were treated by all City employees. That cultural change also contributed to the creation of a Miami-Dade County Homeless Trust supported by taxes and grants that yield an annual budget of approximately $61-65 million to assist the homeless in various activities, including medical assistance, shelters, etc. (Tr. vol. 2, 24).

Because of these changed circumstances, the City of Miami seeks termination of the twenty-year old *Pottinger* Agreement. On the other hand, the Plaintiffs not only oppose the

---

Tr. vol. 3 refers to September 26, 2018 transcript
Tr. vol. 4 refers to October 24, 2018 transcript
Tr. vol. 5 refers to October 25, 2018 transcript
Tr. vol. 6 refers to November 1, 2018 transcript

[2] The original Plaintiffs, Michael Pottinger, Peter Carter, and Berry Young, are deceased or their whereabouts are unknown. On December 23, 2013, the Court granted Plaintiffs' Motion to Add Class Representatives and named Carole Patman and David Peery as class representatives.

termination of the agreement, but they have also moved to hold the City of Miami in contempt for violating the agreement by seizing the property of the homeless in the City's clean-up operations. The City's 2018 clean-up operations were essential because of the health and safety concerns stemming from various homeless encampments.

The Court conducted an evidentiary hearing on the parties' motions over numerous days. The Court will make findings of fact and separate conclusions of law based on the testimony of the City's witnesses, over thirty homeless witnesses, and several expert witnesses in the field of homelessness. The Court is not charged with "resolving" the homeless problem in the City of Miami. However, the Court was impressed with all the services provided to the homeless by many individuals and organizations as a direct consequence of the cultural change engendered by the *Pottinger* Agreement. As such, there is little dispute that the number of homeless has been reduced countywide from 10,000 to around 1,000, although those numbers are imprecise because of the difficulty of counting the homeless. Of those, the overwhelming majority (over 600) are in the City of Miami. According to the U.S. Census, the 2017 population estimate for the City of Miami is 463,347 and the estimate for the County is 2,751,796.[3] Meaning, even though the City's population is only about 17% of the County's overall population, it is home to over 60% of its homeless. Indeed, Mr. Ronald L. Book, Chair of the Homeless Trust, testified that 66% of all homeless individuals placed in shelters come from the City of Miami. (Tr. vol. 2 at 10).

Thus, there is little dispute that Miami has changed, its homeless population has declined by 90%, and the City is the <u>only</u> <u>municipality</u> out of 34 in Miami-Dade County and the County's unincorporated area,[4] subject to the *Pottinger* Agreement. Also, both sides agree that arresting

---

[3] See https://www.census.gov/quickfacts/fact/table/miamicityflorida,miamidadecountyflorida/PST045217.
[4] It is estimated that the population of the County's unincorporated area exceeds one million residents, approximately 36% of the total population. *See* https://www8.miamidade.gov/global/disclaimer/about-miami-dade-county.page.

the homeless is never a solution because, apart from the constitutional impediments, it is expensive, not rehabilitating, inhumane, and not the way to deal with the "chronic" homeless, who suffer from mental illnesses and substance abuse addiction. The solution to those problems is beyond the scope of any power given to the judiciary. Yet, the Court does have the power to enforce the parties' agreement and of course, courts always have the power to enforce the United States Constitution to protect individuals from unlawful arrests and seizures of their property.

The dispute in this case is simply the impact that terminating the *Pottinger* Agreement will have on the constitutional rights of the homeless to be free from harassment, arrests, and the unlawful taking of their property. During the last twenty years, so much has changed in how the City of Miami treats its homeless population that the Court finds the *Pottinger* Agreement should indeed be terminated. The changes in the treatment of the homeless are the direct result of the vigorous challenge by the American Civil Liberties Union attorneys on behalf of the homeless in this case.

The Court is under no illusions that the City of Miami has resolved homelessness. But, as homeless expert Judge Steve Leifman, a witness for the Plaintiffs, testified, Miami has become the best city in the country in dealing with the homeless. The health crisis, about which there is no dispute involving drug use, public sex, and rodents in homeless "camps," must be dealt with for the protection of the homeless themselves and the citizens, including children, who live and walk near these gatherings. Any abuse by the authorities is subject to individual civil rights suits. Unattended personal property left on public sidewalks and fences, which pose public health and safety concerns, are allowed to be seized and dispensed by the City. Any arrest not based upon probable cause by the City of Miami police department will subject the police to the same liability whether the aggrieved party is homeless or has a home.

Therefore, the City of Miami's Motion for Termination is GRANTED, and the Plaintiffs' Motion to Hold the City in Contempt is DENIED.

## II. FINDINGS OF FACT

Twenty years ago, this Court approved a settlement between a class of Plaintiffs, consisting of homeless individuals, and the City of Miami, where the Plaintiffs lived. United States District Judge C. Clyde Atkins found the City of Miami had unconstitutionally arrested homeless persons for engaging in life-sustaining acts they were forced to conduct in public, such as sleeping, cooking, eating, sitting, congregating, and relieving themselves. Judge Atkins found the City "used the arrest process for the ulterior purpose of driving homeless from public areas." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1566 (S.D. Fla. 1992).

Recognizing the limited role of the Court in fashioning a remedy, Judge Atkins issued a negative injunction that prohibited the City from arresting homeless people for sleeping, eating, lying down, or sitting in two safe zones he established in downtown Miami. The injunction further prohibited City police from destroying personal property belonging to the homeless. The injunction did not prohibit police from arresting homeless persons for criminal acts.

The Settlement Agreement ultimately reached in this case was the product of ten years of litigation, appeals, and extensive mediation. After a hearing, this Court, assigned to the case after Judge Atkins, approved the *Pottinger* Agreement, which has been in place ever since.

As modified in 2014, the Consent Decree details a protocol that governs City of Miami police interactions with those experiencing homelessness. City police may not approach a homeless individual, who is not committing a crime, unless the approach is to offer services. (Consent Decree, Def. Exh. 1 at 6-8).[5] With certain exceptions, the police may not arrest or threaten to arrest any homeless person for committing "life sustaining conduct misdemeanors,"

---

[5] The Consent Decree is at D.E. 382. The 2014 Addendum is at D.E. 525-1.

unless they first offer the individual an available space in a shelter within city limits or within a mile of those limits, and the individual refuses that offer. *Id.* at 6, 8. Upon refusal of available shelter, the homeless individual is subject to arrest if there is probable cause that a crime has been committed. *Id.* The Consent Decree lists the life-sustaining conduct misdemeanors and does not prohibit police from arresting individuals for misdemeanors not on the list. *Id.* at 9-11. Miami police need not offer shelter prior to arresting a homeless individual committing a felony. *Id.* at 12.

The Consent Decree also offers protection for the property of homeless individuals. The Decree requires all City employees to follow procedures for taking custody of personal property and not to destroy personal property reasonably recognizable as belonging to the homeless. *Id.* at 12-13. The Decree does not prevent the City from destroying contaminated property, or property that otherwise poses a health hazard. *Id.* The evidence showed that although the City has routine protocol in place, the City outreach team did not have <u>written</u> procedures in place for the handling of property when the Plaintiffs filed their motion for contempt.[6]

In its motion, the City of Miami seeks to terminate the Consent Decree, or at the very least, modify it in four different ways. One proposed modification is to exclude what the City calls the chronically homeless from the purview of the decree. The other proposed modification would permit a shelter space anywhere in Miami-Dade County to be offered in lieu of arrest for a life sustaining conduct misdemeanor, rather than only a shelter within the city limits or within one mile, as is currently the case. The City also proposes two additional modifications, which are to include language prohibiting the storage of a homeless person's belongings on public property and exempting from the Decree actions taken by the City in cleaning public areas.

---

[6] After Closing Arguments, the City filed a written Administrative Policy Addressing Treatment of Homeless Property. Because this policy was not introduced at the evidentiary hearing, the Court does not rely on it in ruling on the motions.

In its discretion, the Court held an evidentiary hearing to resolve the disputed issues of fact and to determine whether the City carries its burden to show significant changed circumstances and substantial compliance with the Consent Decree. The inquiry is fact-intensive. The trial court is "vested with broad discretion in granting or denying discovery." *See King v. Greenblatt*, 149 F.3d 9, 13 (1st Cir. 1998). This Court allowed the parties limited discovery prior to conducting the evidentiary hearing.

### A. Summary of Changed Circumstances in the City of Miami since 1998

The testimony was unequivocal that the *Pottinger* Agreement was a catalyst for all the stakeholders in Miami-Dade County to devise appropriate programs to combat homelessness. It was an "incentive to provide the services for the population." (Tr. vol. 4, 8). Judge Steve Leifman, Associate Administrative Judge of Miami-Dade County's Criminal Division, and the Chair of the Florida Supreme Court Steering Committee on Mental Health and Substance Abuse Courts, testified that "[i]t has been a significant motivator for all the stakeholders to come up with appropriate programs on how to deal with this population, and it has worked." *Id.* at 7. The evidence showed that the numbers of homeless persons in Miami has plummeted. *Id.* The evidence also showed that the "population that we have left on the street is different than what we had when we first started." *Id. Pottinger* was not developed to address the mental and substance abuse issues that remain present in our community. It was primarily devised to prevent the police from arresting the homeless in certain circumstances and from unlawfully taking their property. The evidence showed "it has achieved that end." *Id.* at 15. The evidence also showed that the City of Miami is unlikely to revert to those policies given the myriad of programs available to it as a means to aid the homeless. Those programs did not exist when *Pottinger* was filed in 1988. It is true that by the time the Consent Decree was entered, ten years after the litigation began, the wheels were in motion and homeless aid initiatives were beginning to take

shape. In the twenty years since, the proliferation of services and funding available in this community has been transformative causing a 90% reduction in the number of homeless. There is also a general consensus of what work remains and how to chip away at those remaining statistics.

### 1. Changes in Police Work

The City began its presentation by calling its Police Chief Jorge Colina, a 28-year veteran of the force and the chief since January 2018 and James Bernat, an executive officer for the Police Department, and an 11-year veteran with the force. Chief Colina discussed the City's interdepartmental efforts to aid the homeless, including the City's newly formed Department of Human Services. (Tr. vol. 1, 60-61, 94). Both testified regarding the changes in policing since *Pottinger*'s inception. Now, every City officer wears a body camera to record engagements with the public and every officer has access to an interactive simulator to teach them how to react in different scenarios. *Id.* at 65-67. Every police vehicle has a computer, where officers can watch training videos and access Departmental Orders, including those orders explaining how to treat the homeless. *Id.* at 68-69. All officers receive training on *Pottinger*'s requirements and scenario-based training so they are well-versed in the appropriate treatment of the homeless. *Id.* at 54-55; (Def. Exh. 40).

Chief Colina testified that the department has implemented disciplinary procedures since the *Pottinger* agreement was entered. *Id.* at 61. Any police officer found to have violated the order is subject to discipline, up to and including termination or arrest. *Id.* at 47-48. One incident involving a homeless individual named Java Brooks, is under investigation by the Department's Internal Affairs. *Id.* at 87-88.[7]

---

[7] The Court notes that Java Brooks testified that she had recently changed her name and her prior name was Java Houston. In the pleadings, the parties use both names interchangeably. (Tr. vol. 3, 151).

Section VIII of the *Pottinger* Agreement requires the City to keep records of police interaction with the homeless. Pursuant to the agreement, officers document every interaction with a homeless individual in the form of a Field Information Card. (Def. Exh. 1 at 9). Departmental Order 11, Chapter 10 requires that these cards be kept on file with the police records unit like the old library card cataloguing system. (Def. Exh. 95, 100). Beyond dispute is that changes in technology, including body cameras and cellular phones, render this requirement of a "card catalogue" archaic and obsolete. The Court observed videotape evidence documenting police interactions with the homeless in this case. (Pl. Exh. 578-37, 39). Although there are many contributing factors, the transparency in police work, caused by technology, surely helped precipitate the sharp decline in arrest statistics relating to homeless individuals. (Tr. vol. 4, 30).

### 2. *Funding Changes and the Development of the Continuum of Care*

The evidence described the changes in funding efforts in Miami-Dade County since the inception of the *Pottinger* Agreement. Ronald L. Book, the Chairman of the Homeless Trust for the last decade, testified as to the funding efforts to assist the homeless in this community. Prior to serving as the Chair of the Homeless Trust, Mr. Book chaired the finance committee since the Homeless Trust's creation over 24 years ago. Mr. Book began his work 25 years ago on a legislative effort to pass the food and beverage tax in Miami-Dade County. (Tr. vol. 2, 5-6). The tax was an outgrowth of the Governor's Commission on Homelessness and part of a 10-year plan to end homelessness in Miami-Dade County. *Id.* The Homeless Trust is the funding source and overseer of the panoply of services for the homeless, known as the continuum of care in Miami-Dade County. *Id.* Twenty-seven members participate on the public board that administers the food and beverage tax dollars, federal and state grants, and other revenue streams. *Id.* The continuum of care was created to provide all the programs and services needed to end

homelessness. *Id.* at 7. It starts with the City of Miami's outreach teams, known as the Green Shirts, many of whom are formerly homeless individuals themselves. The Green Shirts work on bringing the homeless into the continuum of care, which includes medical care, mental health counseling, substance and alcohol abuse treatment, shelter, and housing. *Id.* at 10.

The City's outreach efforts are "completely intertwined" with the Homeless Trust. *Id.* at 9. The Trust owns two Homeless Assistance Centers, in its partnership with the Chapman Partnership. *Id.* at 10. The City's outreach workers bring the homeless individuals (from the City of Miami and other geographic areas) to these centers; the homeless cannot simply walk into a center for assistance. *Id.* The placements in the Chapman Homeless Assistance Centers are 66% derived from the City of Miami. *Id.* In the 24 years since the creation of the Homeless Trust, the County started with over 8,000 street unsheltered homeless individuals, and that number has plummeted to 1,104. *Id.* at 11. Of the roughly 1,000 homeless in the County, approximately 664 are in the City of Miami. *Id.* at 11, 17. Mr. Book testified there has been a 90% reduction in the City of Miami and countywide since the start of the Homeless Trust. *Id.* at 11.

The Department of Housing and Urban Development also provides funding and dictates certain standards and protocols for homeless individuals to access the system. (Tr. vol. 2, 79). The Homeless Trust developed a Coordinated Entry System, which provides a hotline for homeless individuals to call for aid. *Id.* The evidence showed that homeless individuals sometimes have to call the hotline for 30 days or more to get into a shelter. *Id.* at 79-80; (Tr. vol. 3, 50-51). The Camillus House Day Center provides phones for them to call the hotline. (Tr. vol. 2, 80).

The monies generated by the Homeless Trust from the food and beverage tax are used as an elastic band. *Id.* at 13. When the Trust provides funding to the different community-based

organizations, such as Camillus House and the Salvation Army, the Trust expects these organizations to use those funds as leverage to obtain additional grants and funds to buy more beds and units of housing. *Id.* Of the funds collected by the Trust, approximately 33 to 34% are generated in the City of Miami, which is the dominant source of food and beverage tax revenues in the County.[8] *Id.* The *Pottinger* Agreement has no impact on the collection of the food and beverage tax. *Id.* at 15.

Camillus House is a key component of the continuum of care. Hilda M. Fernandez, the CEO of Camillus House, a Ministry of St. John of God, testified regarding the organization's work with the homeless in Miami-Dade County. *Id.* at 50. Camillus House operates programs throughout the county serving about 1,100 people daily. *Id.* at 51. Some of the programs include the Lazarus project, which is a program that is a combination of employees from Camillus House and Camillus Health. *Id.* at 52. The medical assistants, a psychiatric nurse practitioner, and the Green Shirts engage the hardest to serve, severely mentally ill chronically homeless, medicate them on the street, and get them sufficiently stable to enter the continuum of care. *Id.* Dr. Edward Suarez, the former director of the Lazarus Project, testified that the idea is to get homeless individuals started on necessary medication and therapy while they await housing. *Id.* at 94-95.

Camillus also provides a day center to serve the street homeless, allowing individuals to come in and access showers, clothing, a hot breakfast, and mail service. *Id.* at 52. Camillus operates with a sister agency, Camillus Health Concern, which provides a clinic on the Camillus campus, which provides healthcare services to those that come into the day program. *Id.* at 55. Camillus provides temporary storage while people are accessing services on the Camillus

---

[8] The food and beverage tax is not charged in the cities of Miami Beach, Bal Harbour, and Surfside, which charge tourism-related taxes. The City of Miami Beach provides funds to buy beds in the continuum of care and coordinates with the Homeless Trust in that regard. When the City of Miami Beach purchases beds, oftentimes the beds are in the City of Miami. (Tr. vol. 2, 13-15).

campus. *Id.* at 52. The organization also provides emergency housing, treatment programs, and permanent supported housing. *Id.* at 52-53. In providing all these services, Camillus serves various populations, including unaccompanied homeless youth, victims of human trafficking, and veterans. *Id.*

For the last fifteen years, Camillus has been providing permanent housing, which is known as the Housing First model in the continuum of care. *Id.* This is housing for individuals moving out of homelessness, who do not need intensive support services, and can pay reduced rents to live in facilities owned by Camillus. *Id.* There are on-site clinicians that provide services to individuals in permanent supported housing. *Id.* at 56.

In addition to Camillus House's partnership with the City of Miami on the Lazarus Project, the City has an agreement with Camillus to fund shelter beds and provide support for the Camillus Day Center program. *Id.* at 56-57. The City funds 75 beds, 65 are extended-stay beds, and 10 are 24-hour beds. *Id.* at 59. Former City Commissioner Marc Sarnoff testified that the City provided funding, $10 million dollars, to aid Camillus House's relocation to its new campus. (Tr. vol. 2, 30).

*3. The Chronically Homeless and Outreach Efforts*

The City's outreach efforts have also changed since the inception of the *Pottinger* Agreement. The record demonstrates agreement among City police and administration that arresting homeless individuals is not an effective remedy since the homeless individuals return to the streets within a short time. The City created outreach operations to move homeless individuals off the streets and into the continuum of care. As of the fall of 2018, the City created a new department called the Department of Human Services. (Tr. vol. 1, 276). The Department includes homeless outreach, a child care center, job training, and employment. *Id.* at 277.

Prior to this past fall, the City of Miami's Department of Veterans Affairs and Homeless Services provided outreach to the homeless community.

The City's Green Shirts, the homeless outreach employees, work in the streets of Miami to move the homeless into the continuum of care or to get them social services as needed. Sergio Torres, the Director of the new Department of Human Services, testified that he conducts training sessions for his department, and other City employees, who interact with the homeless, including Parks and Recreation staff and the police department's Neighborhood Enhancement Teams. (Tr. vol. 1, 233-234). David Rosemond, the Assistant Director of Neighborhood Enhancement Teams, oversees the Green Shirts to ensure they are working as a cohesive unit. (Tr. vol. 6, 30). Due to the teams' active engagement with the homeless, the City of Miami has a contract with Miami-Dade County to perform the work countywide. *Id.* at 31. The role of the Green Shirts is to usher the homeless from the streets and to the agencies that can best provide them services. *Id.* at 32. Many know the homeless individuals by first and last names and know their circumstances. *Id.* at 33. The City provides the Green Shirts with training on how to engage the homeless, how to provide them services, and how to talk to people who find themselves homeless. *Id.* The majority of the Green Shirts are formerly homeless individuals, or individuals in recovery. *Id.* at 34. Some of the Green Shirts have been working in that capacity since the inception of the project in 1992. *Id.* at 35.

The outreach efforts are not always successful as many homeless individuals refuse available shelter. Officer James Bernat testified that many prefer to stay homeless even if they can obtain available shelter due to mental illness, substance abuse issues, and other reasons. Judge Leifman, a witness for the Plaintiffs, also confirmed the change in the type of homeless individuals now versus twenty years ago. Shelters are controlled environments with rules, which

many homeless individuals do not want to follow. A majority of the unsheltered homeless population are "chronic homeless," meaning they have been living on the streets for 365 days or more, or they experience four instances of homelessness in a three-year period. (Tr. vol. 2, 17). About 67-69% of the homeless population is chronically homeless. *Id.* This is a population that is shelter-resistant and would benefit from a Housing First program, which is not a shelter facility, but rather an individualized home. *Id.* This population needs to be incentivized to seek housing. Mr. Book testified that allowing street feedings and panhandling, as well as the *Pottinger* agreement, itself, all make it harder to get the chronically homeless into the continuum of care. *Id.* at 17. The County and Jackson Memorial Hospital gave $42 million for the construction of a new facility on 7th Avenue and 22nd Street in the City of Miami to help this population. In addition, there is a city-owned property around that facility, and a desire to build thousands of new units of low-income affordable housing for the chronically homeless. (Tr. vol. 4, 25-26).

There is agreement that many chronically homeless suffer from mental illness. In 2000, Judge Leifman convened a summit to address how to better handle mental health issues in the criminal court. (Tr. vol. 4, 2). The summit devised a pre- and post-arrest diversion system. As a result, Miami-Dade County has the largest squad of officers trained in Crisis Intervention Team policing. *Id.* The program provides training for law enforcement that teaches them to identify people in crisis, how to deescalate a situation, how to Baker Act[9] individuals, and where to take them. The programs provide an alternative to arrest. *Id.*

The summit also set up post-arrest diversion programs for people with serious mental illness who get arrested, one for misdemeanants, one for non-violent felonies, and one for

---

[9] The Florida Mental Health Act, commonly known as the Baker Act, allows for the involuntary institutionalization and examination of an individual. Judges, law enforcement, physicians, and mental health professionals can initiate the process. § 394.463, Fla. Stat.

competency restoration. *Id.* at 3. The success of those programs is evidenced in the statistics. "[B]etween 2010 and 2017, the City of Miami and Miami-Dade Police Department[s] combined, handled 83,427 mental illness calls and only made 149 arrests." *Id.* The recidivism rate has dropped from 72 to 20 percent in the misdemeanor program and the felony program has saved the County "about 68 years of jail bed days with a low recidivism rate." *Id.* The Competency Restoration Alternative Program helps individuals get services as opposed to being sent back to the street without assistance. *Id.* Before these programs started, there were two shootings per month of people with mental illnesses. *Id.* at 19. Now, there have been five or six in eight years. Police injuries of mentally ill people has almost completely vanished and "out of 5,200 calls in the City of Miami last year there were six arrests." *Id.* When a mentally ill homeless person winds up in court, the state court calls the Green Shirts to aid the homeless individual. *Id.* at 33.

The Green Shirts are also involved in the University of Miami's Needle Exchange Program. Dr. Edward Suarez testified that it is Florida's first and only syringe exchange program. (Tr. vol. 2, 92, 96). As part of his work and due to his training in crisis intervention, Dr. Suarez can Baker Act when he sees an "individual who's floridly psychotic, responding to internal stimulation . . . hasn't eaten, hasn't drank, not taking care of himself, is being a danger to themselves by way of self-neglect . . . to the point of self-harm." *Id.* at 98. At that point, Dr. Suarez can call a City of Miami Neighborhood Resource Officer to transport the individual to Jackson Crisis, and that individual gets housed. *Id.* at 99. He says that he has a symbiotic relationship with the City of Miami police and to that end, he testified that "whenever [the police or outreach personnel] get into a jam, before they commit anything – whatever, before they put any hands on anybody or anything of that sort, I get a phone call" seeking advice and assistance since he is familiar with many homeless individuals. *Id.*

The objective of the Needle Exchange Program is to test the homeless individuals for HIV and Hepatitis C. When homeless individuals test positively for HIV, Dr. Suarez starts HIV medication that same day. *Id.* at 106. He then goes out to find that person in the street, days later, to remind them to refill their medications. *Id.* The City of Miami aids in the process by helping Dr. Suarez locate individuals and place them into shelters.[10] *Id.* at 107, 120. Once the individual is in a shelter, Dr. Suarez can get that person into HIV care, and that person will have a dedicated space to store the HIV medication. *Id.* at 107.

### B. Outreach Efforts and Procedures Regarding Property

The Consent Decree contains a section titled: "Disposition of Property Belonging to Homeless Person who is arrested." It states:

> The City shall respect the personal property of all homeless people. The Miami Police Department (and all other Departments including but not limited to Parks and Recreation and Solid Waste) shall follow their own internal procedures for taking custody of personal property. In no event, shall any city official or worker destroy any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e. bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned), except as is permissible by law and in accordance with the department's operating procedure, or if the property is contaminated or otherwise poses a health hazard to City workers or to members of the public.

(Def. Exh. 1 at 12). This section places two requirements on the City departments with regard to property of homeless individuals: (1) all departments must "follow their own internal procedures for taking custody of personal property," and (2) no City employee may destroy property belonging to homeless individuals except where permitted by law, or if the property is contaminated. The evidence showed that the City outreach workers follow internal procedures, albeit unwritten ones, for the handling of property. The *Pottinger* Agreement did not require the

---

[10] Dr. Suarez testified that Green Shirt Willie Rachel helps him locate these individuals. (Tr. vol. 2 at 102, 107).

City to have written procedures for the handling of property. Although a written protocol is preferable and has finally been prepared, it is important to note that in the twenty years that *Pottinger* has been in place there has not been a complaint regarding the handling of property or a lack of written procedures until now.

When an outreach worker assists a homeless individual into a shelter, the worker follows a procedure to deal with the property. (Tr. vol. 1, 248-49, 254). When a homeless individual accepts an offer of shelter from an outreach worker, the outreach team assists him in storing bulkier property that the individual cannot take into a shelter. (Tr. vol. 6, 44). The homeless person entering a shelter takes the belongings he may want to keep, and the outreach worker will itemize the rest of the items on a receipt, which the outreach worker then gives to the homeless individual. *Id.* The outreach worker then takes that property to the City's storage unit. *Id.* This same protocol would be used when encountering abandoned property in the streets. *Id.* at 46-47. In that situation, the outreach worker will go through the property and separate items of value, including documentation, medication, phones, or pictures. *Id.* The outreach worker itemizes those things and puts them in a bag to take to storage. *Id.* The outreach worker also leaves a note on the site where the things were located so that the individual knows that his belongings were gathered by the outreach team. *Id.*; (Def. Exh. 28) (photographs of notes on fences). The notice contains an address and phone number where the homeless can retrieve their property. *Id.* The department stores the property as long as there is space, and in reality, has not thrown anything away. (Tr. vol. 6, 48-49). The outreach team patrols those areas for days where the property would be taken in the event someone is looking for his belongings. *Id.* at 46-47. Only one homeless person, Robert Rhodes, testified that he attempted to retrieve his property from the facility, and was unable to do so. (Tr. vol. 3, 17-18).

*1. 2018 Clean-Ups*

The City outreach workers unquestionably began clean-up efforts in the downtown Miami area in 2018 due to health and sanitation concerns from the homeless encampments. The City Manager Emilio Gonzalez coordinated various city departments to target and clean up hotspots. His direction to clean these areas indicates that the work should be done in accordance with the *Pottinger* Agreement. (Pl. Ex. 601-65). Plaintiffs claim Mr. Gonzalez's directive was the beginning of a coordinated attempt to disperse the homeless from the downtown Miami area and resulted in a violation of constitutional rights. Evidence showed that the City's efforts were, at least in some part, due to complaints it had received from residents. The Plaintiffs rely on an email from Milton Vickers, Special Assistant to the City Manager, to make this point. The text of the email from Milton Vickers to Police Chief Colina reads:

> Chief Colina, the Homeless Outreach staff have developed a plan to address homeless encampments and unattended contaminated items. It is imperative that this be coordinated with police in these locations and be patrolled in the future to ensure that homeless individuals do not return to these locations. The Homeless Outreach staff will be in full compliance with the Pottinger Agreement. Please see thread below.

(Pl. Exh. 601-65 at 1); (Tr. vol. 1, 82). The Deputy City Attorney Barnaby Min also wrote an email to other Assistant City Attorneys requesting that they follow-up with Milton Vickers to make sure the clean-ups were *Pottinger* compliant. (Pl. Exh. 601-4). The evidence showed that the City tried to relocate the individuals that were living in the clean-up areas to available shelters and that individuals returned to the spots after the clean-ups. (Tr. vol. 3, 13) (Testimony of Robert Rhodes) (stating he walked down the street with his belongings while the City power washed the street and he returned later that afternoon and slept in the same location that night.). That the City wanted to prevent the squalor and unsanitary conditions from re-manifesting after completing a clean-up is not a *Pottinger* violation. Rather, the clean-up efforts inure to the

benefit of the homeless sleeping on the sidewalks. Overall, the evidence showed the City was working to clean the streets for the public welfare, while also meeting its *Pottinger* obligations.

On September 19, 2018, the Florida Department of Health notified the City of a specific area of concern located between 13th and 14th Streets and between NW 1st and 2nd Avenues in Overtown, a neighborhood in Miami north of the downtown area. The Department indicated that these areas were a significant public health concern and were being investigated. (D.E. 658-1).[11] The clean-up had to be handled with the assistance of a specialized biohazard waste clean-up crew. Video evidence showed human feces, rats, and contaminated items in the area. Judge Leifman testified that he observed this site under the expressway overpass, in the Overtown section of Miami, which he described as a public health crisis. (Tr. vol. 4, 12). "It was like a horror movie. There were a lot of women using right in front of us. There were needles hanging out of different parts of their body. Many were collapsed lying on the street half naked. There were rats running around, there were needles everywhere. It was an opioid den . . . There was a big concern that if we disturbed the site too quickly those illnesses would spread." *Id.* Judge Leifman testified that a young boy was walking through the area on his way to school and got his hands on fentanyl and died. *Id.* at 21. Despite the gravity of the situation, there was not one arrest. *Id.* at 15, 20. With regards to this site, Judge Leifman testified that 30 people were moved into treatment within a week and property was appropriately taken. He did not witness City officials seizing and destroying personal property. *Id.* at 20. He noted that from what he observed, however, that mattresses and whatever else was being used for sleep were not fit for human use. *Id.* Dr. Suarez was also involved in this clean-up of this Overtown site. (Tr. vol. 2, 110). Once it was clear that there was an HIV network, Dr. Suarez stated that City workers

---

[11] The City filed a motion for judicial notice of the Florida Department of Health letter. The Plaintiff did not oppose the request as to this particular document and the motion is granted as to this document.

understood that the homeless individuals in this area could not be dispersed and that when the appropriate time came, they would work to get the people into shelters. *Id.* at 111.

The City protocol for executing the clean-ups includes posting notices at least seven days prior to the clean-up. (Tr. vol. 1, 235-36; 216-17); (Tr. vol. 2, 65). In the two weeks leading up to a clean-up, the City outreach workers would provide increased efforts to place the individuals living in certain areas of downtown in available shelters. *Id.*; (Tr. vol. 6, 43). Camillus House ensures there are beds available when the outreach teams identify areas for clean-ups. (Tr. vol. 2, 64). The evidence showed there is daily engagement, which means that the outreach teams go out daily at different times to offer individuals placement opportunities as often as possible before the clean-up.[12] (Tr. vol. 2, 65-66); (Tr. vol. 6, 43-45). Much like the City's general protocol for handling property, the outreach workers followed the same procedure during clean-ups. If the outreach workers identify anything important – such as identification cards or medications – they inventory and store the property. They discard contaminated property. (Tr. vol. 1, 248-49). The outreach workers leave a notice for property they take to storage or discard. (Tr. vol. 2, 65); (Def. Exh. 28). The Plaintiffs dispute that these notes were left and argue there was no guarantee that the owner of the property would receive these notes. The evidence showed a few examples where the handwritten notes were placed on a fence, such that they would not easily blow away. The handwritten notes provided an address where the City took the unattended personal property. *Id.*

Dr. Edward Suarez testified about the clean-ups stating that the team comes with "engagement tools: bottles of water, food, blankets. We do not go in there with the idea of. . . dispersing or kicking people out because that doesn't help. That just spreads the problem across the city, and we use engagement tools to build rapport. So the clean-up is really rapport

---

[12] Clean-ups are also referred to as encampment closures on the record. (Tr. vol. 2, 64).

building." (Tr. vol. 2, 103). Dr. Suarez explained that he shows up with the City employees to perform the clean-up and they ask the individuals to move. They offer them clean clothes. While the clean-up is going on, the individuals are offered detox at Banyan Behavioral or shelter beds. They work with Camillus and the Homeless Trust to ensure there are shelter beds available during a clean-up. *Id.* at 104-105. He also testified that they ask individuals to "move for a little bit until we clean everything, and they're more than welcome to come back to that spot." *Id.*

Plaintiffs presented the testimony of over thirty homeless individuals, including the class representative David Peery. Cumulatively, the homeless witnesses testified about what occurred during the clean-ups.[13] The Plaintiffs presented testimony that the clean-ups in the Lot 16 area would start very early in the morning. That appears reasonable so as not to impede both vehicular and pedestrian traffic, which increases tremendously as thousands of employees come to work before 8:00 a.m. The homeless witnesses testified that officers and Green Shirts would sound loud noises, shine bright lights, and request the homeless, who are sleeping on the sidewalks, move so that they could pressure clean the sidewalks. (Tr. vol. 3, 12, 42, 76). Officer Jose Galvez, who works with the City's Neighborhood Enhancement Team, testified regarding the clean-ups. As a neighborhood resource officer, he goes to community meetings to address issues in the downtown Miami area. (Tr. vol. 1, 203). Officer Galvez testified that the City starts the clean-ups early in the morning before 8 a.m. *Id.* at 204. The Neighborhood Solid waste teams drive trucks to collect bulky items in the streets or on the curb. *Id.* at 207.

The manner that the City handled personal property during the clean-ups is vehemently contested in this proceeding. When property is found, the Neighborhood Solid Waste team will

---

[13] There are a few areas where the clean-ups occurred: 1) the downtown area known as Lot 16, a municipal parking lot east of the Miami River under the I-95 underpass, bounded by the Miami River on the east, S.W. 1st Street on the north, and S.W. 3rd Street on the south; 2) Overtown area under the I-395 overpass on N.W. 11th and 13th streets between N.W. 1st and 2nd Avenues; 3) the downtown area by the old Macy's on Flagler street; 4) N.W. 6th street by the new Brightline station and one block from this courthouse; 4) the downtown area by Government Center across the street from this courthouse; and 5) Peacock Park in Coconut Grove.

take contaminated unattended property, such as cans, food, or soiled sheets. *Id.* at 210. Officer Galvez said the team does not discard abandoned bookbags, which he says are left in the middle of everything. *Id.* In video footage, the Court observed the officers placing sheets and mattresses, and trash bags in a pile to be discarded. Again, such actions appear reasonable due to the evidence of contamination and the spread of diseases. However, unattended bicycles, which pose no such health risk, were left by the clean-up crews on the street. Officer Galvez testified about the need to pressure wash the street on 1st Street and Southwest 2nd Avenue, because of the amount of human feces, urine, and contaminated sheets in the area. *Id.* at 213. During the pressure washing, the homeless were asked to move, even if they were sleeping, and many went across the street to an empty parking lot. *Id.* at 214. They were again offered available shelter, which is corroborated by the testimony of Hilda Fernandez, who testified that Camillus House sets aside beds during clean-ups so that the affected individuals would have a place to go. Dr. Suarez also testified that affected individuals were offered an opportunity to go to a detox facility. (Tr. vol. 2, 64, 105). The Neighborhood Solid Waste team discarded whatever property the homeless no longer wanted to keep and would provide bags so they could carry their personal belongings. (Tr. vol. 1, 215-216). Officer Galvez corroborated that notice would be posted for a clean-up, although he did not do it himself. *Id.* at 216-17, 219; (Tr. vol. 3, 89) (homeless individual testifying that "there were signs up saying that they were going to be cleaning.").

Almost all the homeless witnesses testified that they saw City workers take property. A few testified that they personally witnessed either their own or other people's property being seized. Several witnesses testified generally that they had witnessed City of Miami employees throwing unattended property into trucks. (Tr. vol. 5, 18). For the most part, the testimony was that property was kicked around, thrown into piles, and then loaded into trucks when the

homeless were not present, even if they had left their belongings neatly by the side of the fence or in a manner that did not obstruct the sidewalks. *Id.*; (Tr. vol. 3, 90). Some said they asked the City for their property back, but that their requests were denied. *Id.* at 263-64. Plaintiffs testified to losing small items, such as identifications, medicine, eye glasses, cellular phones, personal notes from family members, and photographs. *Id.* at 52-57, 83, 90-91, 113, 263. Various homeless persons, who lost their property, testified that they had left items in either a backpack, bag, or suitcase and positioned them out of the way. *Id.* at 44, 193, 222. Some claim that police and City workers did not allow homeless people to retrieve and save the property of another from disposal during a clean-up operation. *Id.* at 76. For example, Eli Halter, a Marine veteran, testified, if you were not there, your property went into a pickup truck. *Id.* at 76; (Tr. vol. 4, 18). Robert Rhodes, however, testified that he was able to grab the belongings of his neighbor, who slept next to him on the street and left shortly before the clean-up. (Tr. vol. 3, 15). Obviously, there is no excuse for the taking of identification cards, medicine, eye glasses, cellular phones, or photos, as they, by themselves, do not present a health hazard. The dilemma is what to do with those items if they are commingled with backpacks, mattresses, sheets, food, etc. that clearly pose health and security concerns. The solution to this dilemma is that these individuals should never abandon their identifications, prescriptions, eye glasses, or phones that are so important. Rather, they should keep those items with them when they are on the move.

Class representative, David Peery, testified as to an incident involving another witness, Wilbur Cauley, which was partially recorded on a video. (Tr. vol. 5, 35-36); (Pl. Exh. 578-40-A). This incident occurred during a clean-up in the area of concern flagged by the Florida Department of Health in Overtown. Mr. Cauley's property was up against a fence, neatly bundled. Plaintiffs introduced a photograph of the property, which showed its position and

contents, including a personal bag. (Pl. Ex. 578-41-A). While Mr. Cauley went to a nearby store and left his property, a City worker kicked his property and then moved it from its position against the fence into a pile with other property. (Tr. vol. 3, 88-89); (Pl. Ex. 578-40A). When Mr. Cauley returned to the scene and saw his property in the pile, the City worker did not allow Mr. Cauley to retrieve his property. *Id.* The Court agrees with the City's position that given the "horror movie" conditions of squalor as described by Judge Leifman at this location, it would have been eminently difficult to discern contaminated property from sanitary property in this area.

### C. Orders to Move

Plaintiffs focus on orders to homeless individuals to "move on" by members of the City of Miami Police Department. The Court agrees with the City that orders to move during clean-up operations are essential to the public welfare and do not violate *Pottinger*. The evidence that the City roused the homeless from slumber in the early mornings did not indicate the City workers intended to harass the homeless. Rather than harassment, the intent was to clear the areas where the homeless spent the night before the arrival of vehicle and pedestrian traffic that is typical of most cities. The Court finds the testimony of Dr. Suarez, who is not a City employee, credible as to how he observed the City workers treat homeless individuals to achieve the goals of the large-scale cleaning of public areas. (Tr. vol. 2, 109) ("I've never seen them do any of these types of things they're being accused of. I've only seen them do it with dignity and respect. . ..").

Putting aside the clean-up operations, Plaintiffs also provided evidence of instances where police ordered homeless individuals to move. The Court viewed a video taken by Java Brooks, whom police asked to move from the area by the old Macy's in downtown Miami. (Pl. Exh. 578-39). This incident is admittedly under investigation by the City of Miami Police

Internal Affairs to determine if discipline is warranted. (Tr. vol. 1, 88). Rafael Villalonga's incident was another, where he was asked to move from his area on Lot 16. Villalonga testified that he complied with the request. There is no evidence that he was threatened with arrest. (Tr. vol. 5, 8-9). Guthrie Chibanguza testified that he was ordered by the police to leave a bus stop, and he went across the street by a FedEx office. (Tr. vol. 3, 96). Willie Richardson testified that police made him get up and move. (Tr. vol. 3, 101-102). The Consent Decree, however, specifically prohibited arrests, and did not specifically prevent officers from asking the homeless to temporarily relocate. Plaintiffs conceded at closing argument that the Consent Decree does not explicitly prohibit officers from ordering homeless individuals to move under certain circumstances. Plaintiffs, however, argue the orders to move violated their constitutional rights because the order was meant to disperse them from particular locations. There was no evidence that upon returning to a particular location after moving, or after a clean-up, that arrests were made.

### D. Arrests of Chetwyn Archer and Tabitha Bass

At the heart of the *Pottinger* agreement is the criminalization of homelessness. To that end, the Consent Decree does not permit City police to arrest homeless individuals engaged in life-sustaining misdemeanors without offering them available shelter. Plaintiffs presented evidence of two arrests made simultaneously of Chetwyn Archer and Tabitha Bass, neither of whom testified in this evidentiary hearing. Police arrested the two individuals for the misdemeanor of obstructing the sidewalk. (Pl. Exh. 578-37, 578-38) (police identified a crack pipe at the scene, but the arrests did not appear to be drug-related). Under the 2014 modification to the Consent Decree, "obstructing passage on sidewalks" is excepted from the list of "life sustaining misdemeanor conduct" if the entire sidewalk is obstructed and the police has given the

individual a prior warning about the situation. The body camera of Officer C. Gonzalez captured the arrests, however, the video did not show what transpired beforehand. The video begins as the arrest of Chetwyn Archer is being initiated. The video shows a mattress obstructing the sidewalk and no passageway for pedestrians. The individuals' belongings, including garbage bags, a shopping cart filled with clothing and blankets, and a bicycle obstruct the passageway.

The issues for the Court in these proceedings are whether the City of Miami has substantially complied with the purpose of the Consent Decree, such that federal oversight should end, or whether the Plaintiffs have met their burden to show the City should be found in civil contempt.

<u>III. CONCLUSIONS OF LAW</u>

District courts are empowered to modify or vacate consent decrees. *Horne v. Flores*, 557 U.S. 433, 447 (2009). The City argues that absent systemic violations of 42 U.S.C. § 1983 and in light of policy and practice changes concerning the homeless, continued enforcement of the *Pottinger* Consent Decree is inequitable. Plaintiffs argue the City continues to violate the terms of the Decree.

*A. Termination of the Consent Decree*

A party seeking termination of a consent decree bears the burden to show "a significant change in either factual conditions or the law." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992) (relying on Fed. R. Civ. P. 60(b)(5)). The Supreme Court has acknowledged that consent decrees "are not intended to operate in perpetuity" and cannot condemn an agency to "judicial tutelage for the indefinite future." *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 249 (1991) (school desegregation).

To determine whether to terminate a consent decree, the Court must first look to the basic purpose of the decree. *United States v. City of Miami*, 2 F.3d 1497, 1504 (11th Cir. 1993) (citing *Dowell*). Then, the Court must determine whether there is "substantial compliance." That means the Court must determine whether the City of Miami has complied in good faith with the core purpose of the decree, whether the purposes of the litigation have, to the extent practical, been achieved, and whether it is necessary or sensible, under current circumstances, for the Court to continue to exercise judicial oversight. *Id.*, 2 F.3d at 1508 (consent decree addressed under-representation of women and minorities in City's workforce).

The Eleventh Circuit provided additional guidance when it stated that district courts should terminate consent decrees when the system had "undergone radical changes and was on secure footing to continue its progress in the years to come, without court supervision," notwithstanding the fact that the system is "not yet perfect and may never be." *R.C. v. Walley*, 270 F. App'x 989, 992 (11th Cir. 2008). In so doing, this Court may rely on the state's "history of good faith and its present commitment to remedying remaining problems." *Id.* "Federal courts should not be in the business of running important functions of state government for decades at a time." *Id.* (quoting *Reynolds v. McInnes*, 338 F.3d 1201, 1219 (11th Cir. 2003)). If this Court determines that the City has implemented a durable remedy, continued enforcement is improper. *Horne*, 557 U.S. at 450 (stating that federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law).

Federalism concerns also exist in institutional reform litigation, such as this, where core areas of state responsibility are involved. *Horne*, 557 U.S. at 448. The Supreme Court has acknowledged that "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances . . . that warrant

reexamination of the original judgment." *Id.* at 447-48. The Supreme Court has also noted that "the dynamics of institutional reform litigation differ from those of other cases," where, "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.* "Injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." *Id.* at 449.

It is well beyond dispute that there have been changed circumstances since the start of *Pottinger*. As detailed, *supra*, changes in police work, technology, and most importantly the implementation of a dedicated source of funding to the tune of $60 million dollars a year to aid the homeless in this community sufficiently establish that the conditions in place when *Pottinger* was filed 30 years ago, and even when the Consent Decree was entered in 1998, are no longer the case. The evidence showed that the continuum of care available to homeless individuals in Miami-Dade County is unparalleled in the United States. And, the numbers prove it. The amount of homeless individuals in Miami has plummeted 90% since *Pottinger* was entered. The number of arrests has also decreased as explained by Judge Leifman.

The dispute in this case centers on whether the City has substantially complied with the core purpose of the *Pottinger* Agreement, and the Plaintiffs claim that the City has <u>not</u> due to its actions in cleaning up homeless encampments starting in 2018.[14]  There is no question after hearing the testimony and viewing the video evidence that the City was compelled by the gravity of the unsanitary and unhygienic conditions to literally clean the streets for the betterment of the common welfare, including the homeless, the City's residents, and its businesses.

*1. Substantial Compliance by the Police Department*

---

[14] Plaintiffs have not previously filed a motion to enforce the agreement or to hold the City in contempt. Plaintiffs' counsel likened the situation to a probation violation that occurs after sometime, but is still punishable.

There can be no doubt that the core purpose of *Pottinger* was to stop the criminalization of homelessness. The primary goal of this litigation and the Consent Decree was to prohibit the City of Miami Police Department from arresting homeless individuals for engaging in life-sustaining conduct misdemeanors.[15] Because *Pottinger* prohibited arrest as a solution to get the homeless off the streets, the City and the community, at large, developed a myriad of programs that City Police could tap into when interacting with the homeless. The County's Homeless Trust, the recipient of $60 million in tax revenue a year, provides funding and Camillus House, the Chapman Partnership, and Lotus House provide shelter, medical care, and other services to the homeless in our community. The state court system, through Judge Leifman, developed diversion programs to avoid putting the mentally ill in jails. The whole system, described *supra*, and known as the continuum of care has provided an outstanding support network for the City police and other outreach workers. There can be no doubt that the primary purpose of the agreement, to stop the arrests of the homeless for being homeless, has been achieved. The Court finds that the continuum of care is exactly the type of durable remedy that requires this Court to cease its oversight of these primarily state functions. This is not to say that more cannot be done to achieve the goal of eradicating homelessness. The goal of the Consent Decree, however, was not to solve homelessness. Rather, the goal of the Consent Decree was to reform the manner that City Police treated the homeless. That goal has been achieved to the credit of all the individuals, particularly in this litigation.

---

[15] In fact, the class certified by Judge Atkins includes "homeless persons . . . who have been, expect to be, or will be arrested, harassed, or otherwise interfered with by members of the City of Miami Police Department for engaging in the ordinary and essential activities of daily living in public due to the lack of other adequate alternatives." *Pottinger v. City of Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989). The Consent Decree focuses almost entirely on the implementation of training, policies and procedures to ensure that the police department engaged with the homeless population in a humane manner and within the bounds of the constitution. (Def. Exh. 1).

Plaintiffs' evidence, in this case, of two arrests that purportedly violated *Pottinger* is insufficient to convince this Court that a durable remedy is not in place. The overwhelming evidence supports the finding that City police will not revert to arresting individuals, because they have an ample support network to turn to in handling difficult situations. (Testimony of Ronald L. Book) (Tr. vol. 2, 18) ("[T]he City clearly understands the need to treat the homeless population with respect and with dignity and with a desire to put a permanent end to it and that is our goal and I think that's our joint goal. I don't see that changing should *Pottinger* be discontinued.").

The evidence also showed that for those chronically homeless individuals, *Pottinger*, serves as a crutch enabling them to avoid entering the continuum of care. The video of Java Brooks was emblematic of this where she basically flaunted the City police, who ordered her to move, when she said she was aware of her rights. She showed little incentive to try to get off the streets. The testimony of Ronald Book, Chairman of the Homeless Trust, exemplified this point, when he was discussing the chronically homeless population. He said the chronically homeless are "shelter resistant . . . if you make it easier for them to be on the streets, they're not coming in. It's why we don't support street feedings. It's why we don't support panhandling. I believe Pottinger at this point, my opinion, is that continuation doesn't make it easier for us, it makes it harder for us to finish what's out there because it's chronic." *Id.* at 17. Likewise, *Pottinger* has a chilling effect on an officer's ability to provide aid to the homeless. Dr. Suarez said it best, when he said "it's just sad to see that we're still stuck in the past and I see the officers are handcuffed by this. And I think that might be why subconsciously I brought up that young officer saying 'I'm going to be on YouTube by the end of the day.' I think that's *Pottinger* . . .getting in her

way of doing the right thing because she is afraid for herself, and I can't blame her for that." (Tr. vol. 2, 116).

Not only has the City substantially complied with the main purpose of *Pottinger* regarding arrests, the City Police Department has implemented the required training as set forth in section IV of the Consent Decree, which nowadays includes scenario based training. (Def. Exh. 95, 95A). The City also complies with its departmental orders and police officers, who fail to comply, are subject to investigation by Internal Affairs and discipline. The Departmental Order is modeled after the protocol in Section VII of the settlement agreement.

The Departmental Order also contains specific directives as to how the police should handle property. While the Plaintiffs' evidence regarding the loss of property during clean-ups often reflected a police presence, there was no evidence that any City of Miami police destroyed or seized property and there are no internal affairs investigations on the record in this regard.

Finally, the police implemented a system to document interactions with the homeless known as Field Information Cards, which are used in cases where there is no arrest. Those forms are maintained by the police as required by Section VIII of the Settlement Agreement. Technology has certainly rendered this requirement obsolete.

The question that remains is whether the evidence of police ordering homeless individuals to move negates a finding a substantial compliance. Java Brooks and Rafael Villalonga testified that the City Police told them to move from where they were staying at night, without cause and without offering shelter. Likewise, Guthrie Chibanguza testified that he was asked to leave a bus stop, even though he had a bus pass, and he walked across the street. Willie Richardson testified that police also ordered him to move. Plaintiffs cite *City of Chicago v. Morales*, 527 U.S. 41 (1999) to argue that the directive to move violates the homeless person's

fundamental right to travel. In *City of Chicago*, the Supreme Court held that an ordinance violates the due process clause of the Fourteenth Amendment where it prohibited street gang members from loitering in a public place. To enforce the ordinance, the officers could order the gang members to disperse, and a failure to comply would be grounds for arrest. *Id.*, 527 U.S. at 50. The Supreme Court found the ordinance unconstitutionally vague as to what conduct was proscribed. *Id.* at 53. In so holding, the Supreme Court stated that "freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Id.*

Plaintiffs, however, do not lose their constitutional rights by termination of the Consent Decree. It bears noting that no other municipality in Miami-Dade County's 34 is subject to the *Pottinger* Agreement except for the City of Miami. And, individuals in Miami-Dade County are not gaining greater constitutional protections when they cross from Miami Beach into Miami. The issue here is whether there has been substantial compliance with the tenets of the Consent Decree. The basic tenets of the Consent Decree prohibit "arrest or detention" of homeless individuals not engaged in any criminal activity. Neither took place here. The Court does not find the evidence of these four instances where individuals were ordered to move negates a finding of substantial compliance. Substantial compliance "impl[ies] something less than a strict and literal compliance with the contract provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Wells Benz, Inc. v. U.S. for Use of Mercury Elec. Co.*, 333 F.2d 89, 92 (9th Cir. 1964) (citations omitted). The alleged actions of a few police officers do not constitute the type of deviation necessary to find a lack of substantial compliance, especially where there is

no evidence of arrest and the circumstances under which the police issued the directives to move are unclear.[16]

### 2. Substantial Compliance by other City Departments

This institutional reform litigation sought to revamp police interactions with the City's homeless population. Its effects, however, are seen throughout the City of Miami's government departments. There are three sentences in the Settlement Agreement that address property of homeless individuals and are written so as to encompass other City departments, in addition to the police. That provision, *supra*, requires City departments to respect the property of the homeless and to follow their own internal procedures for taking custody of property, It also prohibits city departments from destroying property except as allowed by law, or where the property is contaminated or poses a health risk. (Def. Exh. 1 at 12-13). Plaintiffs argue that the City's failure to have written procedures equates with noncompliance. The agreement, however, functioned for twenty years without incident and at no time did the Plaintiffs complain about a lack of written procedures. The testimony from the City outreach managers, Sergio Torres and David Rosemond, was consistent on the procedures the City workers employ to determine when and how to take property. The testimony also showed that the Department of Veterans Affairs and Homeless Services, now the Department of Human Services, trains the other relevant City departments, such as the Parks and Recreation Department, on the procedures. (Def. Ex. 39). With respect to section VII(F) of the Consent Decree, the Court finds the City in substantial compliance.

Plaintiffs presented testimony of many homeless individuals regarding the taking of property during the 2018 clean-up operations that took place in Downtown Miami and

---

[16] Indeed, Chief Colina testified that the City was investigating the instance with Java Brooks to determine whether the City would discipline the police officer for his actions.

Overtown. There is no question that the City exercised a valid governmental power in addressing the sanitation and public health concerns created by the large encampments of homeless congregating and living in certain areas of the City. Plaintiffs argue the City's actions during those clean-ups negate a finding of substantial compliance.

The City presented ample evidence that notice was given in advance of the clean-ups and that shelter beds were secured to move people from those areas into the continuum of care. The City's evidence was corroborated by Dr. Suarez and Hilda Fernandez, who both testified regarding their joint efforts and work with the City in performing the clean-ups. The testimony of the homeless witnesses was that if they left their belongings unattended, they were gone when they returned. Some witnesses testified that they asked the City workers to recover their belongings, but were denied those requests. Other witnesses, such as Robert Rhodes, testified that he was able to grab his neighbor's belongings during a clean-up. One witness, Eli Halter, testified that if you were at the clean-up, you had the ability to move your stuff. (Tr. vol. 3, 76). This testimony is consistent with the information provided by Dr. Suarez, Sergio Torres, and David Rosemond regarding clean-up operations.

Plaintiffs emphasize that the incident involving Wilbur Cauley's property shows the City's noncompliance with the Consent Decree. The incident described by Wilbur Cauley and David Peery, and shown in a video (D.E. 578-40-A), took place in the area in Overtown underneath the I-395 overpass. Judge Leifman described that area saying "[i]t was dangerous to put anything on the ground. You had to step around the needles and the rats that were all over the place." (Tr. vol. 4, 34). The evidence showed the unsanitary conditions in that location, and it is not difficult to extrapolate the potential consequences to the public health, which would lead a City worker to discard more property than not, because he believed it to be contaminated. The

squalor present prevented the clean-ups from being easy operations where the City workers could examine items one by one. Unfortunately, some medications, identifications, and personal notes were necessarily discarded in the process and the Court sympathizes with that loss, but the Court cannot ignore that those items were commingled with food, soiled materials, and garbage creating a public health crisis. The Court noted that the bicycles present were not discarded, presumably because a bicycle does not pose a health or safety risk. The testimony of Ronald L. Book exemplifies the contents of the evidence. He said: "Nobody is ever going to accuse me of being anything other than compassionate and understanding as it relates to the plight of those who live on our streets, but oftentimes you end up in situations where there's been hoarding and it's more garbage than it is property of value." (Tr. vol. 2, 21). Therefore, the Court concludes the City has substantially complied with the Consent Decree's property provisions, even though there were instances during the clean-ups where City workers mistakenly discarded valuable items due to the gravity of the unsanitary conditions.

### B. Motion for Contempt

Injunctions, such as Consent Decrees, are enforced through the civil contempt power of the trial court. *Reynolds v. G.M. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000). Plaintiffs bear the burden of proving by clear and convincing evidence that the City violated the *Pottinger* Consent Decree. *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002) ("A finding of civil contempt – willful disregard of the authority of the court – must be supported by clear and convincing evidence."). To establish that a party acted in contempt, the party seeking the contempt ruling must show by clear and convincing evidence that: (1) the allegedly violated order was valid and lawful, (2) the order was clear and unambiguous, and (3) the alleged violator had the ability to comply with the order. *Id.*; *Wyatt v. Rogers*, 92 F.3d 1074, 1078 n.8 (11th Cir.

1996). If the Plaintiffs do so, the burden shifts to the Defendant to show that it has complied with the injunction, or why it should not be adjudged in contempt. *Reynolds*, 207 F.3d at 1298.

Plaintiffs presented evidence of three different types of alleged violations to validate a finding of contempt. The first group is the directives from police to homeless individuals to move. The second group is evidence relating to the taking of personal property by City workers during clean-up operations in 2018. The last is the arrests of the two individuals for obstructing the sidewalk.

Although the Consent Decree contains a general requirement that City police not harass the homeless, the Consent Decree and Police Departmental Order 11 do not explicitly prohibit the police from ordering homeless persons to move from their locations or from sounding loud noises to wake people before a clean-up operation. It goes without saying that directives to move during a clean-up operation are essential to facilitate the pressure washing of the sidewalks. Pressure cleaning, while individuals are sleeping on the sidewalks, is obviously hazardous to their safety. And, not cleaning poses health hazards to them and others. During the clean-up operations, the evidence showed that homeless individuals often moved close by or were offered shelter. Dr. Suarez testified that the team engages any homeless individual at the clean-up location, helps them to discard any garbage that has accumulated around them, offers them clean clothes and blankets. (Tr. vol. 2, 104). The team then offers shelter placement and, if the offer for shelter is rejected, the team members ask the homeless person to relocate temporarily. *Id.* The City has an interest in preserving the public welfare, hygiene and sanitation. It makes sense and the evidence confirmed that the City's intent was to move these homeless individuals, living in squalor and in encampments, into the continuum of care. The Court does not view the City's actions, in this regard, to be a concerted plan to violate the homeless civil

rights. And, there is no clear and convincing evidence that requiring the homeless to move during clean-up operations was a violation of the Decree, especially because the evidence showed that people returned to the locations after the clean-ups and no one was arrested.

As noted, *supra*, the Plaintiffs argue there are four instances, outside of a clean-up operation, where the police were harassing homeless individuals and ordering them to move, Java Brooks, Rafael Villalonga, Guthrie Chibanguza, and Willie Richardson. Other than the general prohibition on harassment contained in Consent Decree, there is nothing in the Consent Decree or in the Police Departmental Order 11 specifically precluding a police officer from instructing someone to move. Moreover, the testimony from the witnesses and the video evidence did not show the underlying circumstances under which the officers issued the directives. To find civil contempt, the Court must find by clear and convincing evidence that the *Pottinger* Agreement clearly and unambiguously said that officers could not ask homeless individuals to move or the evidence must show that the police officers were harassing these individuals. The evidence does not establish a violation of the Decree's general statement that the police not harass the homeless. Therefore, the standard for civil contempt is not met.

The Plaintiffs also seek to hold the City in contempt due to their handling of homeless individuals' personal property. Again, the *Pottinger* Agreement allows officers and City workers to take unattended property in accordance with their internal procedures and discard property that is contaminated. The Consent Decree also contains a general requirement that City police and outreach workers treat the property of the homeless with respect.

The majority of Plaintiffs' witnesses complained about the handling of property during clean-up operations. Witnesses testified that workers moved in quickly and that they had little time to collect their belongings. Homeless individuals testified that they left items in backpacks,

bags, and positioned out of the way and that their property was kicked around, thrown into piles, and then loaded into trucks to be disposed. Plaintiffs' witnesses also testified that City workers routinely did not allow homeless persons to retrieve and save the property of another homeless person from disposal. But, it would be unreasonable for City workers to decide their course of action based on a non-owner's statement regarding abandoned property. The evidence also showed that City workers complied with their procedures, gave notice ahead of time, provided outreach to affected individuals, gave homeless persons bags to put away their belongings, and left notes at the scene on the fences to let people know the location of property. Some of Plaintiffs' own witnesses testified that they were able to keep the property on them, and retrieve property belonging to others. The evidence also showed the gravity of the circumstances at these clean-up spots, which has already been detailed in this order. Even assuming that, at times, the City workers could have handled the homeless person's belongings more delicately, the Court does not find that a violation of the Consent Decree occurred by clear and convincing evidence. The Consent Decree allows the City workers to take property in a manner consistent with their procedures. The evidence showed that, at least for the most part, that was done, and to discard contaminated property. Deciphering what is and is not contaminated inside a bag is difficult and going through a bag that possesses contaminated materials to fish out identifications and medications is not a requirement of the Consent Decree. The evidence did not show an officer or a worker taking away identifications and medications, rather it showed that those items were unfortunately lost as part of a process of cleaning areas in desperate need of sanitation. The Court does not hold the City in contempt for its handling of the personal belongings.

Finally, the Court, for reasons already detailed in this Order, does not find the two arrests are sufficient to meet the standard that the City violated the decree and should be held in

contempt. There is no evidence as to what preceded the arrests, and as such, the standard for contempt is not met.

Heroes for the Homeless

Although the Plaintiffs have opposed the termination of this agreement, in a very real sense, they are the victors. Their lawsuit, and the work of their excellent and capable counsel, under the guidance of the Americans Civil Liberties Union and the Florida Justice Institute, engendered a revolution in this community as to the treatment and care of persons experiencing homelessness. Twenty years ago, the undersigned could not have predicted the myriad of services made possible by the efforts of the Homeless Trust and Mr. Ronald L. Book. The Court could not have envisioned the dedication of people, like Dr. Pedro Joe Greer and Dr. Edward Suarez, who have taken medicine to the streets of Miami to help people and gain their trust to improve their care. The lifetime of work by Camillus CEO Hilda Fernandez is commendable as she has worked in a variety of roles to assist the homeless and better their lives in a truly compassionate way. The work of Constance Collins at the Lotus House has also contributed to aiding homeless women and children and helped them find solutions to homelessness. It goes without saying that this community owes a debt of gratitude to Judge Steve Leifman, who has implemented sustainable programs to help the mentally ill, which will continue to improve their circumstances. Simply put, Judge Atkins would be proud of the results. Accordingly, it is

ADJUDGED that the Court terminates the Consent Decree and denies the motion to hold the City of Miami in contempt.

DONE AND ORDERED in Chambers at Miami, Florida, this _15th_ of February 2019.

_[signature]_

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record